UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

|  |  |  |
|---|---|---|
| **UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **UNITED STATES,** | ) ) | **Court No. 20-03944** |
| **Defendant,** | ) ) | |
| **and** | ) ) | |
| **WHEATLAND TUBE COMPANY,** | ) ) | |
| **Defendant-Intervenor.** | ) ) ) | |

## ORDER

Upon consideration of the motion of Plaintiffs, Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Framework LLC, for judgment upon the agency record pursuant to Rule 56.2 of the Rules of this Court, and all other papers and proceedings herein, it is hereby

**ORDERED** that Plaintiffs' motion is hereby granted; and it is further

**ORDERED** that the final results of administrative review of the antidumping duty order on circular welded carbon-quality steel pipe from the United Arab Emirates in Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2017-2018, 85 Fed. Reg. 77,159 (Int'l Trade Admin. December 1, 2020) are remanded to the U.S. Department of Commerce with instructions to take such further action

**Consol. Court No. 20-03944**

as required by the Court's decision in this matter with respect to Plaintiffs Universal Tube and

Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and

Framework LLC.

     **SO ORDERED**.

By _____
              The Hon. Timothy C. Stanceu, Senior Judge


Dated: _____
     New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, <br><br>    **Plaintiffs,** <br>  **v.** <br><br>UNITED STATES, <br><br>    **Defendant,** <br><br>  **and** <br><br>WHEATLAND TUBE COMPANY, <br><br>    **Defendant-Intervenor.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> **Court No. 20-03944** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFFS' RULE 56.2 MOTION FOR
## JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiffs, Universal Tube and Plastic

Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Framework LLC

(collectively "Universal"), hereby move for judgment upon the agency record with respect to

their complaint challenging the final results of the administrative review of the antidumping duty

order on circular welded carbon-quality steel pipe from the United Arab Emirates, as determined

in Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of

Antidumping Duty Administrative Review; 2017-2018, 85 Fed. Reg. 77,159 (Int'l Trade Admin.

Dec. 1, 2020) ("Final Results"), and accompanying unpublished Issues and Decision

Memorandum (Int'l Trade Admin. Nov. 23, 2020).

**Consol. Court No. 20-03944**
**Motion for Judgment Upon Agency Record**

For the reasons explained in the accompanying memorandum, Plaintiffs respectfully

move for this Court to hold that the contested portion of the <u>Final Results</u> is not supported by

substantial evidence and is otherwise not in accordance with law.  Plaintiffs further move for the

Court to remand this matter to Commerce for disposition consistent with the order and opinion of

the Court, including instructions to reconsider the final results of review with respect to

Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK

Scaffolding and Framework LLC consistent with the arguments raised in the accompanying

memorandum and to grant such other relief as the Court determines is just and proper.

The legal and factual grounds for Plaintiffs' motion are set forth in the memorandum

accompanying this motion.  A proposed order is attached.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jonathan M. Freed

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
Tel.:  (202) 223-3760

*Counsel to Plaintiffs Universal Tube and Plastic*
*Industries, Ltd., THL Tube and Pipe Industries*
*LLC, and KHK Scaffolding and Framework LLC*

Dated:  May 10, 2021

2

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

|  |  |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, | ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) **PUBLIC VERSION** |
| UNITED STATES, | ) **Court No. 20-03944** |
| Defendant, | ) |
| and | ) |
| WHEATLAND TUBE COMPANY, | ) |
| Defendant-Intervenor. | ) |

---

**MEMORANDUM IN SUPPORT OF THE RULE 56.2 MOTION OF PLAINTIFFS, UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, FOR JUDGMENT UPON THE AGENCY RECORD**

Submitted by:

Robert G. Gosselink
Jonathan M. Freed

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
Tel.:  (202) 223-3760

*Counsel to Plaintiffs Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Framework LLC*

Dated:  May 10, 2021

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

I.      STATEMENT PURSUANT TO RULE 56.2(c) .................................................... 1

II.     STANDARD OF REVIEW ................................................................................. 2

III.    STATEMENT OF FACTS ................................................................................... 2

IV.     SUMMARY OF ARGUMENT ........................................................................... 6

V.      ARGUMENT ....................................................................................................... 8

        A.      Statutory Framework for Level of Trade Adjustments ............................ 8

        B.      Commerce's Practice Establishes That Direct Sales From a Producer and
                Sales Through Resellers Can Represent Two Different Stages in the
                Marketing Process ................................................................................ 10

        C.      The Universal Producers and Universal Affiliated Resellers Performed
                Different Selling Activities at Different Levels of Intensity and Frequency
                During the POR ..................................................................................... 13

        D.      The Record Contains Extensive Quantitative Analyses That Corroborate the
                Reported Levels of Intensity of Universal's Selling Activities ............. 24

VI.     RELIEF REQUESTED ....................................................................................... 33

## **TABLE OF AUTHORITIES**

**Judicial Precedent**

Consol. Edison Co. v. NLRB, 305 U.S. 197 (1938).........................................................................2

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951)...........................................................2, 15

Dillinger France S.A. v. United States, 981 F.3d 1318 (Fed. Cir. 2020) .......................................8

Micron Technology, Inc. v. United States, 243 F.3d 1301 (Fed. Cir. 2001)................................8, 9

Nippon Steel Corp v. United States, 458 F.3d 1345 (Fed. Cir. 2006).............................................2

Alloy Piping Products, Inc. v. United States, 33 C.I.T. 349, 357 (2009) .......................... 27, 28-29

Dorbest v. United States, 30 C.I.T. 1671, 462 F. Supp. 2d 1262 (2006)........................................2

Goldlink Indus. Co. v. United States, 30 C.I.T. 616, 431 F. Supp. 2d. 1323 (2006)......................2

**Statutes**

19 U.S.C. § 1516a(b)(l)(B)(i) .........................................................................................................2

19 U.S.C. § 1677b(a)(1)(B)(ii) .......................................................................................................8

19 U.S.C. § 1677b(a)(7)(A)..........................................................................................................8, 9

**Regulations**

19 C.F.R. § 351.412(a) ....................................................................................................................9

19 C.F.R. § 351.412(b) ....................................................................................................................9

19 C.F.R. § 351.412(c)(2)................................................................................................. 9, 22-23, 24

19 C.F.R. § 351.414(f)(2) ............................................................................................................3, 4

19 C.F.R. § 351.414(f)(3) ................................................................................................................3

**Legislative History**

Statement of Administrative Action accompanying the Uruguay Round Agreements
Act, H.R. Doc. No. 103-316, vol. 1 (1994), reprinted in 1994 U.S.C.C.A.N. 4040......................9

## Administrative Determinations

Certain Carbon and Alloy Steel Cut-To-Length Plate From Austria, 82 Fed. Reg. 16,366 (Int'l
Trade Admin. April 4, 2017) ............................................................................................22

Certain Cold-Rolled Steel Flat Products from the United Kingdom, 81 Fed. Reg. 49,929
(Int'l Trade Admin. July 29, 2016).................................................................... 11, 13-14

Certain Fabricated Structural Steel from Mexico, 85 Fed. Reg. 5,390 (Int'l Trade Admin. January
30, 2020) ........................................................................................................... 11-12

Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review
and Notice of Intent Not to Revoke Antidumping duty Order in Part, 75 Fed. Reg. 50,999 (Int'l
Trade Admin. August 18, 2010) ........................................................................................10

Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan, 73 Fed. Reg. 1,202 (Int'l Trade
Admin. January 7, 2008) ..................................................................................................22

Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Affirmative
Preliminary Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 36,881 (Int'l Trade
Admin. June 8, 2016), ......................................................................................................3

Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Determination
of Sales at Less Than Fair Value, 81 Fed. Reg. 75,030 (Int'l Trade Admin. October 28, 2016)....3

Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of
Antidumping Duty Administrative Review; 2017-2018, 85 Fed. Reg. 77,159 (Int'l Trade Admin.
December 1, 2020)....................................................................................................passim

Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Preliminary Results
of Antidumping Duty Administrative Review; 2017-2018, 85 Fed. Reg. 7,279 (Int'l Trade
Admin. February 7, 2020) ..................................................................................................5

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 9,297
(Int'l Trade Admin. March 14, 2019)..................................................................................2

Stainless Steel Bar from Brazil: Preliminary Results of Antidumping Duty Administrative
Review; 2013-2014, 79 Fed. Reg. 75,789 (Int'l Trade Admin. December 19, 2014)..................11

**MEMORANDUM IN SUPPORT OF THE RULE 56.2 MOTION OF
PLAINTIFFS, UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL
TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND
FRAMEWORK LLC, FOR JUDGMENT UPON THE AGENCY RECORD**

## I.    STATEMENT PURSUANT TO RULE 56.2(c)

Plaintiffs, Universal Tube and Plastic Industries, Ltd. ("UTP"), THL Tube and Pipe

Industries LLC ("TTP"), and KHK Scaffolding and Framework LLC ("KHK") (collectively

"Universal"), affiliated producers and exporters of circular welded carbon-quality steel pipe

("CWP") from the United Arab Emirates, contest the U.S. Department of Commerce's final

results of administrative review in Circular Welded Carbon-Quality Steel Pipe from the United

Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2017-2018, 85 Fed.

