## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, | ) ) ) ) ) |
| **Plaintiffs,** | ) ) |
| v. | ) ) |
| UNITED STATES, | ) **Court No. 20-03944** ) **Hon. Timothy C. Stanceu, Judge** ) |
| **Defendant,** | ) ) |
| And | ) ) |
| WHEATLAND TUBE COMPANY, | ) ) |
| **Defendant-Intervenor.** | ) ) ) |

## PROPOSED ORDER

Upon consideration of the USCIT Rule 56.2 Motion for Judgment on the Agency Record filed by Plaintiffs Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC., and KHK Scaffolding and Framework LLC, the response thereto filed by Defendant-Intervenor Wheatland Tube Company, and all other papers and proceedings herein, it is hereby:

ORDERED that Plaintiffs' Motion for Judgment on the Agency Record is DENIED; and it is further

ORDERED that Plaintiffs' Complaint is DISMISSED.

SO  ORDERED.

_____
The Honorable Judge Timothy C. Stanceu
United States Court of International Trade

Dated: _____, 2021
New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, | ) ) ) ) ) |
| **Plaintiffs,** | ) ) |
| v. | ) ) Court No. 20-03944 |
| UNITED STATES, | ) Hon. Timothy C. Stanceu, Judge ) |
| **Defendant,** | ) ) |
| And | ) ) |
| WHEATLAND TUBE COMPANY, | ) ) |
| **Defendant-Intervenor.** | ) ) |

### RESPONSE IN OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF DEFENDANT-INTERVENOR WHEATLAND TUBE COMPANY

Roger B. Schagrin
Christopher T. Cloutier
Michelle R. Avrutin
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, D.C.  20001

*Counsel for Defendant-Intervenor*
*Wheatland Tube Company*

July 9, 2021

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

   1.   ADMINISTRATIVE DETERMINATION TO BE REVIEWED ............................ 2

   2.   ISSUE PRESENTED ........................................................................................ 2

STANDARD OF REVIEW ................................................................................... 2

STATEMENT OF FACTS ...................................................................................... 3

SUMMARY OF THE ARGUMENT ....................................................................... 7

ARGUMENT ....................................................................................................... 8

   I.  COMMERCE PROPERLY DETERMINED THAT THERE WAS A SINGLE
       LEVEL OF TRADE ........................................................................................ 8

CONCLUSION .................................................................................................. 16

# TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 CIT 533, 556 (2009) ............. 12, 16, 17

*Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1366 (CIT 2009) ...................... 5

*Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) ................................................................................ 6

*Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).......... 6

*Clearon Corp. v. United States*, 800 F. Supp. 2d 1355, 1363 (CIT 2011) .................................. 16

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) ........................................................ 5, 16

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)............................................................ 5

*Corus Eng'g Steels, Ltd. v. United States*, 27 CIT 1286, 1290 (2003) ........................................ 12

*Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1359 (Ct. Int'l Trade 2018)........ 13

*Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020).................................... 13

*Dong-A Steel Co. v. United States*, 475 F. Supp. 3d 1317, 1349 (Ct. Int'l Trade 2020).............. 12

*Hyundai Steel Co. v. United States*, 365 F. Supp. 3d 1294, 1301 (Ct. Int'l Trade 2019).............. 17

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)................. 5, 16

*Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001)............. 6

*QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ...................................... 16

*Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998).......................................... 6

*United States Steel Corp. v. United States*, 179 F. Supp. 3d 1114, 1143 (Ct. Int'l Trade 2016) .. 18

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) (2006) ........................................................................................... 5

**Federal Register Notices and Publications**

*Certain Cold-Rolled Steel Flat Products from the United Kingdom: Final Results of the Antidumping Duty Administrative Review; 2017-2018*, 84 Fed. Reg. 59,771 (Nov. 6, 2019) ................................................................................................................................. 12, 18

*Certain Cold-Rolled Steel Flat Products from the United Kingdom: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 Fed. Reg. 34,868 (July 19, 2019). 12

