## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) Court No. 20-03944 |
| Defendant, | ) ) |
| and | ) ) |
| WHEATLAND TUBE COMPANY, | ) ) |
| Defendant-Intervenor. | ) ) |

## REPLY BRIEF OF PLAINTIFFS UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC

Submitted by:

Robert G. Gosselink
Jonathan M. Freed

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C.  20003
Tel.:  (202) 223-3760

*Counsel to Plaintiffs Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Framework LLC*

Dated:  August 27, 2021

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

I.     INTRODUCTION ............................................................................... 1

II.    ARGUMENT .................................................................................... 2

       1.     The Level of Trade in the United States Is Irrelevant to This Appeal. ................... 3

       2.     Commerce's Finding of Only a Single Level of Trade in the Home Market Is Not Supported by Substantial Evidence ....................................................... 5

       3.     Administrative Practice Supports a Finding That Universal Submitted Sufficient Evidence to Establish Multiple Levels of Trade in the Home Market .................. 9

III.   CONCLUSION ................................................................................ 15

**TABLE OF AUTHORITIES**

**Judicial Precedent**

Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951) ................................................7

Ad Hoc Shrimp Trade Action Comm. v. United States, 616 F. Supp. 2d 1354 (Ct. Int'l Trade 2009) ................................................................................................................................4

Dorbest v. United States, 30 C.I.T. 1671, 462 F. Supp. 2d 1262 (2006) ........................8

Goldlink Indus. Co. v. United States, 30 C.I.T. 616, 431 F. Supp. 2d. 1323 (2006) .......8

Manchester Tank & Equip. Co. v. United States, 483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) .....8

Pasta Zara SpA v. United States, 703 F. Supp. 2d 1317 (Ct. Int'l Trade 2010) ..............9

U.S. Steel Corp. v. United States, 637 F. Supp. 2d 1199 (Ct. Int'l Trade 2009) .............9


**Administrative Determinations**

Antidumping Duties; Countervailing Duties: Final Rule, 62 Fed. Reg. 27296, 27371 (May 19, 1997) ...............................................................................................................................9

Certain Corrosion-Resistant Steel Products from the Republic of Korea; Preliminary Results of Antidumping Duty Administrative Review; 2019-2020, 86 Fed. Reg. 42784 (August 5, 2021) ..10

Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2018-2019, 86 Fed. Reg. 41015 (July 30, 2021) ..........................10

Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2018-2019, 86 Fed. Reg. 21688 (Int'l Trade Admin. April 23, 2021)................................................................................................................13

Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico: Final Results of Antidumping Duty Administrative Review; 2018-2019, 86 Fed. Reg. 41448 (August 2, 2021) ................................................................................................................................12

Oil Country Tubular Goods From Ukraine: Preliminary Results of Antidumping Duty Administrative Review; 2019-2020, 86 Fed. Reg. 43522 (August 9, 2021) ................................11

**REPLY BRIEF OF PLAINTIFFS UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC**

## I.      INTRODUCTION

Plaintiffs, Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Framework LLC (collectively "Universal"), affiliated producers and exporters of circular welded carbon-quality steel pipe ("CWP") from the United Arab Emirates, submit this reply to the July 16, 2021, response of Defendant, the United States, and the July 9, 2021, response of Defendant-Intervenor, Wheatland Tube Company, both of which respond to the claims raised by Plaintiffs in their Rule 56.2 motion for judgment on the agency record.  See Def.'s Resp. Pls.' Mot. J. Upon Agency R. Public Document, July 16, 2021, ECF No. 28 ("Def. Resp. Br."), Wheatland's Resp. Oppong Pls.' Mot. J. On Agency R. Public Document, July 9, 2021, ECF No. 27 ("Wheatland Resp. Br.").  Plaintiffs' motion for judgment on the agency record contests various aspects of the U.S. Department of Commerce's final results of administrative review of the antidumping duty order on circular welded carbon-quality steel pipe from the United Arab Emirates.  See Pls.' Rule 56.2 Mot. J. Agency R., May 10, 2021, ECF No. 22, Mem. Supp. Mot. Pls. J. Upon Agency R. Confidential Version, May 10, 2021, ECF No. 22 ("Plaintiffs' 56.2 Memorandum"); see also Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2017-2018, 85 Fed. Reg. 77,159 (Int'l Trade Admin. December 1, 2020) ("Final Results"), PR 229, and accompanying Issues and Decision Memorandum (Nov. 23, 2020) ("IDM"), PR 223.