Reg. 77,159 (Int'l Trade Admin. December 1, 2020) ("Final Results"), PR 229.[1]  The challenged

determination, findings, and conclusions are set forth in Commerce's unpublished Issues and

Decision Memorandum (November 23, 2020) ("IDM"), PR 223.  Plaintiffs seek judgment upon

the agency record with respect to a single issue: whether Commerce's determination that there

was only a single level of trade ("LOT") in the home market was unsupported by substantial

evidence and otherwise not in accordance with law.

- Universal consists of three affiliated producers of circular welded carbon-quality steel pipe.  During the POR, these producers sold subject pipe in the UAE directly to unrelated distributor customers.  The producers also sold pipe to affiliated distributors, which then resold the merchandise to unrelated customers.  In calculating the dumping margin, the law requires Commerce to compare U.S. sales to home market sales at the same level of trade. Substantial record evidence established that the selling activities performed by the affiliated resellers were more numerous and more intense than the selling activities performed by the producers at the less advanced marketing stage, and that this difference in LOT had an effect on price comparability.  In the Final Results, Commerce determined that the sales made by the producers and

---

[1]  Citations to public documents from Commerce's Administrative Record List are designated as "PR __," and citations to confidential documents are designated as "CR __."  All record documents cited will be included in the Joint Appendix to be filed with the Court.

the downstream affiliated resellers all were at the same marketing stage in the chain of distribution. The issue is whether Commerce correctly concluded that the selling activities of the producers and the affiliated resellers were the same and that all home market sales were made at the same LOT. Substantial record evidence shows that they were not.

## II.   STANDARD OF REVIEW

This Court is required to hold unlawful Commerce's determinations in antidumping and countervailing duty proceedings if they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(l)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (citing Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). This standard requires the court to view the record as a whole, and "can be translated roughly to mean 'is {the determination} unreasonable?'" Nippon Steel Corp v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citation omitted). In order for the Court to affirm Commerce's determination, the agency must have provided "a reasoned explanation ... that is supported by the administrative record." Dorbest v. United States, 30 C.I.T. 1671, 1677-78, 462 F. Supp. 2d 1262, 1269-70 (2006) (citing Goldlink Indus. Co. v. United States, 30 C.I.T. 616, 629, 431 F. Supp. 2d. 1323, 1334 (2006)).

## III.   STATEMENT OF FACTS

On March 14, 2019, Commerce initiated the second administrative review of the antidumping duty order on circular welded carbon-quality steel pipe ("CWP") from the United Arab Emirates for the period December 1, 2017 through November 30, 2018. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 84 Fed. Reg. 9,297 (Int'l Trade Admin. March 14, 2019) ("Initiation Notice"). The review covered numerous producers and exporters of subject merchandise, including Plaintiffs, Universal Tube and Plastic Industries, Ltd. ("UTP"), KHK Scaffolding and Framework LLC ("KHK"), and THL Pipe and Tube

Industries LLC ("TTP") (collectively, "Universal Producers"). In the original less-than-fair-

value investigation, Commerce determined that UTP, KHK, and TTP's predecessor (Universal

Tube and Pipe Industries LLC) constituted a single entity (i.e., the three producers were affiliated

and should be collapsed and considered a single respondent). See Circular Welded Carbon-

Quality Steel Pipe from the United Arab Emirates: Affirmative Preliminary Determination of

Sales at Less Than Fair Value, 81 Fed. Reg. 36,881 (Int'l Trade Admin. June 8, 2016),

unchanged in Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final

Determination of Sales at Less Than Fair Value, 81 Fed. Reg. 75,030 (Int'l Trade Admin.

October 28, 2016). Since the original investigation, Commerce has treated the three Universal

Producers as a collapsed single entity in all subsequent proceedings, and on April 15, 2019,

Commerce selected the Universal Producers as a single mandatory respondent in the second

administrative review.

In May and June 2019, Universal submitted timely responses to the antidumping duty

questionnaire. Based on Commerce's instructions and 19 C.F.R. § 351.414(f)(2)-(3), Universal

reported all sales of the foreign like product in the UAE during the three months preceding the

month of the earliest U.S. sale, all sales during the December 2017 to November 2018 period of

review, and all sales made in the two months after the month of the last U.S. sale, thus reporting

all home market sales made from July 2017 through January 2019. See Universal Section B

Response (June 13, 2019), at B-2, Exhibit B-1, CR 45, PR 73. During this 19-month period,

Universal sold the foreign like product in the UAE through two channels: the Universal

Producers sold directly to unrelated customers, and the Universal Producers also sold the foreign

like product to affiliated UAE trading companies (i.e., the Universal Affiliated Resellers), which

resold the merchandise in the UAE to unrelated downstream customers. Id. at B-1, Exhibit B-1,

**Plaintiffs' Rule 56.2 Memorandum**
**Consol. Court No. 20-03944**

*Public Version*

CR 45, PR 73. From July 2017 to October 2017, there were three Universal Affiliated Resellers, including Dayal Steel Suppliers LLC ("DSS"); DSS Ajman & Sharjah Branch ("DSSSA"); and Al Zaher Building Materials LLC ("Al Zaher"). In November 2017, DSS, DSSSA, and Al Zaher sold their assets to DSS Steel LLC ("DSL"), which then purchased the foreign like product from the Universal Producers for resale to unrelated UAE customers for the period November 2017 through January 2019. See Universal Section A Response (May 22, 2019) ("Univ. Sec. A"), at A-8 to A-9, CR 14, PR 56.[2]

     As part of its responses to Sections A and B of the antidumping duty questionnaire, Universal submitted substantial information related to the differences between sales made through the two channels of distribution in the home market, i.e., (1) Channel 1 sales made by the Universal Producers directly to unrelated customers in the UAE; and (2) Channel 2 sales by the Universal Producers to the Universal Affiliated Resellers, which first purchased and stored the merchandise in inventory and then resold the merchandise to unrelated customers in the UAE. See Univ. Sec. A, at A-18 to A-25, Exhibits A-5, A-6, A-21, A-22, CR 14-32, PR 56-62; Universal Section B Response (June 13, 2019), at B-18, B-27, and Exhibit B-17, CR 45, PR 73. Universal included lists of the specific selling activities performed for each channel of distribution by each Universal company for each claimed level of trade; documentation demonstrating that Universal performed each of these activities during the POR; explanations of how this documentation supported Universal's claims that it performed each reported activity,

---

[2]    On October 31, 2017, the trading inventory and fixed assets of DSS, DSSSA, and Al Zaher were sold to DSL, and the companies ceased all operational activities. See Universal Supplemental Section A Response (December 11, 2019) ("Univ. Supp. A"), at Supp A-3, CR 107, PR 137. DSL thereafter was the only affiliated reseller that re-sold the foreign like product in the UAE during the POR. The other affiliated resellers thus sold the foreign like product in the UAE only during the POR's "front shoulder window period." See 19 C.F.R. § 351.414(f)(2).

Case 1:20-cv-03944-TCS  Document 23  Filed 05/10/21  Page 13 of 42

Plaintiffs' Rule 56.2 Memorandum                                    *Public Version*
Consol. Court No. 20-03944

and a discussion of how the reported activities were relevant to the LOT analysis.  Univ. Sec. A,

at A-18 to A-25, Exhibits A-5, A-6, A-21, A-22, CR 14-32, PR 56-62.  Universal also indicated

how often each company performed the specific activities during the POR, demonstrated how the

indirect selling expenses varied by the different levels of trade, and provided quantitative

analyses showing how the expenses assigned to the POR sales made at the different levels of

trade impacted price comparability.  Univ. Sec. A, at A-18 to A-25, Exhibits A-5, A-6, A-21, A-

22, CR 14-32, PR 56-62.

    In December 2019, Universal provided additional responses to supplemental

questionnaires, including voluminous quantitative information that demonstrated the differences

in the selling activities for sales made through the two channels of distribution and established

further that Channel 2 sales made through the Universal Affiliated Resellers were conducted at a

level of trade further removed from the factory than the direct sales to unrelated customers by the

Universal Producers.  Univ. Supp. A, at Supp A-4 to Supp A-10 and Exhibits SA-7, SA-8, and

SA-9, CR 107, 111-117, PR 137.

    On January 31, 2020, Commerce issued its preliminary results of the 2017-2018

administrative review.  See Circular Welded Carbon-Quality Steel Pipe from the United Arab

Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018, 85 Fed.

Reg. 7,279 (Int'l Trade Admin. February 7, 2020) ("Preliminary Results"), PR 171, and

accompanying unpublished Decision Memorandum for the Preliminary Results (Jan. 31, 2020)

("Preliminary Decision Memorandum"), PR 160.  In the Preliminary Results, notwithstanding

that Universal had reported sales through two channels of distribution in the home market,

Commerce found that "the differences were not quantitatively sufficient to warrant finding

different LOTs in the home market."  Preliminary Decision Memorandum at 28, PR 160.  Thus,

Commerce preliminarily found that Universal's home market sales all were made at the same level of trade.