*Certain Frozen Warmwater Shrimp from Thailand*, 72 Fed. Reg. 52,065 (Sept. 12, 2007) ........ 14

*Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Affirmative Preliminary Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 36,881(Int'l Trade Admin. June 8, 2016) ................................................................................................................ 7

*Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 75,030 (Int'l Trade Admin. Oct. 28, 2016)................................................................................................................... 8

*Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 77,159 (Int'l Trade Admin. Dec. 1, 2020) ........................................................................................... 6

*Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 7,279 (Int'l Trade Admin. Feb. 7, 2020) ....................................................................................... 10

*Emulsion Styrene-Butadiene Rubber from Brazil: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 38,847 (June 29, 2020)............................... 13

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 9,297 (Int'l Trade Admin. Mar. 14, 2019) ....................................................................... 7

*Magnesium from Israel: Final Affirmative Determination of Sales at Less Than Fair Value*¸ 84 Fed. Reg. 65,781 (Nov. 29, 2019) ...................................................................... 12

*Magnesium from Israel: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*¸ 84 Fed. Reg. 32,712 (July 9, 2019) ............................................................................. 12

**Regulations**

19 C.F.R. § 351.401(b)(1)............................................................................................ 12

**UNITED STATES COURT OF INTERNATIONAL TRADE**

_____

|  |  |
|---|---|
| **UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC** | ) ) ) ) ) |
|  | ) |
| **Plaintiffs,** | ) |
| **v.** | ) |
|  | ) **Court No. 20-03944** |
| **UNITED STATES,** | ) **Hon. Timothy C. Stanceu, Judge** |
|  | ) |
| **Defendant,** | ) |
|  | ) |
| **And** | ) |
|  | ) |
| **WHEATLAND TUBE COMPANY,** | ) |
|  | ) |
| **Defendant-Intervenor.** | ) |

_____

**MEMORANDUM OF DEFENDANT-INTERVENOR WHEATLAND TUBE COMPANY IN RESPONSE TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant-Intervenor Wheatland Tube Company ("Wheatland") hereby submits its Response to the USCIT Rule 56.2 Motion for Judgement on the Agency Record filed by Plaintiffs Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Framework LLC's (collectively "Universal") challenging the final results of the administrative review of the antidumping duty ("AD") order on circular welded carbon-quality steel pipe ("CWP") from the United Arab Emirates ("UAE") issued by the U.S. Department of Commerce ("Commerce" or the "Department"). Memorandum in Support of the Rule 56.2 Motion of Plaintiffs (May 10, 2021) ("Universal Br.").

## STATEMENT PURSUANT TO RULE 56.2

### 1.  ADMINISTRATIVE DETERMINATION TO BE REVIEWED

The administrative determination at issue is Commerce's final results of the administrative review of the AD order on CWP from UAE. *Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 77,159 (Int'l Trade Admin. Dec. 1, 2020) ("*Final Determination*"), PR 224, and accompanying unpublished Issues and Decision Memorandum (Int'l Trade Admin. Nov. 23, 2020) ("DM"), PR 223.

### 2.  ISSUE PRESENTED

Whether Commerce properly denied Universal's request for a level of trade ("LOT") adjustment when the respondent did not carry its evidentiary burden of showing its entitlement to such an adjustment and the agency acted in accordance with applicable precedent?

## STANDARD OF REVIEW

Final determinations in AD investigations may be held unlawful only if "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2006). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1366 (CIT 2009) ("The administrative record for an {AD} administrative review may support two or more reasonable, though inconsistent, determinations on a given issue").

2

In determining whether Commerce's interpretation and application of the AD statute is in accordance with law, the Court applies the two-step analysis articulated in *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984); *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001). Under *Chevron*, the Court "must first carefully investigate the matter to determine whether Congress's purpose and intent on the question at issue is judicially ascertainable," examining the statute's text and applying traditional tools of statutory construction. *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881 (Fed. Cir. 1998). Only if Congress's intent is not apparent or is ambiguous will the Court evaluate whether the agency's interpretation is a "reasonable means of effectuating the statutory purpose." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).