The Court must remand Commerce's determination that (1) Universal's Channel 1 direct sales to unrelated customers in the home market and (2) the Channel 2 indirect sales through affiliated reseller trading companies to unrelated downstream customers all were made at the

same level of trade.  Qualitative and quantitative record evidence amply demonstrates that that the Channel 1 and Channel 2 sales represented different marketing stages, that the Channel 2 sales were more advanced than the Channel 1 sales, and that Universal's home market sales were made at two discrete levels of trade.

In their response briefs, Defendant and Wheatland fail to address the "doubling-up" of selling activities for Channel 2 sales.  Nor do they address the voluminous quantitative differences presented by Universal that establish that the selling activities performed by the affiliated resellers were more numerous and more intense than the selling activities performed by the Universal producers at the less advanced marketing stage.  Nor do Defendant and Wheatland address the fully supported impact that such differences had on price comparability at the different marketing stages during the POR.  Defendant and Wheatland misread the record evidence, ignore vast portions of the administrative record that significantly undermine Commerce's determination, and repeat Commerce's conclusory remarks.  Therefore, the Court must remand the <u>Final Results</u> with instructions to Commerce to find two levels of trade in the home market or to otherwise explain why the substantial qualitative and quantitative information on the record does not support different stages of marketing in the home market.

## II.    ARGUMENT

Commerce's determination that all home market sales were made at the same LOT is unsupported by substantial evidence because substantial qualitative and quantitative information on the record confirm that the Universal Producers and the Universal Affiliated Resellers engaged in significantly different selling activities for sales made through the different channels of trade; that the selling functions performed by the Universal Affiliated Resellers for Channel 2 sales were distinct and more burdensome than the selling functions performed by the Universal

Court No. 20-03944, Plaintiffs' Reply Brief

Producers for Channel 1 sales; and that where there was overlap in the selling activities, the level

of engagement by the Universal Affiliated Resellers was much more frequent, and with a much

higher level of intensity, than that of the Universal Producers.  The response briefs of Defendant

and Wheatland address irrelevant issues, ignore the critical arguments raised by Universal in

Plaintiffs' 56.2 Memorandum, and fail to defend Commerce's single LOT determination.

     **1.  The Level of Trade in the United States Is Irrelevant to This Appeal.**

     Both Defendant and Wheatland spend much of their response briefs addressing

Commerce's findings and the law with respect to the irrelevant issue of the level of trade *in the*

*United States*.  In its statement of the facts, Defendant describes in great detail Commerce's

issuance of "another supplemental questionnaire, requesting further information about

Universal's level of trade claims."  Def. Resp. Br., at 4-5.  For its part, Wheatland argues that

"Commerce provided Universal *a third opportunity* to submit additional quantitative evidence

through another questionnaire."  Wheatland Resp. Br. at 7 (emphasis in original); see also

Wheatland Resp. Br. at 11, 12 ("Commerce gave Universal three opportunities …").  Defendant

and Wheatland do not mention, however, that these supplemental questions relate to requesting

information from Universal's U.S. affiliates, UTP Pipe USA and Prime Metal Corp., regarding

the selling activities and levels of selling activity intensity *in the United States* similar to those

that Universal already had provided for the Universal Producers and the Universal Affiliated

Resellers in the home market.  See Universal's Supplemental Sections A and D Response (Feb.

18, 2020), at SuppAD-1 – SuppAD-5, PR 172, CR 180.  As discussed below, however,

Commerce's decision regarding the LOT of Universal's U.S. sales is not on appeal here.