In February 2020, at the request of Commerce, Universal submitted supplemental information further demonstrating that Universal sold in the home market through two different levels of trade.  In particular, Universal provided additional charts and other information that quantitatively established that there was a difference between the actual selling functions performed by the Universal Producers and the Universal Affiliated Resellers at the different levels of trade in the home market, and that the Universal Affiliated Resellers engaged in a higher level of sales effort for home market sales made through Channel 2.  Universal Supplemental Section AD Response (February 18, 2020) ("Univ. Supp. AD"), at SuppAD-4 to SuppAD-8 and Exhibits SAD-2, SAD-4, and SAD-5, CR 180-193, PR 172.  Universal included in its response Commerce's explanations for finding previously in the original less-than-fair-value antidumping duty investigation and in the first administrative review that Universal's home market sales had been made through two different levels of trade.  Id. at Exhibit SAD-5.

On December 1, 2020, Commerce published its Final Results in which it affirmed its preliminary decision that Universal's home market sales all were made at the same one LOT.  The legal bases for Commerce's Final Results were set forth in an unpublished Issues and Decision Memorandum dated November 23, 2020.  This appeal ensued.

## IV.   SUMMARY OF ARGUMENT

During the period of review, Universal sold the foreign like product in the United Arab Emirates through two distinct channels of distribution.  For Channel 1 sales, the three Universal Producers sold the foreign like product directly to unrelated customers in the UAE.  For Channel 2 sales, the three Universal Producers first sold the foreign like product to four Universal

Affiliated Resellers, which inventoried the merchandise and then subsequently resold the

merchandise in the UAE to downstream unrelated customers.  Universal presented information

to Commerce in the course of the review that demonstrated that the Channel 1 and Channel 2

sales represented different marketing stages, that the Channel 2 sales were more advanced than

the Channel 1 sales, and that Universal's home market sales therefore were made at two discrete

levels of trade.  In the Final Results, Commerce determined that all of Universal's U.S. and home

market sales during the POR were made at the same LOT.  As a result, Commerce found that an

LOT adjustment to home market prices was not warranted when Channel 2 sales in the UAE

were compared to Universal's U.S. sales.

The statute and the record evidence do not support Commerce's determination.

Specifically, substantial record evidence confirms that the Universal Producers and the Universal

Affiliated Resellers engaged in significantly different selling activities during the period of

review for the sales made through the different channels of trade; that the selling functions

performed by the Universal Affiliated Resellers for Channel 2 sales were distinct and more

burdensome than the selling functions performed by the Universal Producers for the Channel 1

sales; and that where there was overlap in the selling activities, the level of engagement by the

Universal Affiliated Resellers was much more frequent, and with a much higher level of

intensity, than that of the Universal Producers.  By failing to consider sufficiently (1) the

"doubling-up" of selling activities for Channel 2 sales, (2) the types of selling activities

performed for each sales channel, (3) the relative intensity and frequency of the selling activities,

(4) the quantitative differences in the selling activities, and (5) the impact such differences had

on price comparability at the different marketing stages, Commerce did not properly assess

whether Universal's home market sales through Channels 1 and 2 were made at different levels

7

of trade.  The antidumping statute authorizes Commerce to interpret ambiguous or unclear

situations, but the law does not permit Commerce to disregard substantial portions of the

administrative record that established that Universal sold the foreign like product through two

levels of trade in the home market.  In finding that the selling functions of the Universal

Producers and the Universal Affiliated Resellers were not sufficiently different, and that an LOT

adjustment was not warranted, Commerce ignored substantial record information and failed to

make a rational connection between the facts on the record and the conclusions drawn.

## V.    **ARGUMENT**

### A.    **Statutory Framework for Level of Trade Adjustments**

Antidumping duty calculations involve a comparison of U.S. prices to normal value (i.e.,

the sale of the foreign like product in the comparison market).  The antidumping duty statute

requires Commerce, to the extent practicable, to calculate normal value at the same level of trade

("LOT") as the U.S. sales.  19 U.S.C. § 1677b(a)(1)(B)(ii).  If Commerce is unable to find sales

in the foreign market at the same LOT as the sales to the United States, Commerce compares

sales in the United States and foreign markets at a *different* level of trade.  If that is necessary,

however, the antidumping statute requires Commerce to increase or decrease normal value "to

make due allowance for any difference (or lack thereof) between the export price ... and {normal

value} that is shown to be wholly or partly due to a difference in level of trade."  19 U.S.C. §

1677b(a)(7)(A).  The level of trade adjustment thus "is designed to ensure that the normal value

and U.S. price are being compared ... at the same level of trade, that is, at the same marketing

stage in the chain of distribution that begins with the manufacturer."  Dillinger France S.A. v.

United States, 981 F.3d 1318, 1326-27 (Fed. Cir. 2020), quoting Micron Technology, Inc. v.

United States, 243 F.3d 1301, 1305 (Fed. Cir. 2001) ("Micron Tech").  For example, the LOT

adjustment ensures that a normal value wholesale price will not be compared to a United States CEP retail price.

An LOT adjustment is not made in all cases, however.  A difference in LOT is cognizable only if it (i) involves the performance of different selling activities; and (ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.  19 U.S.C. § 1677b(a)(7)(A); see also 19 C.F.R. § 351.412(a)-(b); Micron Tech., 243 F.3d at 1305.  While neither the statute nor the Statement of Administrative Action defines the phrase "same level of trade," the U.S. Court of Appeals for the Federal Circuit has interpreted the term to mean "comparable marketing stages in the home and United States markets."  Micron Tech., 243 F.3d 1301, 1305 (Fed. Cir. 2001) (for example, "a comparison of wholesale sales in Korea to wholesale sales in the United States"); see also 19 C.F.R. § 351.412(c)(2) ("The Secretary will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent).").  Commerce therefore grants an LOT adjustment only where "there is a difference between the actual functions performed by the sellers at the different levels of trade in the two markets."  Statement of Administrative Action ("SAA"), H.R. Doc. No. 103–316, 103rd Cong., 2d Sess. (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4168.

To determine whether sales in the comparison market are made at different levels of trade, i.e., at different stages in the marketing process, Commerce examines the distribution system (i.e., the chain of distribution), including the selling functions and class of customer (i.e., customer category), and the level of selling expenses for each type of sale.  See Preliminary Decision Memorandum at 26, PR 160.  To determine whether there is a difference in the stages of marketing, Commerce's practice is that there must be substantial differences in selling

activities.  See Certain Orange Juice from Brazil: Final Results of Antidumping Duty

Administrative Review and Notice of Intent Not to Revoke Antidumping duty Order in Part, 75

Fed. Reg. 50,999 (Int'l Trade Admin. August 18, 2010) (Issues and Decision Memorandum, at

Comment 7).  In 2018, in order to enhance Commerce's ability to determine whether reported

differences in selling functions are substantial enough to warrant a finding that sales were made

at different LOTs, Commerce began requiring respondents in all proceedings to supplement their

LOT claims with quantitative evidence.  IDM at 16, PR 223.  As described below, it was under

this structure and these requirements that Universal provided Commerce with substantial

information and quantitative analyses in its original and supplemental responses demonstrating

significant differences in the selling activities that its entities performed for sales in the different

channels of distribution and how the expenses that were assigned to the home market sales made

at the different levels of trade impacted price comparability.

   **B.    Commerce's Practice Establishes That Direct Sales From a Producer
          and Sales Through Resellers Can Represent Two Different Stages in
          the Marketing Process**

   In order to determine whether comparison market sales are made at different stages in the

marketing process, Commerce "examines the distribution system in each market (i.e., the chain

of distribution)" Preliminary Decision Memorandum at 26, PR 160.  In this case, Universal

reported that it made home market sales through two channels of distribution, i.e., direct sales by

the Universal Producers to unaffiliated customers (Channel 1), and sales by the producers to

affiliated resellers (e.g., DSL), which in turn re-sold the merchandise to unaffiliated customers

(Channel 2).  For Channel 1 sales, Universal performed certain selling functions to sell to its

unaffiliated customers.  For home market sales made through Channel 2, the producers

performed some of the same selling activities to sell to the Universal Affiliated Resellers as they

Plaintiffs' Rule 56.2 Memorandum
Consol. Court No. 20-03944

*Public Version*

did for Channel 1, and *in addition* the Universal Affiliated Resellers also performed significant additional selling activities to resell the merchandise to their customers.