## STATEMENT OF FACTS

On March 14, 2019, Commerce initiated the second administrative review of the AD order on CWP from the UAE covering the period December 1, 2017 through November 30, 2018. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 9,297 (Int'l Trade Admin. Mar. 14, 2019) ("Initiation Notice"). Commerce previously determined in the original AD investigation that certain Universal affiliates constituted a single legal entity. *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Affirmative Preliminary Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 36,881 (Int'l Trade Admin. June 8, 2016), unchanged in *Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Determination of Sales at Less Than Fair Value*, 81 Fed. Reg. 75,030 (Int'l Trade Admin. Oct. 28, 2016).

Commerce issued its initial questionnaire on April 16, 2019. *See* Commerce's Letter "Antidumping Duty Questionnaire," Apr. 16, 2019 ("*Initial AD Questionnaire*"), PR 38. In that questionnaire, Commerce directed Universal to:

> Provide a quantitative analysis showing how the expenses assigned to POI/POR sales made at different claimed levels of trade impact price comparability. Your analysis should not include direct expenses reported to Commerce in your comparison market and U.S. market sales database. For example, if you arranged freight services for sales of subject merchandise, you may consider in that analysis the expenses incurred for arranging freight services in your level of trade analysis, but should not consider the per-unit inland freight expenses reported to Commerce in your sales database. Do not include selling activities performed by affiliated parties located in the United States in your analysis.

*Id.* at A-8; DM at 16.

In the Section A Questionnaire, Commerce also asked Universal to provide the following information in regard to its selling activities:

> i)    List the specific activities performed for that sales activity category.
> ii)   Provide documentation demonstrating that they performed each of these activities during the POI/POR and to explain how the documentation supports the claim, and how the reported activity is relevant to the LOT analysis.
> iii)  Indicate how often they performed each of the specific activities during the POR.
> iv)   Provide a *quantitative* analysis showing how the expenses assigned to POI/POR sales made at different claimed levels impact price comparability.
> v)    Demonstrate how indirect selling expenses vary by different levels of trade claimed.
> vi)   Explain how the quantitative analysis provided in response to the requests for information support the claimed levels of intensity for the selling activities reporting in the selling functions chart.
> vii)  Submit annual historical expense data reflecting the average expenses incurred during a three-year period prior to the beginning of the POI/POR for Commerce's consideration, if they did not incur an expense for a selling activity during the POR that they normally would have incurred.

*See* Response of Universal to the Department's Section A Questionnaire, Case No. A-520-807 (May 22, 2019) ("*Universal AQR*") at A-16 – A-17, PR 56.

4

Universal responded to different portions of the original questionnaire in May and June of 2019. PR 56-62, PR 73-75. In its Section A response, Universal provided at Exhibit A-4 a flowchart and description of each company's channels of distribution in the U.S. and domestic markets. Universal AQR at A-17, PR 56. Universal stated that in its domestic market, the collapsed producers sell directly to unrelated customers who are manufacturers, fabricators, distributors, or contractors (Channel 1 home market sales), and also to related distributors who re-sell the merchandise to manufacturers, end-users, fabricators, or retailers and to some other distributors (Channel 2 home market sales). Universal AQR at A-17 ("Universal AQR"), PR 56.

Universal attempted to distinguish the two channels by assigning codes for different levels of activity (*i.e.* 1 – low; 5 – average; 9 – high). Universal AQR at A-18, Exhibit A-5, PR 56. In doing so, Universal observed that "the pipe producers (UTP, KHK, and THP) and affiliated resellers perform many of the same selling activities." *Id*. Universal nonetheless maintained that the affiliated resellers undertake a higher degree of selling functions with more frequency and performed additional sales functions. *Id.* Universal also provided an exhibit purporting to show how expenses at different claimed LOTs in the home market affected price comparability. Universal AQR at A-22 and Exhibit A-6, PR 56. Universal did not provide the quantitative analysis that Commerce had instructed it must provide to support its claim that different LOTs exist in the home market.