     Defendant and Wheatland also provide a lengthy review of the legal standard and

precedent for granting a "CEP offset" when normal value is established at a level of trade

Court No. 20-03944, Plaintiffs' Reply Brief

constituting a more advanced stage of distribution but information is insufficient to provide an appropriate level of trade adjustment.  Def. Resp. Br. at 8-9; Wheatland Resp. Br. at 14; see also Def. Resp. Br., at 9-10 and Wheatland Resp. Br. at 9 (both discussing the decision in Ad Hoc Shrimp Trade Action Comm. v. United States, 616 F. Supp. 2d 1354 (Ct. Int'l Trade 2009) to deny a respondent a CEP offset).  But this appeal also does not involve a CEP offset.

In its preliminary results, Commerce concluded that all sales in the United States were made through a single distribution channel and that there was one LOT in the United States. Preliminary Decision Memorandum, at 29, PR 160.  Commerce also concluded that the U.S. LOT was equivalent to the home market LOT of the Universal Producers.  Preliminary Decision Memorandum at 29, PR 160.  Plaintiffs did not contest these determinations before Commerce and are not appealing these determinations now before the Court.  The sole issue contested in this appeal is Commerce's determination that there was only a single level of trade *in the home market*, a decision that is unsupported by substantial evidence.  Whether Universal's U.S. sales were made at a more advanced marketing stage than sales by the Universal Producers in the home market or whether Commerce should have granted a CEP offset are issues that are not germane to this appeal.  It is unclear whether Defendant and Wheatland are trying to add confusion by discussing irrelevant issues or if they themselves do not understand the distinctions among the comparison of U.S. and home market levels of trade, a company's eligibility for a CEP offset, and the comparison of levels of trade solely within the home market.  This appeal involves only the latter.  Defendant's and Wheatland's response comments on everything else should be ignored.

To the degree the Court considers such comments, however, it is instructive that Commerce acknowledged in its Supplemental Sections A and D Questionnaire that Universal

Court No. 20-03944, Plaintiffs' Reply Brief

already had provided substantial *quantitative* information regarding its home market selling

activities.  Specifically, as shown in question "b" in Defendant's response brief, at 4, Commerce

requested Universal to "revise your charts provided in Exhibit A-6 of your May 22, 2019, initial

questionnaire response and Exhibit SA-9B of your December 10, 2019, supplemental

questionnaire response *to include quantitative analysis of your U.S. affiliates' selling functions*."

Because Exhibit A-6 and Exhibit SA-9B contained worksheets illustrating the duration,

frequency, and intensity of the sales activities performed by the Universal producers and the

Universal Affiliated Resellers, and Commerce requested Universal to supplement these

worksheets with similar "quantitative" analyses for Universal's U.S. affiliates, it would be

unreasonable to draw any conclusion other than that Commerce found Universal's Exhibit A-6

and Exhibit SA-9B to contain quantitative analyses of Universal's home market selling activities.

Defendant's and Wheatland's repeated claims in their response briefs that Universal did not

provide quantitative evidence regarding the different marketing stages in the UAE is contradicted

by Commerce's own finding that Universal did.  See Universal's Section A Response (May 22,

2019), at Exhibit A-6, PR 56, CR 14; Universal's Supplemental Sections A and B Response

(Dec. 11, 2019), at Exhibit SA-9B, PR 137, CR 117.

    **2.  Commerce's Finding of Only a Single Level of Trade in the Home Market Is Not
       Supported by Substantial Evidence**

    Neither Defendant nor Wheatland confront or challenge key aspects of Universal's Brief

wherein Universal explained how Commerce's finding of only a single level of trade in the home

market lacked a basis in substantial evidence.  Instead, both responses mischaracterize

Universal's arguments and claim that Universal is simply asking the Court to replace

Commerce's judgment with its own.  See Def. Resp. Br. at 15; Wheatland Resp. Br. at 13.

Moreover, like Commerce's <u>Final Results</u> explanation, Defendant and Wheatland dedicated no

part of their responses to addressing the substantial LOT quantitative analyses that Universal

submitted to Commerce and fail to provide any reasonable basis for, or clarification of,

Commerce's determination.  Instead, Defendant and Wheatland simply recite Commerce's

assertion that Universal did not provide such an examination or evaluation:

- "Universal failed to provide sufficient quantitative evidence to demonstrate that home market sales were made at two different marketing stages."  Def. Resp. at 6

- "Universal did not submit sufficient quantitative analysis to demonstrate that its home market sales were made at two different levels of trade."  Def. Resp. at 8.