In previous cases, Commerce has found that direct sales from producers and sales by producers through resellers represent different stages in the marketing process because for sales through resellers the same selling activities often are repeated twice or the reseller performs additional activities that the producer did not. In <u>Certain Cold-Rolled Steel Flat Products from the United Kingdom</u>, Commerce concluded that "{i}t is our view that direct sales from the mill and sales through a distribution center represent two different stages in the marketing process." <u>See</u> 81 Fed. Reg. 49,929 (Int'l Trade Admin. July 29, 2016) (Issues and Decision Memorandum, at Comment 1). Similarly, in <u>Stainless Steel Bar from Brazil</u>, where the respondent reported two channels of distribution, <u>i.e.</u>, direct mill-order sales to distributors and large end-user, and sales to end-users from inventory maintained in distribution centers located away from the mill, Commerce determined the company "made sales at two distinct marketing stages (<u>i.e.</u>, two levels of trade) in the home market. <u>Stainless Steel Bar from Brazil: Preliminary Results of Antidumping Duty Administrative Review; 2013-2014</u>, 79 Fed. Reg. 75,789 (Int'l Trade Admin. December 19, 2014) (Preliminary Decision Memorandum, at 8). A situation where the different distribution channels involve the merchandise changing hands a different number of times is exactly the situation that existed in this case. In this review, for Channel 2 sales, the Universal Producers first sold pipe products to the Universal Affiliated Resellers, and the Universal Affiliated Resellers then resold the merchandise a second time to unrelated customers. While Commerce's practice does not automatically equate two channels of distribution with two levels of trade, there is a strong indication of different levels of trade where the merchandise changes hands twice and there is a necessary doubling-up of selling activities. <u>See</u>, <u>e.g.</u>, <u>Certain</u>

Fabricated Structural Steel from Mexico, 85 Fed. Reg. 5,390 (Int'l Trade Admin. January 30,

2020) (Issues and Decision Memorandum, at Comment 8) ("{T}he merchandise does not

necessarily have to change hands twice in order to reach the more remote LOT ... {and it} is

sufficient that, at the more remote level, the seller takes on a role comparable to a reseller if the

merchandise had changed hands twice."). But in its Issues and Decision Memorandum,

Commerce did not even address the issue – discussed at length in Universal's case brief – that

the two home market channels of distribution reported by Universal represented two different

*chains* of distribution, i.e., one distribution chain where the merchandise was sold by the

Universal Producers directly to unrelated customers, and a second distribution chain where the

merchandise was sold *twice*: first by the Universal Producers to the Universal Affiliated

Resellers, and then again by the Universal Affiliated Resellers to unrelated customers. IDM at

16-18, PR 223; see also Universal's Case Brief (April 20, 2020) at 8-10, CR 207, PR 196.

Commerce made no mention in its Issues and Decision Memorandum that while there was only

one layer of selling activities when the Universal Producers sold directly through Channel 1,

there necessarily existed two separate layers of selling activities for sales made through Channel

2. IDM at 16-18, PR 223.

      In this proceeding, the existence of physically different channels of distribution involving

different layers of sellers supports a finding of two different levels of trade because the existence

of more remote sales by the Universal Affiliated Resellers necessarily resulted in an additional

layer of selling activities, amounting in the aggregate to substantially different selling functions.

Commerce's failure to discuss at all the existence of the different number of layers of selling

activities within the two channels of home market sales renders Commerce's decision arbitrary

and unsupported by substantial evidence.

### C.    The Universal Producers and Universal Affiliated Resellers Performed Different Selling Activities at Different Levels of Intensity and Frequency During the POR

In the Preliminary Results, Commerce found that Universal provided selling activities "at the same intensity in the home market … irrespective of distribution channel." Preliminary Decision Memorandum at 29, PR 160 (emphasis added).  Commerce provided no comparative examination of the intensities of the selling activities reported by Universal for Channel 1 and Channel 2 home market sales, and merely concluded that "the differences were not quantitatively sufficient to warrant finding different LOTs in the home market." Preliminary Decision Memorandum at 29, PR 160.  In the Final Results, Commerce did not advance further its evaluation of the selling functions that Universal performed at each marketing stage, and found that "the Universal producers and affiliated resellers perform *virtually the same* selling functions for unaffiliated customers in the home market." IDM at 18, PR 223 (emphasis added).

Commerce's sole example for its conclusion that the differences in selling functions were insufficient to warrant finding different LOTs was that Universal reported an intensity level of "6" for sales promotion and advertising for the Universal Affiliated Resellers for Channel 2 sales and, as support, "merely stated that it annually advertises in the yellow pages and gives gifts to some customers." IDM at 18, PR 223. As an initial matter, while Universal reported a level "6" for sales promotion and advertising for the Universal Affiliated Resellers, Universal did not report *any* promotion or advertising for the Universal Producers.  In Certain Cold-Rolled Steel Flat Products from the United Kingdom, Commerce confirmed that "the regulations state that there must be differences in selling functions, not that the differences must be all larger or smaller in one channel." See 81 Fed. Reg. 49,929 (Int'l Trade Admin. July 29, 2016) (Issues and Decision Memorandum, at Comment 1).  Having found that the respondent in that case reported

"low" levels of activity for market research, product development, and inventory maintenance,

Commerce nonetheless concluded that "the fact remains that {these} selling functions {were}

performed at one channel but not performed at the other channel," and therefore determined that

there were "significant differences between Channel 1 sales and Channel 2 sales." Id. Similarly,

the Universal Producers in this review did not perform *any* promotion and advertising activities,

thus illustrating an important difference in the selling functions at the two levels of trade.

Furthermore, contrary to Commerce's assertion, Universal did not "merely state" that it annually

advertised in the yellow pages and gave gifts to some customers. Rather, Universal reported that

the Universal Affiliated Resellers performed numerous advertising and other promotional

activities, including running advertisements in the yellow pages, designing advertisements for

newspaper supplements, providing small promotional gifts (such as mugs, diaries, pends, water

bottles, wall calendars, table calendars) to customers throughout the year, and giving larger gifts

to specific customers at particular times. Univ. Sec. A, at A-18, Exhibit A-5, CR 14, PR 56.

Universal also reported that Universal Affiliated Reseller DSL developed advertising, catalogs,

and brochures to introduce the company and to identify the products that could be sold, and

made these promotional items available for visitors to the company, and also distributed them to

the public. Univ. Sec. A, at Exhibit A-21, CR 14-16, PR 56. Universal also provided examples

of invoices that Universal Affiliated Reseller DSL paid for advertising and photoshoot services

as well as additional invoices for business promotional gifts to customers. Univ. Sec. A, at

Exhibits A-21-12, A-21-13, CR 14-16, PR 56. And Universal provided similar descriptions and

documentary support examples for the advertising and promotional gifts provided by Universal

Affiliated Reseller DSS (Univ. Sec. A, at Exhibits A-22-12, A-22-13, CR 14, CR 17-18, PR 56);

Universal Affiliated Reseller Al Zaher (Univ. Supp. A, at Exhibits SA-7-0, SA-7-12, CR 111,

CR 114, PR 137); and Universal Affiliated Reseller DSSSA (Univ. Supp. A, at Exhibits SA-8-0,

CR 115, PR 137).  Altogether, the justifications, explanations, and documentation that Universal

provided to support the level of promotion and advertising services performed by the Universal

Affiliated Resellers were substantial and diverse, and were not "merely stated."

    More importantly, Commerce's practice is not to limit its selling activity analysis simply

to "promotion and advertising" services.  Instead, Commerce recognizes that selling activities are

diverse and can be grouped into a number of different categories, including Provision of Sales

Support, Provision of Training Services, Provision of Technical Support, Provision of Logistical

Services, and Performance of Sales-Related Administrative Activities.  Preliminary Decision

Memorandum at 26-27, PR 160.  In this case, however, Commerce's LOT analysis focused not

just on a single category of selling activity (i.e., Sales Support), but also on a single selling

activity (i.e., sales promotion and advertising) within that category.  Therefore, even if

Commerce addressed advertising services, Commerce ignored significant detracting information

showing substantial differences in the selling activities in the other categories.  See Universal

Camera Corp v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into

account whatever in the record fairly detracts from its weight").

    Contrary to Commerce's assertion, when viewed in their totality, the selling activities that

the Universal Producers and the Universal Affiliated Resellers reported were not "the same."

And where there was overlap in the selling functions, there were substantial differences in the

levels of intensity and frequency of the selling activities performed for sales made in the

different distribution channels.  Moreover, for all these activities, Universal supported the

intensity and frequency of its reported selling functions with hundreds of pages of supporting

documentation.  See Univ. Sec. A, at A-18 to A-25, Exhibits A-5, A-6, A-21, A-22, CR 14-19,

PR 56, PR 62; Univ. Supp. A, at Supp A-4 to Supp A-10 and Exhibits SA-7, SA-8, and SA-9,

CR 107, 111-117, PR 137; Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibits SAD-2,

SAD-4, and SAD-5, CR 180-193, PR 172.  Universal's Supplemental Sections A and D response

alone contained more than 450 pages of source documentation related to the level and frequency

of selling functions that Universal performed through each channel during the POR.  For

example, with respect to sales support, Exhibits SAD-5A, SAD-5B, SAD-5C, SAD-5D, SAD-

5E, SAD-5F, and SAD-5G of that submission contained emails and source documentation

related to advertising and promotions, customer credit applications, customer inquiries, customer

visit reports, internal price lists, salesperson diaries, and stock planning orders.  With respect to

personnel and customer training services, Exhibits SAD-5H and SAD-5I contained emails and

source documentation related to employee training, product familiarity, and customer

educational visits.  Regarding technical advice and support, Exhibits SAD-5J, SAD-5K, and

SAD-5L contained emails and source documentation related to technical specifications, mill test

certificate requirements and requests, and product cutting instructions.  With regard to logistical

activities, Exhibits SAD-5M and SAD-5NS contained source documentation related to

merchandise loading instructions and fuel reimbursements.  Regarding sales-related

administrative activities, Exhibits SAD-5O, SAD-5P, SAD-5Q, and SAD-5R contained emails

and source documentation related to price negotiations, after sales services, commissions, and

merchandise quality inspections.  To further support the selling functions reported in Universal's

response, Exhibits SAD-5S and SAD-5T contained Commerce's sales verification reports from

the original less-than-fair-value investigation in this proceeding with respect to Commerce's

previous investigation and review of Universal's sales activities and levels of trade in the UAE.