Unsatisfied, Commerce gave Universal *a second opportunity* to provide quantitative evidence in a supplemental questionnaire. *See* Response of Universal to Department's Sections A and B Supplemental Questionnaire Response, Case No. A-520-807 (Dec. 11, 2019) ("Universal SABQR"), at A-4, PR 137. In particular, Commerce asked the following questions to gather quantitative evidence regarding the claimed LOTs:

5) In our initial questionnaire, we requested that you to provide documentation demonstrating you performed each reported selling function during the POR. You appear to have done so only for the DSS branch of DSL. Does each branch perform the same or similar selling functions? If not, revise Exhibit A-5 to treat each branch that performs different selling functions as a separate channel.

6) In our initial questionnaire, we asked you to indicate how often you performed each of the specific activities. Provide a key indicating for your selling function chart in Exhibit A-5 demonstrating how often (i,e, daily, weekly, monthly) employees performed these activities, the duration of the activities performed during the POR, the budget for the activities in the POR, and any other information necessary to support your claim of intensity and frequency of each selling function. Provide support for the frequency with which Universal producers and DSL (or its branches, as noted in the preceding question) perform each activity.

*See* Universal SABQR at Supp A-4 – Supp A-5, PR 137.

In response to supplemental question 5, Universal provided Exhibits A-21 and A-22 showing the claimed selling activities of the affiliated resellers. *Id.* In response to supplemental question 6, Universal revised its selling functions chart in Exhibit SA-9 to include, *inter alia*, the purported frequency of selling activities performed by the relevant sales staff for each company and for each channel of trade. *Id.* at Supp A-5. Universal's response still lacked the required quantitative analysis requested by Commerce.

Commerce issued its preliminary results on January 31, 2020. *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 7,279 (Int'l Trade Admin. Feb. 7, 2020) ("*Preliminary Results*"), PR 171, and accompanying unpublished Decision Memorandum for the Preliminary Results (Jan. 31, 2020) ("*Preliminary Decision Memorandum*"), PR 160. In the *Preliminary Results* Commerce determined that the differences Universal reported for its two channels of distribution "were not quantitatively sufficient to warrant finding different LOTs in the same home market." *Preliminary Decision Memorandum* at 28, PR 160.

6

Following the preliminary determination, Commerce provided Universal *a third opportunity* to submit additional quantitative evidence through another supplemental questionnaire. *See* Universal's Supplemental to Sections A and D Response, (Feb. 18, 2020) ("Universal SADQR2"), PR 157. In that questionnaire, Commerce asked Universal again to provide "documentary support for the claimed levels of intensity and frequency of each selling function." Universal SADQR2 at SuppAD-2, PR 157. In its response, Universal provided a variety of new exhibits including purported examples of its sales activities. Universal SADQR2 at SuppAD-2 – SuppAD-3, PR 157.

Commerce also in the supplemental questionnaire instructed Universal to revise its charts to include quantitative analyses of its affiliates' selling functions and to provide a chart quantitively comparing several factors for each selling group. *See id.* at SuppAD-3 – SuppAD4. Universal updated the chart and attached Exhibit SAD-4, and provided additional exhibits with anecdotal examples of selling activities. *Id.* On December 1, 2020, Commerce affirmed its preliminary decision that Universal's home market sales were all made within the same LOT, explaining that Universal had not sufficiently demonstrated its entitlement to the adjustment. *Final Determination*, PR 224.

## SUMMARY OF THE ARGUMENT

Commerce properly determined that Universal's sales were made at one LOT, as the respondent did not carry its burden of demonstrating that its home market sales were at a more advanced LOT. Commerce provided Universal with three opportunities to present quantitative evidence to justify its requested LOT adjustment, but Universal was unable to do so – instead submitting volumes of anecdotal information. Upon review of all the information provided,

Commerce correctly noted that the differences in the level of activities performed in Universal's claimed channels of distribution were not sufficiently different to warrant a LOT adjustment.