- "Universal did not provide the quantitative analysis that Commerce had instructed it must provide."  Wheatland Resp. Br. at 5.

- "Universal … did not submit sufficient quantitative evidence to support its argument that differences in selling activities reflected a difference in marketing stages."  Def. Resp. Br. at 11.

- "The level of activities performed in Universal's claimed channels of distribution were not sufficiently different to warrant a LOT adjustment."  Wheatland Resp. at 8.

- "The record did not have sufficient quantitative evidence to find that the home market has two levels of trade."  Def. Resp. Br. at 12.

But Defendant and Wheatland have not supported any of these conclusions nor explained

why the extensive information that Universal provided was "insufficient."  Defendant and

Wheatland have not explained why it was appropriate for Commerce to disregard the doubling

up of expenses for Channel 2 sales (because the Universal Producers performed selling functions

to sell to the Universal Affiliated Resellers and *in addition* the Universal Affiliated Resellers

performed significant additional selling activities to resell the merchandise to their customers).

Defendant and Wheatland have not provided a rationale for why Commerce did not address

Universal's numerical comparisons at the different levels of trade of (1) indirect selling

expenses; (2) indirect selling expense ratios; (3) indirect selling expenses per metric ton sold; (4)

movement expenses; (5) inventory carrying costs; (6) numbers of salespersons; (7) number of

salespersons per metric ton sold; (8) number of invoices issued per day; (9) quantity of

merchandise sold per invoice; (10) quantity of different line items per invoice; (11) warehousing area in square meters; (12) warehousing costs per metric ton sold; (13) number of sales with delivery charges; (14) number of sales with packing expenses; (15) number of sales with commissions; (16) number of sales with discounts and price adjustments; and why Commerce did not consider such comparisons and analyses to constitute "sufficient" quantitative information.  Nor have Defendant and Wheatland explained why the worksheets and extensive analysis that Universal provided with respect to specific merchandise pricing at the different levels of trade (i.e., how the expenses assigned to home market sales made at different levels of trade impacted price comparability) did not constitute quantitative information.  Instead, Defendant and Wheatland have simply repeated Commerce's conclusory remarks without providing any basis for such conclusions.

It is well-settled that for agency action to be based on substantial evidence, the agency must explain why evidence that fairly detracts from the reasonableness of its determination is not outweighed by evidence that supports Commerce's determination.  See, e.g., Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).  Defendant and Wheatland address none of the record evidence highlighted by Universal that detracts from Commerce's conclusion that all home market sales were made at the same marketing stage.  Wheatland suggests that "even the most basic review of the record reveals that Commerce did examine the proffered evidence, Wheatland Resp. Br. at 15, but provides zero citations to the record to substantiate its claim. Defendant suggests (1) that Commerce should not have needed to repeat in its Decision Memorandum its analysis from the Preliminary Results and (2) that Commerce is not required to address all evidence submitted by the parties.  Def. Resp. Br. at 13.  But (1) Commerce did not discuss Universal's quantitative analyses in the Preliminary Results and (2) Universal's