The chart below – which was provided to Commerce – outlines in a glance the substantial

**Plaintiffs' Rule 56.2 Memorandum**          *Public Version*
**Consol. Court No. 20-03944**

differences in the selling activities performed by the Universal Producers and the Universal

Affiliated Resellers in the different channels of distribution.

**Universal -- AR2**                                          Level of Intensity of Activity    1 = Low
**Circular Welded Carbon-Quality Steel Pipe**                                                   5 = Medium
**Selling Activities and Functions, Including Quantitative Comparison**                          10 = High

| Selling Activity / Function | | | Home Market -- Channel 1 | | | | Home Market -- Channel 2 | | | | | |
| | | | Universal Producers to Unrelated Customers | | | | Universal Producers to Universal Affiliated Resellers | | | Universal Affiliated Resellers to Unrelated Customers | | |
| | | | Perf | Lev | Frequen | | Perf | Lev | Frequen | Perf | Lev | Frequen |
| Sales Support | Sales Forecasting | | Yes | 2 | Annual | | No | | | Yes | 6 | Monthly |
| | Sales Meetings | | Yes | 2 | Monthly | | No | | | Yes | 7 | Weekly |
| | Mkt. Research/Econ. Planning | | Yes | 2 | Quarterly | | No | | | Yes | 6 | Weekly |
| | Sales Promotion/Advertising | | No | | | | No | | | Yes | 6 | Annual |
| | Customer Sales Support | | No | | | | No | | | Yes | 9 | Daily |
| | Sales Personnel | | Yes | 4 | Weekly | | Yes | 2 | Monthly | Yes | 9 | Daily |
| Training Services | Personnel Training | | Yes | 2 | Annual | | No | | | Yes | 8 | Weekly |
| | Small Customer Support | | Yes | 2 | Monthly | | No | | | Yes | 7 | Daily |
| | Customer Personal Training | | No | | | | No | | | Yes | 3 | Daily |
| Tech. Support | Technical Advice | | Yes | 2 | Annual | | No | | | Yes | 5 | Daily |
| Logistical Services | Procurement/ Sourcing Services | | No | | | | No | | | Yes | 8 | Daily |
| | Pre-sale Res.; Period Fulfillment | | No | | | | No | | | Yes | 2 | Monthly |
| | Inventory Maintenance | | Yes | 2 | Weekly | | No | | | Yes | 3 | Daily |
| | Packing | | Yes | 2 | Daily | | Yes | 2 | Daily | Yes | 2 | Daily |
| | Delivery Arrangements | | Yes | 8 | Daily | | Yes | 3 | Daily | Yes | 10 | Daily |
| | Company Delivery | | Yes | 3 | Daily | | Yes | 3 | Daily | Yes | 9 | Daily |
| | Post-Sale Warehousing | | No | | | | No | | | Yes | 3 | Daily |
| | Repacking Services | | No | | | | No | | | Yes | 3 | Daily |
| Sales-Related Admin | Customer Contact/Negotiation | | Yes | 5 | Weekly | | Yes | 3 | Monthly | Yes | 8 | Daily |
| | Order Processing | | Yes | 5 | Weekly | | Yes | 3 | Weekly | Yes | 8 | Daily |
| | Price/Billing Adjustments | | Yes | 2 | Annual | | Yes | 2 | Annual | Yes | 7 | Daily |
| | Quality Assurance/Warr. Services | | Yes | 5 | Daily | | Yes | 5 | Annual | Yes | 8 | Daily |
| | After Sales Service | | No | | | | No | | | Yes | 3 | Monthly |
| | Commission Payments | | Yes | 1 | Monthly | | No | | | Yes | 3 | Daily |
| | Payment Collection | | Yes | 5 | Weekly | | Yes | 3 | Quarterly | Yes | 8 | Daily |
| | Tax/Duty Collection | | Yes | 2 | Weekly | | Yes | 2 | Monthly | Yes | 9 | Daily |

<u>See</u> Univ. Sec. A, at A-18 to A-25, Exhibit A-5, CR 14, PR 56; Univ. Supp. A, at Supp A-4 to

Supp A-10 and Exhibit SA-9, CR 107, 117, PR 137; Univ. Supp. AD, at SuppAD-4 to SuppAD-

8 and Exhibits SAD-2 and SAD-4, CR 180, PR 172.

 <u>Sales Support</u>: The type and level of "sales support" selling activities reported by the

Universal Affiliated Resellers far exceeded any such activities by the Universal Producers. First,

as noted above, the Universal Producers did not report performing sales promotion, advertising,

or customer sales support activities at all. In contrast, the Universal Affiliated Resellers reported

high intensity engagement in all these activities, and – in the case of customer sales support –

reported conducting such selling activities on a *daily* basis.  That these selling functions were

performed for Channel 2 sales and not for Channel 1 sales resulted in significant differences with

respect to these selling functions.  In addition, the Universal Affiliated Resellers reported holding

sales meetings, preparing various sales reports, and continuously engaging in sales forecasting at

high levels of intensity.  See, e.g., Univ. Sec. A, at A-18 to A-25, Exhibit A-5, CR 14, PR 56;

Univ. Supp. A, at Supp A-4 to Supp A-10 and Exhibit SA-9, CR 107, 117, PR 137; Univ. Supp.

AD, at SuppAD-4 to SuppAD-8 and Exhibits SAD-2 and SAD-4, CR 180, PR 172.  The

Universal Affiliated Resellers also provided sales and marketing support for its customers,

assigned customer account representatives, conducted frequent customer visits, performed

customer service activities, developed numerous marketing activities, and conducted customer

outreach after identifying potential new customers.  See Univ. Sec. A, at A-18 to A-25, Exhibits

A-5, A-21, A-22, CR 14, PR 56; Univ. Supp. A, at Supp A-4 to Supp A-10 and Exhibit SA-9,

CR 107, 117, PR 137; Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibits SAD-2 and

SAD-4, CR 180, PR 172.  Universal reported that the Universal Affiliated Resellers provided

these activities on either a daily or weekly basis (except for sales forecasting, which it conducted

monthly) and at a very high level of intensity (i.e., often at a level of "9" and never lower than

"6").  In contrast, the Universal Producers had smaller sales staffs that engaged primarily in

order input activities, limited any sales forecasting to yearly meetings, conducted sales meetings

only infrequently, and provided little marketing support to large customers already familiar with

their products.  Universal reported that the Universal Producers provided these activities either

on a monthly or quarterly basis and at a very low level of engagement (i.e., reporting a "2" for

most activities and a "4" in only one instance).  See, e.g., Univ. Sec. A, at A-18 to A-25, Exhibits

**Plaintiffs' Rule 56.2 Memorandum**
**Consol. Court No. 20-03944**

*Public Version*

A-5, A-21, A-22, CR 14, PR 56. In addition, the degree of involvement by the Universal

Producers in these activities was even more attenuated because UTP and TTP shared the same

sales staff, and KHK had only one individual who made and processed sales. Id. Furthermore,

Universal reported that, unlike the Universal Producers, the Universal Affiliated Resellers also

were physically close to their customers for purposes of assisting and servicing their customers'

needs, and maintained quality departments to ensure that their customers purchased the correct

product quality.[3] Commerce did not discuss any of these distinctions in its Final Results.

    Training Services: With respect to training, Universal reported that new sales staff

members at the Universal Affiliated Resellers started in the logistics departments to learn about

the products. Each salesman was assigned a customer list and given price lists to quote to these

customers. Salesmen were trained on what discounts, if any, can be offered. The sales staff also

identified products that were in demand, but that were not currently being sold, and followed up

to see if the producers could produce them. The sales staff visited their customers' locations on a

monthly basis to provide support to their customers, and also were given credit for their cell

phones, which they used to communicate with customers. See Univ. Sec. A, at A-18 to A-25,

Exhibits A-5, A-21, A-22, CR 14, PR 56; Univ. Supp. A, at Supp A-4 to Supp A-10 and Exhibit

SA-9, CR 107, 117, PR 137; Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibits SAD-2

and SAD-4, CR 180, PR 172. Universal reported that the Universal Affiliated Resellers

---

[3]  Id. Furthermore, the Universal Producers also did not perform any of the following sales functions, which DSL and the other Universal Affiliated Resellers performed frequently: (1) maintaining inventory for sales of a wide range of products, including pipe; (2) regularly selling to small customers and making small-quantity sales; (3) extensively training sales personnel over a number of years; (4) holding weekly meetings with sales staff to discuss market fluctuations and identify in-demand products; (5) assisting customers with identifying the proper product; (6) providing product loading for walk-in customers; and (7) discussing market conditions in weekly sales meetings to assess market needs. See, e.g., Univ. Sec. A, at A-18 to A-25, Exhibits A-5, A-21, A-22, CR 14, PR 56

Plaintiffs' Rule 56.2 Memorandum
Consol. Court No. 20-03944

*Public Version*

provided all these training and customer support activities mostly on a daily or weekly basis and at a very high level of intensity (i.e., at a level of "7" or "8"). By contrast, the Universal producers either did not perform these selling activities at all, or conducted them only monthly or annually, and never at an intensity greater than "2." Id. In the Final Results, Commerce did not address these distinctions at all.