## ARGUMENT

**I.   COMMERCE PROPERLY DETERMINED THAT THERE WAS A SINGLE LEVEL OF TRADE**

### A.  The Legal Standard Of Review

With regard to LOT adjustments, pursuant to its regulations Commerce

will determine that sales are made at a different level of trade if they are made at different marketing stages (or their equivalent). Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing.

19 C.F.R. § 351.412(c)(2) (emphases added). In 2018, Commerce implemented new requirements for quantitative support to support claimed LOT adjustments to "enhance Commerce's ability to determine whether reported differences in selling functions are substantial enough to warrant a finding that sales were made at different LOTs." DM at 16; *see also Magnesium from Israel: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*¸ 84 Fed. Reg. 32,712 (July 9, 2019), and accompanying Issues and Decision Memorandum at 13, unchanged in *Magnesium from Israel: Final Affirmative Determination of Sales at Less Than Fair Value*¸ 84 Fed. Reg. 65,781 (Nov. 29, 2019); *Certain Cold-Rolled Steel Flat Products from the United Kingdom: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 84 Fed. Reg. 34,868 (July 19, 2019), and accompanying Issues and Decision Memorandum at 10, unchanged in *Certain Cold-Rolled Steel Flat Products from the United Kingdom: Final Results of the Antidumping Duty Administrative Review; 2017-2018*, 84 Fed. Reg. 59,771 (Nov. 6, 2019). The new requirements were utlized in *ESB Rubber from Brazil,* where Commerce declined to find different LOTs "when the record lacked sufficient quantitative

evidence corroborating a respondent's LOT claims." DM at 17 *citing Emulsion Styrene-*

*Butadiene Rubber from Brazil: Final Results of Antidumping Duty Administrative Review; 2017-*

*2018*, 85 Fed. Reg. 38,847 (June 29, 2020) (ESB Rubber from Brazil and accompanying Issues

and Decision Memorandum at Comment 1).

 The burden of establishing a desired adjustment falls squarely on the respondent. As this

Court has explained:

> <u>it is the responsibility of the respondent requesting the CEP offset to procure and</u>
> <u>present the relevant evidence to Commerce</u>. *19 C.F.R. § 351.401(b)(1)* "The
> interested party in possession of the relevant information must establish the
> amount and the nature of a desired judgment."; *see also Antidumping Duties;*
> *Countervailing Duties, 62 Fed. Reg. 27,296, 27,370 (May 19, 1997) Antidumping*
> *Duties: Final Rule* ("all adjustments, including LOT adjustments, must be
> demonstrated to the satisfaction of the Secretary."); *Corus Eng'g Steels, Ltd. v.*
> *United States, 27 CIT 1286, 1290 (2003)* ("{B}urden of proof is upon the claimant
> to prove entitlement {to a CEP offset}.")

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 33 CIT 533, 556 (2009) (emphasis added).

Further, Commerce is entitled to draw its own conclusions over what constitutes a sufficiently

"significant" difference in LOTs so as to merit something like a CEP offset. *See Dong-A Steel*

*Co. v. United States*, 475 F. Supp. 3d 1317, 1347 (Ct. Int'l Trade 2020).