quantitative analyses constituted a significant argument that seriously undermined Commerce's conclusions and should have been addressed.  See Manchester Tank & Equip. Co. v. United States, 483 F. Supp. 3d 1309, 1317 (Ct. Int'l Trade 2020).  The absence of precise numerical standards for LOT determinations does not relieve Commerce of the requirement to provide support for its decisions.  Conclusions are not substantial evidence.  In order for the Court to affirm Commerce's determination, the agency must have provided "a reasoned explanation ... that is supported by the administrative record." Dorbest v. United States, 30 C.I.T. 1671, 1677-78, 462 F. Supp. 2d 1262, 1269-70 (2006) (citing Goldlink Indus. Co. v. United States, 30 C.I.T. 616, 629, 431 F. Supp. 2d. 1323, 1334 (2006)).  Commerce failed to do so in this case. Furthermore, in ignoring Universal's quantitative analyses and neglecting to support its decision with a review of all of Universal's proffered information (described in detail in Plaintiffs' 56.2 Memorandum), Commerce reached a determination that is directly contradicted by record evidence.  Given the wealth of information submitted by Universal that reconciled to its reported sales and expense information (i.e., the quantitative information presented was complete, accurate, and verifiable), and that established that Universal's Channel 1 and 2 sales were made at different marketing stages, it was entirely unreasonable that Commerce found only a single level of trade in the home market.  Because Commerce ignored quantitative record evidence indicating that the selling activities of the Universal Producers for Channel 1 sales and the selling activities of *both* the Universal Producers *and* the Universal Affiliated Reseller for Channel 2 sales were not the same, and because other record evidence demonstrated that the selling activities performed by the Universal Producers *and* the Universal Affiliated Reseller for Channel 2 sales were more numerous and more intense than the selling activities performed solely by the Universal Producers at the less advanced Channel 1 marketing stage, and that this

8

difference in LOT had an effect on price comparability, Commerce's determination cannot be

supported by substantial evidence.[1]

### 3. Administrative Practice Supports a Finding That Universal Submitted Sufficient Evidence to Establish Multiple Levels of Trade in the Home Market

Defendant claims that each Commerce proceeding is *sui generis*, involving a unique

combination and interaction of many variables, and other administrative determinations therefore

are not legally binding on reviews before the Court.  Def. Resp. Br. at n.1, <u>citing</u> <u>U.S. Steel Corp.</u>

<u>v. United States</u>, 637 F. Supp. 2d 1199, 1218 (Ct. Int'l Trade 2009) (citation omitted).

Nonetheless, other Commerce administrative reviews illustrate what types of information the

agency considers to be "quantitative evidence."  And based on Commerce's practice in such

other proceedings, Universal presented substantial quantitative evidence to support its claim that

---

[1] Defendant complains that Universal provided quantitative evidence for only "three of the five" broad selling activity categories (sales support, logistical services, and sales-related administrative activities), and did not highlight in Plaintiff's 56.2 Memorandum the quantitative difference for technical support and training services.  Def. Resp. Br. at 17.  As an initial matter, Defendant's recognition of the quantitative analyses presented by Universal is a welcome acknowledgement.  Regarding the remaining technical and training service functions, the "quantitative" difference between "no" selling activity and "some" selling activity is readily apparent.  For example, the Universal Producers provided <u>no customer training services</u> for Channel 1 sales whereas the Universal Affiliated Resellers <u>did provide customer training services</u> for Channel 2 sales.  <u>See</u> Universal Section A Response (May 22, 2019), at Exhibits A-5 and A-6, CR 14-32, PR 56-62.  As a purely mathematical exercise, the Universal Affiliated Resellers thus provided "infinitely" more customer training services for Channel 2 sales than the Universal Producers did for Channel 1 sales.  An analysis that quantifies the extent of certain selling activity differences is unnecessary when the difference is "some services versus zero services."  Commerce does not require respondents to explain the quantitative difference between "Yes (provided)" and "No (did not provide)."  <u>See</u> <u>also</u> <u>Pasta Zara SpA v. United States</u>, 703 F. Supp. 2d 1317, 1325 (Ct. Int'l Trade 2010) ("According to the *Preamble*, the substantial differences in selling activities must amount in the aggregate to a substantially different selling function at the more remote level; hence, demonstrating adequately a different selling function, as opposed to demonstrating merely a difference in selling activities, would be 'sufficient.'") (<u>citing</u> <u>Antidumping Duties;</u> <u>Countervailing Duties: Final Rule</u>, 62 Fed. Reg. 27296, 27371 (May 19, 1997)).

Universal's Channel 1 and Channel 2 home market sales were made at different marketing stages sufficient to establish separate levels of trade.