Technical Support: With respect to technical support, Universal reported that the Universal Affiliated Resellers again engaged in a higher level of intensity than the Universal Producers. Not only did the Universal Affiliated Resellers provide greater technical assistance by answering customer questions and engaging in post-sale follow-up on a *daily* basis, but the Universal Affiliated Resellers' smaller customers also required greater technical assistance with respect to product specifications and product usages. In contrast, the Universal Producers combined had only two small customers for which they provided technical assistance only *annually*. Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibit SAD-2, CR 180, PR 172. The infrequent and limited technical advice provided by the Universal Producers does not compare at all with the far greater intensity of effort conducted on a daily basis by the Universal Affiliated Resellers. Moreover, the Universal Affiliated Resellers were responsible on a daily basis for reviewing the quality of every incoming shipment of merchandise received to be resold – an activity that the Universal Producers did not perform at all. Id. Commerce's Final Results again did not address these distinctions whatsoever.

Logistical Services: With respect to logistical services, such as inventory maintenance and warehousing, record expense information supported Universal's reporting of these activities as daily sales functions with a high level of intensity for the Universal Affiliated Resellers, while these same activities either were not performed or performed only occasionally by the Universal

Producers for home market sales.  For example, the Universal Producers did not report

performing procurement or sourcing services, period fulfillment services, post-sale warehousing

services or repacking services at all.  In contrast, the Universal Affiliated Resellers reported

engagement in all these activities, and reported conducting such selling activities on a *daily*

basis.  Univ. Supp. A, at Supp A-4 to Supp A-10 and Exhibit SA-9, CR 107, 117, PR 137.  With

respect to inventory maintenance, while the Universal Producers combined had only two small

customers for which they provided the service only *weekly*, the Universal Affiliated Resellers

reported providing this service daily at a higher level of intensity.  Regarding merchandise self-

deliveries, the Universal Producers reported engaging in such services at only a level of "3"

while the Universal Affiliated Resellers maintained fleets of delivery vehicles and conducted

such deliveries daily at a high engagement level of "9."  Id.  In the Final Results, Commerce

ignored these distinctions in making its home market LOT determination.

     Sales-Related Administrative Activities:  Universal reported that customer contact,

customer negotiation, and sales order processing were activities in which both the Universal

Producers and the Universal Affiliated Resellers engaged.  But whereas the Universal Producers

engaged in such activities only on a weekly basis, the Universal Affiliated Resellers performed

these activities daily.  Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibit SAD-2, SAD-5,

CR 180, PR 172 (containing evidence of sales, sales meetings, sales diaries, etc.).  In addition,

the Domestic Producers rarely collected taxes or made tax payments, and hardly ever had sales-

related price or billing adjustments, while the Universal Affiliated Resellers reported that they

performed such services daily.  Moreover, while the Universal Producers' level of activity was

never higher than a "5" out of 10 for any of the sales-related administrative services, the

Universal Affiliated Resellers reported an "8" or "9" for degree of intensity for almost all such

sales functions. The Universal Affiliated Resellers also reported that they conducted after sales

services, which the Domestic Producers did not perform at all. Id. Overall, the differences in the

sales-related administrative services provided by the Universal Affiliated Resellers compared to

the Universal Producers for sales made through the different channels of trade were numerous

and extreme, and yet Commerce did not address these differences in its LOT determination.

It is Commerce's practice to consider the intensity of the selling functions performed in

determining whether channels of distribution constitute different levels of trade. See Certain

Carbon and Alloy Steel Cut-To-Length Plate From Austria, 82 Fed. Reg. 16,366 (Int'l Trade

Admin. April 4, 2017) (Issues and Decision Memorandum, at Comment 3) (finding two home

market levels of trade based on the types and intensity of the selling functions performed for

each channel); see also Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan, 73 Fed.

Reg. 1,202 (Int'l Trade Admin. January 7, 2008) (Issues and Decision Memorandum, at

Comment 2) ("Although Ta Chen's activities related to freight and delivery arrangements are

somewhat greater for sales to {the United States} than for home market sales, the record shows

that Ta Chen engages in a higher level of sales effort for home market sales than for U.S. sales").

But in this case, as described above, Commerce addressed Universal's selling activity levels of

intensity in only one instance, and even then the reference was not for comparison purposes

between the Universal Producers and the Universal Affiliated Resellers. IDM at 18, PR 223

(discussing only that Universal reported a level "6" for sales promotion and advertising for the

Universal Affiliated Resellers for Channel 2 sales). Nor did Commerce address the differences

in the reported frequencies of the selling activities. Furthermore, Commerce's (incorrect)

assertion that the Universal Producers and Universal Affiliated Resellers performed some of the

same functions ignores entirely the regulatory standard that "some overlap in selling activities

will not preclude a determination that two sales are at different stages of marketing. 19 C.F.R. §

351.412(c)(2) (emphasis added).

In this case, Commerce's failure to address the intensity and frequency of the selling

activities is all the more unreasonable because it was Commerce that requested Universal to

provide this information in the first place. In the Section A questionnaire, Commerce

specifically instructed Universal to "report level of intensity information using a scale of zero to

ten in which five represents a sale with average associated selling expenses." Antidumping

Questionnaire (April 16, 2019), at A-16. Commerce also asked Universal to "indicate how often

you performed each of the specific activities during the POR." Id. at A-7. For Commerce to

request the information and then to ignore the specific responses that Universal provided resulted

in a home market LOT determination that was not based on substantial evidence.

As noted above, Commerce's position in the review was that Universal provided the

*same* selling activities at the *same* intensity levels for *all* sales in the home market, irrespective

of distribution channel. But considering the significant differences in the types, intensities, and

frequencies of the selling activities undertaken by the Universal Affiliated Resellers for Channel

2 sales versus those performed by the Universal Producers for Channel 1 sales, the record

evidence does not support Commerce's conclusion. Moreover, the Final Results do not even

address the additional factor – as discussed in the previous section – that the Universal Producers

themselves were engaged in selling activities for Channel 2 home market sales (i.e., to sell to the

Universal Affiliated Resellers).

Overall, the selling activity descriptions and documentary support presented to

Commerce by Universal demonstrated that the selling functions performed by the Universal

Affiliated Resellers for home market sales were substantially different both in degree of intensity

and frequency of occurrence for all the selling activity categories that Commerce normally

considers.  Substantial record evidence thus supports a conclusion that the selling functions

performed by the Universal Affiliated Resellers constituted a marketing stage within the meaning

of 19 C.F.R. 351.412(c)(2) that was different from the marketing stage of the home market sales

made by the Universal Producers.  Commerce's conclusions that the Universal Producers and

Universal Affiliated Resellers performed the same selling functions at the same level of intensity

is contradicted by substantial record information.  The Court therefore should remand to

Commerce with instructions to reconsider whether the differences in the selling activities of the

Universal Producers and Universal Affiliated Resellers, and intensities and frequencies thereof,

resulted in Universal making sales in the home market at two different levels of trade.

## D.    The Record Contains Extensive Quantitative Analyses That Corroborate the Reported Levels of Intensity of Universal's Selling Activities

In the Final Results, Commerce dedicated two-thirds of its LOT discussion to a recitation

of its requests to Universal to provide a quantitative analysis of its selling expenses and

boilerplate language as to why a quantitative analysis was important to Commerce's level-of-

trade determinations.  IDM at 16, PR 223.  Commerce dedicated no part of its position to

addressing the quantitative analyses that Universal actually submitted and, by omission,

suggested that Universal did not provide such an examination or evaluation.  However, as

demonstrated below, Universal presented voluminous quantitative analyses and detailed

information to Commerce that expressly demonstrated how the expenses assigned to home

market sales made at different levels of trade impacted price comparability, how the indirect

selling expenses varied by the different levels of trade, and how Universal's quantitative analyses

supported Universal's claimed levels of intensity for the reported selling activities.  As illustrated

24

by the comparisons of the number of sales staff, volumes sold, selling ratios, and selling

expenses of the Universal Producers and those of Universal Affiliated Reseller DSL contained in

the chart below (Universal provided similar analyses for all Universal Affiliated Resellers), it

was unreasonable for Commerce to conclude that Universal did not present a quantitative

analysis of the data and to determine that Universal made all home market sales at a single LOT.