 Commerce has wide discretion to deny a claim for a LOT adjustment when record

evidence does not demonstrate that differences in selling activities sufficiently impacted pricing

between the purported LOTs. For example, in *Ad Hoc Shrimp*, this Court affirmed Commerce's

denial of a CEP offset because the respondent "did not meet its burden of presenting sufficient

evidence to support its request." *Id*. at 556, 558. The respondent had argued that additional

selling activities in its home market constituted a more advanced LOT than for its sales on the

U.S. side, but Commerce evaluated the proffered evidence and found that "such differences were

not material selling function distinctions which were significant enough to warrant a separate

LOT." *Certain Frozen Warmwater Shrimp from Thailand*, 72 Fed. Reg. 52,065 (Sept. 12, 2007) (final results), and accompanying Issues and Decision Memorandum ("*Shrimp from Thailand AR1 IDM*"), at 50, 52 ("these selling activities, either individually or in the aggregate, are not significant enough"). The plaintiff appealed, claiming insufficient agency consideration of selling activity intensity levels, but this Court disagreed:

> Thai I-Mei relies on a chart comparing its selling activities to those of Pakfood and Good Luck. . . . The chart itself does not adequately convey the different level of trade that is required for a CEP offset because it does not describe the differences in sales activities with any particularity. Accordingly, Thai I-Mei has not met its burden of proof to qualify for a CEP offset.

*Ad Hoc Shrimp Trade*, 33 CIT at 556 (emphasis added).[1]

In *Dillinger France S.A. v. United States*, the Court upheld Commerce's denial of a LOT adjustment as supported by substantial evidence. *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1359 (Ct. Int'l Trade 2018). In the underlying case, the respondent had reported that its factories and affiliated service centers performed three distinct selling activities, and argued that these differences were enough to constitute distinct LOTs. *Id*. The Court, however, found that Commerce "reasonably concluded that the sales activities of the affiliated service centers did not differ substantially enough to merit a separate level of trade." On further appeal, the Federal Circuit affirmed Commerce's denial of a LOT adjustment. *See Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020).

---

[1]     The plaintiff requesting a CEP offset in *Ad Hoc Shrimp* had its constructed value expenses based on the experience of the other respondents. *See Shrimp from Thailand* AR1 IDM (cmt. 13).

**B.  Commerce Properly Determined That Universal's Home Market Sales Were Made At A Single Level of Trade**

Commerce gave Universal three opportunities to submit sufficient quantitative evidence to demonstrate its entitlement to a LOT adjustment. The burden was on Universal to submit adequate evidence, but it failed to do so.

In the initial questionnaire, Commerce directed the company to:

> Provide a quantitative analysis showing how the expenses assigned to POI/POR sales made at different claimed levels of trade impact price comparability. Your analysis should not include direct expenses reported to Commerce in your comparison market and U.S. market sales database. For example, if you arranged freight services for sales of subject merchandise, you may consider in that analysis the expenses incurred for arranging freight services in your level of trade analysis, but should not consider the per-unit inland freight expenses reported to Commerce in your sales database. Do not include selling activities performed by affiliated parties located in the United States in your analysis.

*Initial AD Questionnaire* at A-8, PR 38; DM at 16. In addition, Commerce instructed Universal to provide documentation supporting selling activities during the POR and a quantitative analysis showing how the expenses assigned impacted price comparability, among other things. *See* Universal AQR at A-16 – A-17, PR 56.

Plaintiff directs the Court's attention to pages 18 through 25 and Exhibits 5 and 6 of its Section A response. PR 56. Exhibit 5 contains a list of selling functions. *Id*. Although Universal claimed that Exhibit A-6 contained "quantitative" information supporting the requested adjustment to prices, Commerce found that the information did not include data from all of the relevant entities. *See* Universal SABQR at A-4, PR 137. Furthermore, the additional exhibits that Universal provided were also inadequate. For example, in Exhibit A-5, Universal attempted to distinguish between the two channels by assigning codes for different levels of selling activity. Universal AQR at A-18, Exhibit A-5, PR 56. However, this assignment of codes is subjective

and not the type of quantitative analysis requested from Commerce so that it can analyze whether differences in sales activities have an impact on the sales prices in different LOTs.

Commerce offered the company a second opportunity to provide additional information to justify an adjustment in the supplemental questionnaire. In response Universal provided new exhibits SA-7 through SA-9, but these exhibits did not include quantitative data for all of the entities at issue. Although voluminous, Exhibits SA-7 and SA-8 contained only anecdotal information in support of the requested adjustment, and Exhibit SA-9 contained only unsupported assertions regarding the frequency with which various entities purported to undertake certain actions.