In Certain Corrosion-Resistant Steel Products from the Republic of Korea; Preliminary Results of Antidumping Duty Administrative Review; 2019-2020, 86 Fed. Reg. 42784 (August 5, 2021), Commerce concluded that respondent Dongkuk (1) had provided documentation supporting the activities in its selling function chart; (2) had indicated how often it performed each of the specific activities; and (3) had provided a quantitative analysis showing how the expenses assigned to separate levels of trade sales differed, "thereby demonstrating a higher level of activity with respect to the selling activities performed" at the different levels of trade." Id. at Issues and Decision Memorandum, at 15.  Universal provided similar analyses to Commerce, including numerical comparisons showing how the expenses assigned to separate levels of trade sales differed.  See Plaintiffs' 56.2 Memorandum, at 25; see also Univ. Supp. A, at Supp A-6 to Supp A-9 and Exhibit SA-9, CR 107, 117, PR 137; Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibits SAD-4, CR 180, PR 172.  But Commerce provided no explanation for why Universal's demonstration that the different selling expenses assigned at separate levels of trade sales did not constitute a quantitative analysis.

In Certain Oil Country Tubular Goods From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2018-2019, 86 Fed. Reg. 41015 (July 30, 2021), Issues and Decision Memorandum, at 98, Commerce concluded that respondent SeAH had provided quantitative evidence for a LOT adjustment "through tying its reported activity levels to expenses in the U.S. and third-country sales databases.  For example, all the indirect selling expenses reported in the U.S. sales database were linked to selling activities performed by SeAH's U.S. affiliate PPA, while all the indirect selling expenses reported in the third-country

database were linked to selling activities performed by SeAH." In its responses to Commerce's

initial and supplemental questionnaires, Universal similarly demonstrated that its reported selling

activities linked to the expenses reported for its home market sales at the different levels of trade.

For example, all the indirect selling expenses reported for home market Channel 1 sales were

linked to the selling activities performed by the Universal Producers, while all the indirect selling

expenses reported for Channel 2 sales were linked to the selling activities performed by the

Universal Producers (for sales to the Universal Affiliated Resellers) *and* by the Universal

Affiliated Resellers (for sales to unrelated downstream customers). See Plaintiffs' 56.2

Memorandum, at 25; see also Univ. Supp. A, at Supp A-6 to Supp A-9 and Exhibit SA-9, CR

107, 117, PR 137. Moreover, the specific indirect selling expense ratios in its quantitative

analysis (which showed that the total indirect selling expense ratio for Channel 2 sales was *more*

*than 20 times higher* than the indirect selling expense ratio for Channel 1 sales) linked directly to

the indirect selling expenses reported in Universal's home market sales database for Channel 1

and Channel 2 sales. See Universal Section B Response (June 13, 2019), at Exhibits B-1 and B-

17, CR 45, PR 73. Commerce provided no explanation for why Universal's worksheets showing

a comparison of the indirect selling expenses assigned to the different channels of sale did not

constitute a quantitative analysis.

In Oil Country Tubular Goods From Ukraine: Preliminary Results of Antidumping Duty

Administrative Review; 2019-2020, 86 Fed. Reg. 43522 (August 9, 2021), Issues and Decision

Memorandum, at 12, Commerce concluded that respondent Interpipe did not provide adequate

documentation to support the intensities in its selling function chart because it did not show how

the expenses in each sales channel impact price comparability, i.e., "Interpipe provided a

quantitative analysis that fell short of demonstrating a difference in price." Id. Commerce

concluded that respondent Interpipe also "did not demonstrate how indirect selling expenses vary" by the claimed LOTs. Id. at 13. In contrast, Universal provided a complete analysis demonstrating how the expenses in each sales channel impact price comparability and also showed how indirect selling expenses varied by the claimed LOTs. See Plaintiffs' 56.2 Memorandum, at 31-32; see also Univ. Supp. AD, at SuppAD-4 to SuppAD-8 and Exhibit SAD-4, CR 180, PR 172; Univ. Supp. A, at Supp A-6 to Supp A-9 and Exhibit SA-9, CR 107, 117, PR 137. Moreover, Universal demonstrated that the sales by the Universal Affiliated Resellers overall had a higher selling price that closely approximated the difference between the total indirect selling expense ratios applicable to the sales in the different channels of distribution. See Univ. Sec. A, at A-18 to A-25, Exhibit A-4, CR 14, PR 56. Again, Commerce did not explain why Universal's price comparability worksheets for different LOTs and the varying indirect selling expenses applied to each channel of sale did not constitute a quantitative analysis.

In Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Mexico: Final Results of Antidumping Duty Administrative Review; 2018-2019, 86 Fed. Reg. 41448 (August 2, 2021), Issues and Decision Memorandum, at 30-31, Commerce concluded that respondent Prolamsa "provided adequate quantitative data in support of its LOT claim" when it provided a chart comparing the POR selling expenses and a calculation showing the differing sales staff headcount as a percentage of total sales at the different marketing stages. Universal similarly provided data comparing its selling expenses and sales staff (both in terms of actual numbers and numbers per metric ton sold) at the different marketing stages. See Plaintiffs' 56.2 Memorandum, at 25; see also Univ. Supp. A, at Supp A-6 to Supp A-9 and Exhibit SA-9, CR 107, 117, PR 137. Again, Commerce provided no explanation for why the quantitative data for selling expenses and level of staffing resources provided by Universal did not corroborate the

qualitative the qualitative selling activities that Universal performed at the different LOTs.

Perhaps most critically, Commerce's findings in other segments *of this same proceeding*

support that the mathematical comparisons that Universal submitted constitute significant

quantitative evidence that demonstrated adequately that Universal's home market sales were

made at two different levels of trade.  In the <u>Preliminary Results</u>, Commerce found that:

> {S}elling activities can be generally grouped into five selling function categories.
> Based on these selling function categories, we find that Universal and its affiliates
> performed sales support, training services, technical support, logistical services, and
> sales-related administrative activities for their home market sales made through both
> channels.  Notwithstanding that Universal reported two channels of distribution in the
> home market, we find that the differences were **not quantitatively sufficient** to
> warrant finding different LOTs in the home market.  Thus, we preliminarily find that
> Universal's home market sales were made at **one LOT**.

<u>Preliminary Decision Memorandum</u>, at 29, PR 160 (emphasis added).  This decision stands in

stark contrast to the LOT finding by Commerce in the immediate subsequent administrative

review covering the 2019-2020 period.  In this more recent review, using almost identical

language to describe the same factual situation and the same type of supporting documentation,

Commerce reached the exact opposite LOT conclusion.  Commerce found that:

> {S}elling activities can be generally grouped into five selling function categories.
> Based on these selling function categories, we find that Universal and its affiliates
> performed sales support, training services, technical support, logistical services, and
> sales-related administrative activities for their home market sales made through both
> channels.  However, we find that the differences reported in the two channels of
> distribution **were quantitatively sufficient** to warrant finding different LOTs in the
> home market.  Thus, we preliminarily find that Universal's home market sales were
> made at **two LOTs**.

See <u>Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Preliminary</u>

<u>Results of Antidumping Duty Administrative Review; 2018-2019</u>, 86 Fed. Reg. 21688 (Int'l

Trade Admin. April 23, 2021), Decision Memorandum for the Preliminary Results (April 16,

2021), at 21.  The only difference between Commerce's analysis in the two proceedings is that

Court No. 20-03944, Plaintiffs' Reply Brief

Commerce preceded its conclusion in the more recent review with an acknowledgement that "to accompany its qualitative analysis, Universal provided internal documentation demonstrating the intensity and frequency of different home market selling activities.  Universal also provided a quantitative analysis of expenses assigned to its home market POR sales made at the different claimed levels of trade."  Id.