**Quantitative Analysis of Selling Activities for Sales in the Reporting Period**

| Item | | Producers | DSL | |
|---|---|---|---|---|
| Number of Invoices | [ | 3,942 | 10,063 | ] |
| Number of Reported Sales Observations | [ | 33,937 | 15,566 | ] |
| Number of Invoices per Sales Observation | [ | 0.12 | 0.65 | ] |
| Number of Reported Sales Observations per Invoice | [ | 8.61 | 1.55 | ] |
| Quantity (MTs) | [ | 57,177 | 15,094.84 | ] |
| MTs per Invoice | [ | 14.50 | 1.50 | ] |
| Invoices per MT | [ | 0.07 | 0.67 | ] |
| POR Days | [ | 1,740 | 427.00 | ] |
| Invoices per Day | [ | 2.27 | 23.57 | ] |
| Total Finished Goods Warehouse Area (square meters) | [ | 7,240 | 60,437.00 | ] |
| Warehouse Area per MT sold | [ | 0.13 | 4.00 | ] |
| Total Freight to Customer (1) | [ | 1,363,667 | 323,835.11 | ] |
| Total Freight to Warehouse (2) | [ | - | 673,436.21 | ] |
| Total Freight (3) | [ | 1,363,667 | 997,271.32 | ] |
| Total Freight per MT (4) | [ | 23.85 | 66.07 | ] |
| Average Inland Freight to Warehouse per MT (4) | [ | 0.00 | 44.61 | ] |
| Warehousing Expense per MT (4) | [ | 0.00 | 27.13 | ] |
| Average Inventory Turnover Days By Producers | [ | 12.17 | 12.17 | ] |
| Average Inventory Turnover Days By Affiliated Resellers | [ | 0.00 | 79.36 | ] |
| Total Average Inventory Turnover Days | [ | 12.17 | 91.53 | ] |
| Average Inventory Carrying Cost per MT (5) | [ | 3.74 | 29.24 | ] |
| Number of Invoices with Commissions | [ | 40.00 | 275.00 | ] |
| % of Invoices with Commissions | [ | 1.01% | 2.73% | ] |
| Indirect Selling Expense Factor by Producers | [ | 0.42% | 0.42% | ] |
| Indirect Selling Expense Factor by Affiliated Resellers | [ | 0.00% | 8.43% | ] |
| Total Indirect Selling Expense Factor | [ | 0.42% | 8.85% | ] |
| Average Total Indirect Expenses per MT (6) | [ | 10.50 | 283.37 | ] |
| Number of Sales Staff | [ | 9 | 26 | ] |
| Number of Sales Staff per MT Sold | [ | 0.0002 | 0.0017 | ] |
| Number of MT Sold per Sales Staff | [ | 6,352.99 | 580.57 | ] |
| Number of Sales with Discounts, Price or Billing Adjustments | [ | 211 | 345 | ] |
| % of Sales Observations with Discounts, Price or Billing Adjustments | [ | 0.62% | 2.22% | ] |
| Number of Sales with Packing Expenses | [ | 33,937 | 15,566 | ] |
| Number of Sales with Delivery Charges | [ | 33,158 | 15,566 | ] |

See Univ. Supp. A, at Supp A-6 to Supp A-9 and Exhibit SA-9, CR 107, 117, PR 137; Univ.

Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibits SAD-4, CR 180, PR 172.

<u>Sales Support</u>:  Universal Affiliated Reseller DSL's efforts with respect to sales support far exceeded any such activities performed by the Universal Producers.  As shown in the quantitative analysis chart above**,** while the combined [     ] salespersons at the Universal Producers sold [      ] metric tons of merchandise under consideration for an average of [     ] metric tons of subject pipe *per person* during the POR, the much larger sales staff of Universal Affiliated Reseller DSL with [    ] salespersons sold only [      ] metric tons of merchandise under consideration, resulting in each salesperson averaging [        ] metric tons of subject pipe sales per person during the POR.  <u>See</u> Univ. Supp. A, at Supp A-6 to Supp A-9 and Exhibit SA-9, CR 107, 117, PR 137; Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibits SAD-4, CR 180, PR 172.  In this case, the average volume of merchandise sold by each Universal Affiliated Reseller DSL salesperson was *less than one-tenth* that of the Universal Producer salespersons, thus providing ample quantitative support for the higher levels of intensity of sales support services provided by the Universal Affiliated Resellers.  Commerce failed to address these differences in its <u>Final Results</u>.

The actual selling expenses presented to Commerce also provide support for the different reported selling activity intensities for the different channels of distribution and for the existence of two different home market levels of trade.  While Universal Affiliated Reseller DSL did not have a separate budget for each particular selling activity performed during the POR, the significant expenses incurred for all selling functions performed by Universal Affiliated Reseller DSL are evident and observable when the total indirect selling expenses of the company are considered.  For example, as shown in the quantitative analysis chart above, the Universal Producers reported an average total indirect selling expense ratio of [        ], whereas Universal Affiliated Reseller DSL's total indirect selling expense ratio was [        ], <u>i.e.</u>, more than 20

times higher, resulting in significantly higher reported indirect selling expenses.  Specifically,

while the Universal Producers reported total average indirect selling expenses of only [      ]

AED/MT, Universal Affiliated Reseller DSL reported total average indirect selling expenses of

[      ] AED/MT, reflecting its significant additional selling activities and the higher frequency

and intensity thereof.  Id.  In Alloy Piping Products, Inc. v. United States, 33 C.I.T. 349, 357

(2009), the Court confirmed that Commerce may "analyze expenses to measure the frequency of

various selling activities, and consider this frequency with other information in assigning the

level of intensity to the activity."  In this case, Universal fully explored and explained how the

indirect selling expenses varied by the different levels of trade.  But in the Final Results,

Commerce did not address any of the quantitative differences that Universal provided with

respect to sales support services at the different marketing stages.

Logistical Services:  Unlike the Universal Producers (which generally produced to order),

Universal Affiliated Reseller DSL held significant volumes of merchandise for ready sale, and

also held merchandise for its customers that did not have the ability to warehouse themselves.

As shown in the chart above, Universal Affiliated Reseller DSL's finished goods storage area

was [                     ], thus constituting an area more than [              ] than the

*combined* finished goods storage are of the three Universal Producers.  An alternate way to

consider this selling function is that Universal Affiliated Reseller DSL's finished goods storage

area per MT of merchandise under consideration sold during the POR was [         ] greater

than the Universal Producers (i.e., [

]).  See Univ. Supp. A, at Supp A-6 to Supp A-9 and Exhibit SA-9, CR 107, 117, PR 137;

Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibits SAD-4, CR 180, PR 172.  Maintaining

a much larger warehouse with a higher volume of finished merchandise is evidence of a much

**Plaintiffs' Rule 56.2 Memorandum**
**Consol. Court No. 20-03944**

*Public Version*

higher level of warehousing and inventory maintenance services. Moreover, as shown in the chart above, the total average inventory turnover days during the POR for the Universal Affiliated Reseller DSL was [     ] days. This is almost [     ] longer than the [     ] days inventory turnover days for the Universal Producers. The resulting POR average inventory carrying costs for Universal Affiliated Reseller DSL of [     ] AED/MT were almost 800% of the POR average inventory carrying costs of the Universal Producers of [     ] AED/MT. In addition, as shown in the quantitative analysis chart above, Universal Affiliated Reseller DSL incurred an average of [     ] AED/MT during the POR for its daily warehousing activities, while the Universal Producers reported no warehousing expenses at all. Id.

With respect to freight and delivery functions, Universal reported that Universal Affiliated Reseller DSL maintained a fleet of delivery trucks and forklifts because it had numerous customers that required transportation assistance. These typically were fabricator/end-user customers that did not purchase in large quantities. The higher frequency and intensity of these daily freight activities as performed by Universal Affiliated Reseller DSL again is evidenced by its reported expenses. During the POR, as shown above, the producers arranged delivery of an average of [     ] MTs of subject pipe on each invoice. In contrast, Universal Affiliated Reseller DSL arranged delivery of an average of only [     ] MTs of subject pipe on each invoice. See Univ. Supp. A, at Supp A-6 to Supp A-9 and Exhibit SA-9, CR 107, 117, PR 137; Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibits SAD-4, CR 180, PR 172. This means that – for the Universal Affiliated Resellers – significantly more deliveries and delivery arrangements needed to be made for each metric ton of merchandise sold. In Alloy Piping Products, Inc. v. United States, 33 C.I.T. 349, 358 (2009), the Court agreed that the respondent "likely exerted more of an intense effort" for "home market customers who purchase in smaller

**Plaintiffs' Rule 56.2 Memorandum**
**Consol. Court No. 20-03944**

*Public Version*

volumes ... and require more individual contact." In this case, the higher intensity of freight and

delivery functions shown for the Universal Affiliated Reseller DSL in the selling functions chart

above (a level of "10" for delivery arrangement and a level of "9" for company deliveries) was

reflected in the movement expenses reported in the home market sales listing.   See, e.g., Univ.

Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibit SAD-2, CR 180, PR 172.  The quantitative

data that Universal presented to Commerce showed that the Universal Producers reported total

average freight costs of [       ] AED/MT for shipments to customers.  In contrast, Universal

Affiliated Reseller DSL reported total average freight costs of [       ] AED/MT (i.e., [       ]

times higher) for shipments to customers.  See Univ. Supp. A, at Supp A-6 to Supp A-9 and

Exhibit SA-9, CR 107, 117, PR 137; Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibits

SAD-4, CR 180, PR 172.  Together with the warehousing area, warehousing expenses, and

inventory turnover data, the shipment quantity calculations, and delivery cost analyses provide

substantial quantitative support for the higher intensity levels of logistical services provided by

the Universal Affiliated Resellers for the Channel 2 sales.  But in the Final Results, Commerce

again did not address any of the quantitative analyses that Universal provided with respect to

these services.

Sales-Related Administrative Activities:  During the POR, the three Universal Producers,

on average, issued [       ] invoices a day *combined* to customers for sales of the merchandise

under consideration.  In contrast, Universal Affiliated Reseller DSL, on average, *itself* issued

[   ] times as many invoices each day during the POR (i.e., [       ] separate invoices a day) to

customers for sales of merchandise under consideration, thus establishing a far higher level of

intensity for such selling activities.  See Univ. Supp. A, at Supp A-6 to Supp A-9 and Exhibit

SA-9, CR 107, 117, PR 137; Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibits SAD-4,

CR 180, PR 172. That Universal Affiliated Reseller DSL engaged in a higher level of sales and

marketing activities with respect to individual sales also is manifested in the quantities and

products sold on each invoice. The Universal Producers generally sold a higher volume of

merchandise under consideration on each invoice and a greater diversity of products on each

invoice. During the POR, as shown in the quantitative analysis chart above, the producers sold

an average of [      ] MTs of MUC and [      ] different line items of merchandise under

consideration on each invoice. In contrast, Universal Affiliated Reseller DSL sold on average

only [      ] MTs of merchandise under consideration and [      ] different line items of subject

pipe on each invoice. See Univ. Supp. A, at Supp A-6 to Supp A-9 and Exhibit SA-9, CR 107,

117, PR 137; Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibits SAD-4, CR 180, PR

172. This means that a substantially higher intensity of additional selling functions needed to be

undertaken by Universal Affiliated Reseller DSL for each metric ton and each product sold.

Specifically, as shown in the quantitative analysis chart above, Universal Affiliated Reseller DSL

issued [      ] invoices for each *metric ton* sold (in comparison to the [      ] invoices per metric

ton for the Universal Producers); and issued [      ] invoices for each *line item* sold (in

comparison to the [      ] invoices per line item for the producers). Id. The substantial

discrepancy in the sale-specific line items and sale-specific tonnage between the Universal

Producers and Universal Affiliated Reseller DSL reflects the significantly greater intensity of

selling activity efforts by the Universal Affiliated Resellers.

Furthermore, the number of sales with commissions also illustrates the difference in the

level and frequency of commission activities between the Universal Producers and the Universal

Affiliated Resellers in their respective channels of distribution. As shown above, the Universal

Producers *combined* had [      ] invoices on which commissions were paid during the POR out of a

Plaintiffs' Rule 56.2 Memorandum
Consol. Court No. 20-03944

*Public Version*

total of [      ] invoices and 1,740 collective POR days, resulting in commissions paid on [      ]

of all sales (and on approximately one sale every [      ] days). In contrast, Universal Affiliated

Reseller DSL issued [      ] invoices on which commissions were paid during the POR out of a

total of [      ] invoices and 427 collective POR days, resulting in a commission-per-invoice

ratio that was almost three times higher than that of the Universal Producers (i.e., commissions

were paid on [      ] of all sales, or on approximately one sale every [      ] days). See Univ.

Supp. A, at Supp A-6 to Supp A-9 and Exhibit SA-9, CR 107, 117, PR 137; Univ. Supp. AD, at

SuppAD-4 to SuppAD-8 and Exhibits SAD-4, CR 180, PR 172. These quantitative data show

that significantly more sales by the resellers involved commission activities and working with

commission agents than the producers, thus providing important additional support for the higher

levels of intensity of sales-related administrative activities performed by the Universal Affiliated

Resellers. In the Final Results, Commerce did not address any of the quantitative analyses that

Universal provided with respect to these sales-related administrative services.

    Finally, Universal also presented Commerce with critical quantitative information

establishing that the expenses assigned to home market sales made at different levels of trade

impacted price comparability. Specifically, in its original response to Commerce's antidumping

duty questionnaire, Universal created a detailed worksheet that compared the average prices of

all home market sales made by the Universal Producers and the Universal Affiliated Resellers

through Channels 1 and 2 during the POR (including window period sales) on a CONNUM-

specific basis. The analysis demonstrated that the prices charged by Universal for the foreign

like product in the home market varied depending on the marketing stage through which the

merchandise was sold (i.e., whether the sales were made by the Universal Producers through

Channel 1 or by the Universal Affiliated Resellers through Channel 2). Specifically, the sales by

**Plaintiffs' Rule 56.2 Memorandum**
**Consol. Court No. 20-03944**

*Public Version*

the Universal Affiliated Resellers (net of discounts) overall had an [      ] higher selling price,

closely approximately the difference between the total indirect selling expense ratios applicable

to the sales in the different channels of distribution. <u>See</u> Univ. Sec. A, at A-18 to A-25, Exhibit

A-4, CR 14, PR 56. Universal's quantitative price comparison analysis thus demonstrated (1)

that Universal's prices to its home market customers through Channels 1 and 2 reflected the

lower and higher levels of selling activities performed by the Universal Producers and the

Universal Affiliated Resellers, respectively; and (2) that the expenses assigned to the sales at the

different levels of trade impacted price comparability. Universal resubmitted this same analysis

in a supplemental questionnaire response (wherein the average price premium charged by the

Universal Affiliated Resellers decreased slightly to [      ]), and also included the analysis in

its case brief. <u>See</u> Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibit SAD-4, CR 180, PR

172; Universal's Case Brief (April 20, 2020) at 22, Exhibit 2, CR 207, PR 196.

But Commerce never addressed Universal's price comparability analysis in its <u>Final</u>

<u>Results</u>, and does not appear ever to have considered it at all. Rather, in the <u>Final Results</u>,

Commerce concluded merely that Universal's "descriptions of the selling functions and the

claimed levels of intensity {in the selling functions chart} are effectively qualitative in nature."

IDM at 17, PR 223. In focusing solely on Universal's "selling functions chart," Commerce

disregarded and ignored in their entirety the dozens of numerical comparisons, mathematical

examinations, statistical assessments, and AED expenses-per MT calculations (many referenced

above) that formed a complete quantitative analysis of the home market sales made by the

Universal Producers and the Universal Affiliated Resellers at the different levels of trade. In this

case, the considerable quantitative evaluations presented by Universal stand in stark contrast to

Commerce's relatively limited observations. It is impossible to square Commerce's conclusion

that Universal did not provide a quantitative analysis of its selling expenses and selling activities

(and that Universal's analysis was "effectively qualitative in nature") with the wealth of

mathematical and comparative data available on the administrative record.  IDM at 17, PR 223.

The evidence referenced by Commerce does not support the factual assertions that Commerce

made, and the record of the investigation in its entirety – including the complete quantitative

analyses presented by Universal – demonstrates that Commerce erred in concluding that that

there was only a single LOT in the home market.

## VI.    **RELIEF REQUESTED**

For the reasons set forth above, Plaintiffs respectfully request that this Court:  (1)

determine that Commerce's final results of review of the antidumping duty order on Circular

Welded Carbon-Quality Steel Pipe from the UAE were unsupported by substantial evidence on

the record and were otherwise not in accordance with law; (2) remand this case to Commerce

with instructions to revise the Final Results consistent with the findings of the Court; and (3)

provide such other or additional relief as this Court may deem just and proper.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jonathan M. Freed

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
Tel.:  (202) 223-3760

*Counsel to Plaintiffs Universal Tube and Plastic
Industries, Ltd., THL Tube and Pipe Industries
LLC, and KHK Scaffolding and Framework LLC*

Dated:  May 10, 2021

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC,<br><br>          Plaintiffs,<br><br>    v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>    and<br><br>WHEATLAND TUBE COMPANY,<br><br>          Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Court No. 20-03944<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

      The undersigned counsel at Trade Pacific PLLC hereby certifies that the accompanying Memorandum of Law in Support of Plaintiffs' Rule 56.2 Motion for Judgment upon the Agency Record, dated May 10, 2021, complies with the 14,000 word-count limitation described in part 2(B)(1) of the Court's Chambers Procedures. The memorandum of law contains 10,021 words according to the word-count function of the word-processing software used to prepare the memorandum, excluding the table of contents, table of authorities, and counsel's signature block.

                      Respectfully submitted,

                      /s/ Robert G. Gosselink
                      Robert G. Gosselink
                      Jonathan M. Freed
                      TRADE PACIFIC PLLC
                      700 Pennsylvania Avenue, SE, Suite 500
                      Washington, D.C. 20003
                      Tel.: (202) 223-3760

Dated: May 10, 2021              *Counsel to Plaintiffs Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Framework LLC*