Commerce then offered a *third* opportunity to Universal to provide this information in another supplemental questionnaire. *See* Universal SADQR at AD-3—AD-4, PR 172. In its response, Universal mostly provided emails and examples of customer outreach rather than any actual quantitative data. Universal SADQR2 at SuppAD-2 – SuppAD-3, PR 157.

Despite the three opportunities, Commerce ultimately found the information provided by Universal to be insufficient, noting, for example, that Universal "merely stated" that it annually advertises in the yellow pages and gives gifts to its customers. DM at 18.

In its brief before this Court, Universal responds to Commerce's final determination by stating that 1) only the affiliated resellers reported promotion or advertising for the Universal Producers and 2) Universal claimed to do more than advertising in the yellow pages by also giving larger gifts, designing advertisements, and creating promotional materials. Universal Br. at 14-15. However, as Commerce observed, Universal reported that its producers and affiliated resellers sell to different types of customers which would be expected to result in *slightly*

*different* selling styles. DM at 18. But, this difference in selling styles does not automatically rise to a significantly more intense level which would warrant the requested adjustment. *Id.*

Universal also now claims that it provided "hundreds of pages of supporting materials" and that its record contains "extensive quantitative analyses." Universal Br. at 15 and 24. However, upon inspection, these pages relate primarily to qualitative information and do not contain the information Commerce requires. Universal's argument fails to recognize that "the burden of creating an adequate record ultimately falls upon the Plaintiffs." *Clearon Corp. v. United States*, 800 F. Supp. 2d 1355, 1363 (CIT 2011) (citing *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("the burden of creating an adequate record lies with {interested parties} and not with Commerce."). Instead of providing Commerce with sufficient documentation demonstrating that prices were affected by different levels of selling activities, Universal blames Commerce for not drawing the company's preferred conclusion from information the company did provide.

In sum, Commerce properly found based on the record before it that "Universal failed to provide sufficient supporting documentation for its claims of the level and frequency of selling functions it performed through each channel during the POR." DM at 17. Because Universal failed to meet its evidentiary burden, Commerce's denial of the LOT adjustment is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 229; *Matsushita*, 750 F.2d at 933; *Ad Hoc Shrimp*, 33 CIT at 556; *see* Def. Br. at 24-29. The Court should not accept Universal's invitation to substitute its judgment for that of the agency.

C.  **Applicable Precedent Supports Denying Universal's Request For A LOT Adjustment**

Commerce's denial of Universal's request for a LOT adjustment is consistent with past decisions. As in *Ad Hoc Shrimp*, Universal references its selling activity chart and self-reported intensity levels as justification for its requested adjustment to its actual selling prices. Universal Br. at 17 and 24. As the Court explained in *Ad Hoc Shrimp*, however, a chart does not adequately convey the different levels of trade required for an adjustment because it does not describe the differences in sales activities with any particularity. *Ad Hoc Shrimp Trade*, 33 CIT at 556.

Further, Universal relies on *Certain Cold-Rolled Steel Flat Products from the United Kingdom* to argue that a difference in intensity of selling activities denotes two distinct levels of trade. Universal Br. at 13. However, as part of its argument, Universal provides a chart purporting to show that its producers engaged in lower levels of sales related activities than the affiliated resellers. These circumstances are similar to those in *Hyundai Steel,* where the Court sustained Commerce's remand redetermination that a CEP offset to normal value was not warranted. In that case, the plaintiff had argued that Commerce erred in declining to provide a CEP offset for a purported sales channel because "the record confirms that U.S. Channel 2 is at a less advanced level of trade than the remaining channels." *See Hyundai Steel Co. v. United States*, 365 F. Supp. 3d 1294, 1301 (Ct. Int'l Trade 2019). Plaintiff further asserted that it performed "minimal selling functions" for its Channel 2 U.S. sales because its U.S. affiliate "performed the bulk of these selling functions." *Id.* The Court affirmed Commerce's determination that the differences in the categories were minimal and the difference in level of trade was not substantial. *Id.* at 1302. In the instant case, the Court should similarly find that a difference in selling activities is not enough to warrant a finding of two distinct levels of trade.