But Universal provided *the same type of information and quantitative analysis* in the review subject to this appeal.  Specifically, Commerce requested that Universal provide information related to different levels of trade in the original questionnaire, and subsequently requested additional information from Universal to support its claims.  And Universal responded by providing substantial documentation demonstrating the intensity and frequency of its home market selling activities in the different channels of trade, and also provided extensive quantitative analyses of the expenses assigned to its home market sales made at the different levels of trade.  See Universal Section A Response (May 22, 2019), at A-18 to A-25, Exhibits A-5, A-6, A-21, A-22, CR 14-32, PR 56-62; Universal Section B Response (June 13, 2019), at B-18, B-27, and Exhibit B-17, CR 45, PR 73; Universal Supplemental Section A Response (December 11, 2019), at Supp A-4 to Supp A-10 and Exhibits SA-7, SA-8, and SA-9, CR 107, 111-117, PR 137; Universal Supplemental Section AD Response (February 18, 2020), at SuppAD-4 to SuppAD-8 and Exhibits SAD-2, SAD-4, and SAD-5, CR 180-193, PR 172.  As noted above, each Commerce proceeding is *sui generis*, but it is telling that in the very next segment of the same proceeding – where Commerce articulated that it examined the documentation presented by Universal demonstrating the intensity and frequency of different home market selling activities and considered Universal's "quantitative analysis" of expenses assigned to its home market sales made at different claimed levels of trade (which Commerce did

not indicate that it had done in the review under appeal) – that Commerce reached the exact

opposite conclusion and found two LOTs in the home market.  For Commerce to make a

different finding regarding Universal's home market marketing stages where Commerce

acknowledged its actual examination of Universal's quantitative analyses demonstrates that

Commerce failed *in this review* to base its "single home market LOT" determination on

substantial evidence.  In this case, Universal's descriptions of its selling functions, combined

with the documentary support and quantitative analyses regarding its channels of trade, customer

base, product mix, frequency of shipments, volume of shipments, selling expenses, and price

comparability at the different marketing stages, formed a cohesive and comprehensive picture of

different levels of trade within the home market.  Together with the arguments and case authority

described above, such evidence fully supports a remand for Commerce to explain more fully its

failure to address Universal's quantitative analyses that more than reasonably established that

Universal sold at two LOTs in the home market during the POR.

## III.    CONCLUSION

When reviewing the qualitative and quantitative evidence presented by Universal

regarding its home market selling activities as a whole, the Court should find that it was not

reasonable for Commerce to have concluded that the differences between the activities

performed for Channel 1 and Channel 2 sales did not rise to the level of a substantial difference

in selling activities.  Universal more than sufficiently supported its claims that only certain

selling functions were performed for Channel 1 sales and that additional selling activities at a

higher level of activity were performed for Channel 2 sales.  Moreover, substantial quantitative

information on the record establishes that the additional and more intensive selling functions for

Channel 2 sales resulted in sales made at a different marketing stage, as required by Commerce's

Court No. 20-03944, Plaintiffs' Reply Brief

regulations.  Universal's Channel 2 sales therefore were made at a more advanced LOT.  For the

reasons set forth above, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for

judgment on the agency record and remand this case to Commerce with instructions to revise the

<u>Final Results</u> in a manner consistent with the arguments set forth above and in Plaintiffs' 56.2

Memorandum.

<div style="margin-left: 40%">

Respectfully submitted,

<u>/s/ Robert G. Gosselink</u>
Robert G. Gosselink
Jonathan M. Freed

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C.  20003
Tel.:  (202) 223-3760

*Counsel to Plaintiffs Universal Tube and Plastic*
*Industries, Ltd., THL Tube and Pipe Industries*
*LLC, and KHK Scaffolding and Framework LLC*

</div>

Dated:  August 27, 2021

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE**

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) Court No. 20-03944 |
| Defendant, | ) ) ) |
| and | ) ) |
| WHEATLAND TUBE COMPANY, | ) ) |
| Defendant-Intervenor. | ) ) |

## <u>CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)</u>

The undersigned counsel at Trade Pacific PLLC hereby certifies that the accompanying Reply Brief, dated August 27, 2021, complies with the maximum 7,000 word-count limitation described in part 2(B)(1) of the Court's Chambers Procedures. The reply brief contains <u>4,880</u> words according to the word-count function of the word-processing software used to prepare the brief, excluding the table of contents, table of authorities, and counsel's signature block.

Respectfully submitted,

/s/ Robert G. Gosselink
Robert G. Gosselink
Jonathan M. Freed
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE, Suite 500
Washington, D.C. 20003
Tel.: (202) 223-3760

Dated: August 27, 2021

*Counsel to Plaintiffs Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Framework LLC*