14

Universal's reliance on *Certain Cold-Rolled Steel Flat Products from the United Kingdom* and *Stainless Steel Bar from Brazil* is also misplaced. Universal uses these determinations to argue that direct sales and sales through distribution centers represent two different stages in the marketing process. Universal Br. at 10; *see also Certain Cold-Rolled Steel Flat Products from the United Kingdom*, 81 Fed. Reg. 49,929 (Int'l Trade Admin. July 29, 2016); *Stainless Steel Bar from Brazil: Preliminary Results of the Antidumping Duty Administrative Review; 2013-2014*, 79 Fed. Reg. 75,789 (Int'l Trade Admin. Dec. 19, 2014). However, in *United States Steel* the Court noted that the existence of different classes of customers is not sufficient to establish a difference in levels of trade. *See United States Steel Corp. v. United States*, 179 F. Supp. 3d 1114, 1143 (Ct. Int'l Trade 2016). The Court also noted that while titles such as "retailer," "wholesaler," "distributor" etc. *could* describe different levels of trade, they are not sufficient to establish that sales were *actually made* at different levels of trade. *Id.* The Court upheld Commerce's finding that the channels of distribution did not evidence an additional layer of selling activity or function. *Id.* at 1144. Thus, demonstrating that there is an alternate path of distribution through resellers is not sufficient to warrant a LOT adjustment.

Whereas Universal argues that Commerce failed to address the quantitative analyses that the company submitted, Universal BR. 24, even the most basic review of the record reveals that Commerce did examine the proffered evidence – and after doing so offered the company two additional opportunities to provide the quantum of evidence the agency would find sufficient. Even with the additional opportunities, Universal was unable to provide sufficient quantitative evidence, and Commerce's rejection of its claim for a LOT adjustment is therefore justified and should not be disturbed.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Wheatland respectfully requests that this Court deny

Universal's Motion and affirm the *Final Determination* as to Universal's challenges.

Respectfully submitted,

Roger B. Schagrin
Christopher T. Cloutier
Michelle R. Avrutin
**SCHAGRIN ASSOCIATES**
900 7th Street, N.W.
Suite 500
Washington, DC 20001

*Counsel to Defendant-Intervenor*
*Wheatland Tube Company*

Dated:  July 9, 2021

16

**UNITED STATES COURT OF INTERNATIONAL TRADE**

_____

UNIVERSAL TUBE AND PLASTIC )
INDUSTRIES, LTD., THL TUBE AND PIPE )
INDUSTRIES LLC, AND KHK SCAFFOLDING )
AND FRAMEWORK LLC, )
)
                  **Plaintiffs,** )
    **v.** )
) **Court No. 20-03944**
UNITED STATES, ) **Hon. Timothy C. Stanceu, Judge**
)
                 **Defendant,** )
)
    **and** )
)
WHEATLAND TUBE COMPANY, )
)
           **Defendant-Intervenor.** )
_____)

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION

    I, Christopher T. Cloutier, hereby certify that this brief, exclusive of the table of contents, table of authorities, certifications of counsel, and counsel's signature block, but including headings, footnotes, and quotations contains 4,378 words, according to the word count function of the word processing program used to prepare this brief, and therefore complies with the word limitations as set forth in 2(B) of the Standard Chambers Procedures of this Court.

                    /s/ Christopher T. Cloutier

                   Christopher T. Cloutier
                   SCHAGRIN ASSOCIATES
                   900 Seventh Street, N.W.
                   Suite 500
                   Washington, D.C.  20001

                   *Counsel for Defendant-Intervenor*
                   *Wheatland Tube Company*

July 9, 2021