Slip Op. No. 22-83

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNIVERSAL TUBE AND PLASTIC INDUSTRIES, LTD., THL TUBE AND PIPE INDUSTRIES LLC, AND KHK SCAFFOLDING AND FRAMEWORK LLC, | |
| Plaintiffs, | |
| v. | Before: Timothy C. Stanceu, Judge |
| UNITED STATES, | Court No. 20-03944 |
| Defendant, | |
| and | |
| WHEATLAND TUBE COMPANY, | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Remanding to the issuing agency a determination concluding an administrative review of an antidumping duty order on certain welded steel pipe products from the United Arab Emirates]

Dated:  July 15, 2022

*Robert G. Gosselink*, Trade Pacific PLLC, of Washington, D.C., for plaintiffs Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Framework LLC.  With him on the brief was *Jonathan M. Freed*.

*Robert R. Kiepura*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant United States.  With him on the brief were *Brian M. Boynton*, Deputy Principal Assistant Attorney General, *Jeanne*

*E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of counsel on the brief was *Vania Wang*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

   *Roger B. Schagrin*, Schagrin Associates, of Washington, D.C., for defendant-intervenor Wheatland Tube Company.  With him on the brief were *Christopher T. Cloutier* and *Michelle R. Avrutin*.

   Stanceu, Judge: In this action brought under section 516A of the Tariff Act of 1930, *as amended* (the "Tariff Act"), 19 U.S.C. § 1516a,[1] plaintiffs Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK Scaffolding and Framework LLC (collectively, the "Universal Producers") contest a final determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude the second administrative review of an antidumping duty order on imports of circular welded carbon-quality steel pipe from the United Arab Emirates ("CWP" or the "subject merchandise").

   Before the court is the motion of the Universal Producers for judgment on the agency record, brought under USCIT Rule 56.2.  Plaintiffs claim that Commerce, in calculating a weighted average dumping margin for their exports of subject merchandise, unlawfully refused to make a "level-of-trade" ("LOT") adjustment when comparing the sales of the subject merchandise in the United States to sales in the home

---

[1] All citations to the United States Code herein are to the 2018 edition and all citations to the Code of Federal Regulations herein are to the 2020 edition.

market of the United Arab Emirates ("U.A.E.").  Opposing plaintiffs' motion are

defendant United States and defendant-intervenor Wheatland Tube Company.

Ruling that the Department's decision to deny the Universal Producers' request

for a level-of-trade adjustment was based on an analysis that was unsatisfactory when

viewed according to the statutory criteria and the record evidence on the whole, the

court grants plaintiffs' motion and remands the contested decision to Commerce for

reconsideration.

## I. BACKGROUND

### A.  The Contested Agency Determination

The contested administrative determination (the "Final Results") was published

as *Circular Welded Carbon-Quality Steel Pipe From the United Arab Emirates: Final Results of*

*Antidumping Duty Administrative Review; 2017–2018*, 85 Fed. Reg. 77,159 (Int'l Trade

Admin. Dec. 1, 2020) ("*Final Results*").  The Final Results incorporate by reference a

"Final Issues and Decision Memorandum" containing explanatory discussion.  *Issues*

*and Decision Memorandum for the Final Results of the 2017-2018 Administrative Review of the*

*Antidumping Duty Order on Circular Welded Carbon-Quality Steel Pipe from the United Arab*

*Emirates* (Int'l Trade Admin. Nov. 23, 2020) (P.R. Doc. 223) ("*Final I&D Mem.*").[2]  As

subsequently amended to correct a ministerial error, the contested decision culminated

---

[2] All citations to documents from the administrative record are to public
documents.  These documents are cited as "P.R. Doc. __."

in a weighted average dumping margin of 3.63% for the subject merchandise produced

and exported by the Universal Producers.  *Circular Welded Carbon-Quality Steel Pipe From*

*the United Arab Emirates: Amended Final Results of Antidumping Duty Administrative*

*Review; 2017–2018*, 86 Fed. Reg. 289, 289 (Int'l Trade Admin. Jan. 5, 2021) ("*Amended*

*Final Results*").

### B.  The Parties

Universal Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC,

and KHK Scaffolding and Framework LLC are producers of the subject merchandise in

the United Arab Emirates.  In a decision not contested in this litigation, Commerce

treated these three affiliated producers as a single entity for purposes of the review.

Compl. ¶ 3 (Dec. 31, 2020), ECF No. 6.  Defendant is the United States.  Defendant-

intervenor Wheatland Tube Company is a domestic producer of circular welded

carbon-quality steel pipe.  Consent Mot. to Intervene as Def.-Intervenor 2 (Jan. 29, 2021),

ECF No. 13.

### C.  Proceedings Before Commerce

Commerce issued the antidumping duty order (the "Order") in 2016.  *Circular*

*Welded Carbon-Quality Steel Pipe From the Sultanate of Oman, Pakistan, and the United Arab*

*Emirates: Amended Final Affirmative Antidumping Duty Determination and Antidumping*

*Duty Orders*, 81 Fed. Reg. 91,906 (Int'l Trade Admin. Dec. 19, 2016) ("*Order*").[3]

Commerce initiated the second periodic administrative review of the Order in 2019,

covering entries made during the period of December 1, 2017 to November 30, 2018 (the

"period of review" or "POR"). *Initiation of Antidumping and Countervailing Duty*

*Administrative Reviews*, 84 Fed. Reg. 9,297, 9,303 (Int'l Trade Admin. Mar. 14, 2019).

Commerce chose the Universal Producers as one of two "mandatory" respondents, i.e.,

respondents for which Commerce intended to conduct an individual examination of

sales and determine individual dumping margins. *Respondent Selection for the*

*Antidumping Duty Review of Circular Welded Carbon-Quality Steel Pipe from the United Arab*

*Emirates* 1 (Apr. 15, 2019) (P.R. Doc. 37).

Commerce published preliminary results for the second review on February 7,

2020 (the "Preliminary Results"), in which Commerce preliminarily calculated a

dumping margin of 9.11% for subject merchandise produced and exported by the

Universal Producers. *Circular Welded Carbon-Quality Steel Pipe From the United Arab*

*Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2017–2018,*

---

[3] The antidumping duty order pertained to "welded carbon-quality steel pipes
and tube, of circular cross-section, with an outside diameter (O.D.) not more than
nominal 16 inches (406.4 mm), regardless of wall thickness, surface finish (e.g., black,
galvanized, or painted), end finish (plain end, beveled end, grooved, threaded, or
threaded and coupled), or industry specification." *Circular Welded Carbon-Quality Steel*
*Pipe From the Sultanate of Oman, Pakistan, and the United Arab Emirates: Amended Final*
*Affirmative Antidumping Duty Determination and Antidumping Duty Orders*, 81 Fed. Reg.
91,906, 91,906 (Int'l Trade Admin. Dec. 19, 2016).

85 Fed. Reg. 7,279, 7,280 (Int'l Trade Admin.) ("*Preliminary Results*").  Incorporated by

reference in the Preliminary Results is an explanatory document, the "Preliminary

Decision Memorandum."  *Decision Memorandum for the Preliminary Results of the 2017-*

*2018 Administrative Review of the Antidumping Duty Order on Circular Welded Carbon-*

*Quality Steel Pipe from the United Arab Emirates* (Int'l Trade Admin. Jan. 31, 2020) (P.R.

Doc. 160) ("*Prelim. Decision Mem.*").  Commerce preliminarily found that Universal

Producers had made U.S. and home market sales at only one level of trade during the

period of review and, accordingly, preliminarily determined that a level-of-trade

adjustment was not warranted.  *Id.* at 29.

In the Final Results, Commerce assigned the subject merchandise produced and

exported by the Universal Producers a weighted average dumping margin of 3.79%.

*Final Results*, 85 Fed. Reg. at 77,160.  In calculating this margin, Commerce again

determined that the U.S. and home market sales occurred at a single level of trade and,

accordingly, rejected the request for a level-of-trade adjustment.  *Final I&D Mem.* at 18.

To correct ministerial errors, Commerce issued amended final results that reduced this

dumping margin from 3.79% to 3.63%.  *Amended Final Results*, 86 Fed. Reg. at 289.

### D.  Proceedings Before the Court

Plaintiffs brought this action on December 31, 2020.  Summons, ECF No. 1;

Compl., ECF No. 6.  On May 10, 2021, plaintiffs filed the instant motion for judgment on

the agency record and accompanying brief.  Pls.' Rule 56.2 Mot. for J. upon the Agency

R., ECF Nos. 22 (conf.), 23 (public) ("Pls.' Mot.").

On July 9, 2021, Wheatland Tube filed its response in opposition to plaintiffs'

motion.  Resp. in Opp'n to Pls.' Rule 56.2 Mot. for J. on the Agency R. of Def.-Intervenor

Wheatland Tube Company, ECF No. 27 ("Wheatland Tube's Resp.").

Defendant submitted its response in opposition on July 16, 2021.  Def.'s Resp. to

Pls.' Mot. for J. upon the Agency R., ECF No. 28 ("Def.'s Resp.").

On August 27, 2021, plaintiffs filed their reply brief.  Reply Br. of Pls. Universal

Tube and Plastic Industries, Ltd., THL Tube and Pipe Industries LLC, and KHK

Scaffolding and Framework LLC, ECF No. 31.

Plaintiffs filed an unopposed motion for oral argument on their Rule 56.2 motion

on September 10, 2021.  Pls.' Unopposed Mot. for Oral Arg., ECF No. 46.

On April 25, 2022, the court requested that counsel for parties respond to certain

questions arising from the court's review of the administrative record of this action and

the parties' submissions on plaintiffs' 56.2 motion.  Letter, ECF No. 50.  The parties

responded to the request on May 25, 2022.  Def.'s Resp. to the Court's Questions, ECF

Nos. 51 (public), 52 (conf.); Resp. to the Court's Letter, ECF No. 53; Resp. of Plaintiffs,

Universal Tube and Plastic Industries, Ltd., et al., to the Court's April 25, 2022,

Questions to the Parties, ECF Nos. 54 (conf.), 55 (public).

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of

1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced

under section 516A of the Tariff Act, 19 U.S.C. § 1516a, including an action contesting a

final determination that Commerce issues to conclude an administrative review of an

antidumping duty order.

In reviewing a final determination, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  Substantial evidence refers to "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *SKF USA, Inc. v.*

*United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. NLRB*,

305 U.S. 197, 229 (1938)).

### B.  The "Fair Comparison" Requirement in the Tariff Act and Adjustments to Normal Value for "Level of Trade" and "Constructed Export Price Offset"

Section 751(a)(1) of the Tariff Act requires Commerce, upon a proper request, to

conduct a periodic administrative review at least once during each 12-month period

beginning on the anniversary of the date of publication of an antidumping duty order.

19 U.S.C. § 1675(a)(1).  In a review, Commerce is directed to determine a dumping

margin for "each entry" of the subject merchandise, which is calculated by making a

comparison between the "normal value" of the subject merchandise and the "U.S.

price" (i.e., the "export price" ("EP") or "constructed export price" ("CEP")) of the

subject merchandise.  *Id.* § 1675(a)(2)(A)(i), (ii).

Fundamental to antidumping duty determinations is the obligation of

Commerce, imposed by section 773(a) of the Tariff Act, to make a "fair comparison"

between the U.S. price, i.e., the export price or constructed export price (as determined

according to section 772, 19 U.S.C. § 1677a) and normal value.  19 U.S.C. § 1677b(a) ("In

determining . . . whether subject merchandise is being, or is likely to be, sold at less than

fair value, *a fair comparison* shall be made between the export price or constructed export

price and normal value.") (emphasis added).  Normal value, specifically, is determined

according to statutory procedures set forth in section 773 of the Tariff Act, 19 U.S.C.

§ 1677b, that are conducted "[i]n order to achieve a fair comparison with the export

price or constructed export price." *Id.*

In the ordinary method, normal value is determined according to the adjusted

sale price of the foreign like product in the "comparison market," which commonly is

the home market of the producer or exporter (in this case, the United Arab Emirates).

In fulfilling its obligation to arrive at an accurate dumping margin, Commerce must

make such adjustments to the starting prices in the sales used to determine normal

value as are necessary to achieve a fair comparison with the adjusted prices in the U.S.

sales.  To this end, Commerce is to determine normal value beginning with the price

(often referred to as the "starting price") "at which the foreign like product is first sold

. . . for consumption in the exporting country, in the usual commercial quantities and in

the ordinary course of trade and, *to the extent practicable, at the same level of trade* as the

export price or constructed export price." *Id*. § 1677b(a)(1)(B)(i) (emphasis added).

　　　In some instances, it is not "practicable" to determine normal value according to

a starting price in a home market sale of the foreign like product that was made at the

same level of trade as the U.S. sale of the subject merchandise (whether an "export

price" or "constructed export price" sale). When such a situation occurs, Commerce, as

indicated by the statutory phrase "to the extent practicable," *id*., is not necessarily

precluded from using the home market sales price as the starting price for determining

normal value. For that purpose, the statute provides procedures in 19 U.S.C.

§ 1677b(a)(7), under which Commerce determines whether the starting price for

determining normal value must be adjusted so that the calculation of normal value

properly will account for any difference in the level of trade between the U.S. price, and

the starting price for determining normal value, that would affect price comparability.

Among the mechanisms provided are a "level of trade" adjustment made pursuant to

paragraph (A), and a "constructed export price offset" made according to

paragraph (B), of § 1677b(a)(7). Under paragraph (A), Commerce is directed to adjust

the starting price:

> to make due allowance for any difference (or lack thereof) between
> the export price or constructed export price and the price described

in paragraph 1(B) [i.e., the starting price] (other than a difference
for which allowance is otherwise made under this section) that is
shown to be wholly or partly due to a difference in level of trade
between the export price or constructed export price and normal
value, if the difference in level of trade—

> (i)    involves the performance of different selling
>        activities, and

> (ii)   is demonstrated to affect price comparability, based
>        on a pattern of consistent price differences between
>        sales at different levels of trade in the country in
>        which normal value is determined.

In a case described in the preceding sentence, the amount of the
adjustment shall be based on the price differences between the two
levels of trade in the country in which normal value is determined.

19 U.S.C. § 1677b(a)(7)(A). Paragraph (B) applies where U.S. price was determined

according to the constructed export price method of 19 U.S.C. § 1677a(b) (as occurred

with respect to the Universal Producers in the second review) and data are not available

to make an appropriate level-of-trade adjustment under paragraph (A):

> When normal value is established at a level of trade which
> constitutes a more advanced stage of distribution than the level of
> trade of the constructed export price, but the data available do not
> provide an appropriate basis to determine under subparagraph
> (A)(ii) a level of trade adjustment, normal value shall be reduced by
> the amount of indirect selling expenses incurred in the country in
> which normal value is determined on sales of the foreign like
> product but not more than the amount of such expenses for which
> a deduction is made under section 1677a(d)(1)(D) of this title.

*Id*. § 1677b(a)(7)(B).

To summarize, Commerce, when calculating normal value, must make a "level-of-trade" adjustment when: (1) the starting price in the sale of the foreign like product in the comparison market was not made at the same level of trade as the export price or constructed export price of the subject merchandise; (2) an allowance for the difference in level of trade is not otherwise made under § 1677b; (3) the difference in level of trade involves the performance of different selling activities; (4) the difference in level of trade affected the price comparison; and (5) data are available to make an appropriate level-of-trade adjustment in the calculation of normal value.

In paragraph (B) of § 1677b(a)(7), Congress identified a special circumstance that may prevent a fair comparison and specified a remedy. This circumstance arises when U.S. price is determined according to the constructed export price method and the sales of the foreign like product in the comparison market (typically, as here, the home market) are made at "a more advanced stage of distribution than the level of trade of the constructed export price" and data are not available for calculation of a level-of-trade adjustment. 19 U.S.C. § 1677b(a)(7)(B).

**C. The U.S. and Home Market Sales of the Universal Producers and their Affiliates**

All reviewed sales of the subject merchandise produced and exported to the United States by the Universal Producers occurred through one of two affiliated resellers in the United States, UTP Pipe USA or Prime Metal Corp. USA. *See Prelim. Decision Mem.* at 28. Commerce, accordingly, determined the U.S. price of all subject

merchandise in the review according to the constructed export price method of

19 U.S.C. § 1677a(b).  *See id*. at 23.  Commerce made adjustments to the reseller's price

(the CEP "starting price") to arrive at CEP, including the deduction from the starting

price of reseller profit and the "selling expenses associated with economic activities

occurring in the United States, which include direct selling expenses (imputed credit

expenses) and indirect selling expenses (inventory carrying costs and other indirect

selling expenses)."  *Id*. at 24 (citing 19 U.S.C. § 1677a(d)(1)) & 26 ("For CEP sales, we

consider only the selling activities reflected in the price after the deduction of expenses

and profit under section 772(d) of the Act [19 U.S.C. § 1677a(d)] (citing *Micron*

*Technologies, Inc. v. United States*, 243 F.3d 1301, 1314–16) (Fed. Cir. 2001)).

The removal of the reseller profit and selling expenses from the CEP starting

price would appear to have resulted in a reduction in the level of trade.  *See*

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,370–71 (Int'l Trade

Admin. May 19, 1997) ("The adjustments under subsection (d) [19 U.S.C. § 1677a(d),

additional adjustments to constructed export price] normally change the LOT, so that

the Department must determine the LOT of CEP sales after any deductions under

subsection (d).").  Achieving a "fair comparison" of the downwardly-adjusted prices in

the CEP sales with prices in home market sales required Commerce to determine

whether the home market sales, or some portion of those sales, occurred at a different

level of trade than did these CEP sales.

Some of the reviewed sales of the foreign like product in the United Arab Emirates were made directly by the Universal Producers to unaffiliated customers (to which the Universal Producers refer as "Channel 1 sales"), but other reviewed sales (the "Channel 2" sales) were made by resellers affiliated with the Universal Producers (principally, DSS Steel LLC ("DSL")) to unaffiliated customers.[4]  *See Prelim. Decision Mem.* at 28; *see also Final I&D Mem.* at 14.  Commerce used both sets of home market sales in determining normal value.  *See* Def.'s Resp. to Court's Questions 2 (May 25, 2022), ECF Nos. 51 (public), 52 (conf.).  Plaintiffs note that a majority of the U.S. sales (both by volume and by value) Commerce used in determining the margin for the Universal Producers were compared to sales made by affiliated resellers in the home market.  Resp. of Pls., Universal Tube and Plastic Industries, Ltd., et al., to the Court's April 25, 2022, Questions to the Parties 2 (May 25, 2022), ECF Nos. 54 (conf.), 55 (public).

The Tariff Act allows Commerce to use the resale prices in such "indirect sales" as starting prices when determining normal value.  19 U.S.C. § 1677b(a)(5) ("If the foreign like product is sold . . . through an affiliated party, the prices at which the foreign like product is sold . . . by such affiliated party may be used in determining

---

[4] DSS Steel LLC ("DSL") was the home market reseller affiliated with the Universal Producers that made sales to unaffiliated customers during the period of review ("POR").  Other affiliated resellers were involved in home market resales during comparison months adjacent to the POR.  *Issues and Decision Memorandum for the Final Results of the 2017-2018 Administrative Review of the Antidumping Duty Order on Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates* 14 (Int'l Trade Admin. Nov. 23, 2020) (P.R. Doc. 223) ("*Final I&D Mem.*").

normal value."). Nevertheless, if using such sales and comparing them to CEP sales in the United States, Commerce ordinarily must make such adjustments to the starting prices in the home market sales used to determine normal value as are necessary to ensure the "fair comparison" required by 19 U.S.C. § 1677b(a). The dispute in this case arose because Commerce, although deciding to use the indirect "Channel 2" sales in determining normal value, performed neither a level-of-trade adjustment under 19 U.S.C. § 1677b(a)(7)(A), nor a constructed export price offset under § 1677b(a)(7)(B), as an adjustment for them.

In the Preliminary Results, Commerce preliminarily determined that all of the Universal Producers' home market sales of the foreign like product occurred at a single level of trade. *Prelim. Decision Mem.* at 28. Commerce explained that "[n]otwith-standing that Universal reported two channels of distribution in the home market, we find that the differences were not quantitatively sufficient to warrant finding different LOTs in the home market." *Id.* Commerce also preliminarily found that the Universal Producers' U.S. sales also occurred at a single level of trade. *Id.* at 29. Commerce proceeded to conclude, preliminarily, that "the selling functions Universal performed for its U.S. and home market sales [did] not differ substantially, such that they meet the regulatory requirement of being 'made at different marketing stages.'" *Id.* (citing 19 C.F.R. § 351.412 ("The secretary will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent).").

From these findings, Commerce preliminarily determined that "Universal's sales to the United States and home market during the POR were made at the same LOT" and that "neither an LOT adjustment nor a CEP offset is warranted when Universal's U.S. sales are compared to its home market sales." *Id.* Commerce reached the same conclusion for the Final Results. *Final I&D Mem.* at 16–18. In short, Commerce determined in the Final Results that all home market sales, including the indirect sales by the affiliated resellers, were made at the same level of trade as the CEP sales.

In the review, the Universal Producers maintained before the agency that the indirect home market sales by the resellers (i.e., the "Channel 2" sales) occurred through a separate channel of distribution that was more remote from the factory and that were associated with more and different selling expenses. Before the court as well, plaintiffs claim that Commerce erred in finding that all home market sales occurred at a single level of trade and that there was no difference in the level of trade between the U.S. and the home market sales. They argue that record data demonstrate two levels of trade in the home market based on more and different selling activities and that the difference in the level of trade affected the comparability with U.S. price.

Because Commerce included the home market sales made by the resellers in its comparisons with the CEP sales in the U.S. market and made no level-of-trade adjustment or constructed export price offset with respect to them, this case presents the general issue of whether the Department's decision to determine the weighted average

dumping margin in this way satisfied the "fair comparison" obligation imposed by the

Tariff Act.

        In opposing plaintiffs' motion, defendant and defendant-intervenor maintain

that the record evidence supports the Department's finding of a single level of trade

and, therefore, that no level-of-trade adjustment was appropriate in the calculation of

the weighted average dumping margin.

        The court concludes that the Final Results must be remanded to Commerce for

two reasons.  First, the Department's analysis failed to confront the central issue raised

by plaintiffs' claim.  Second, Commerce reached certain findings and conclusions

without analyzing certain detracting evidence that the Universal Producers placed on

the record of the second review.  The court addresses these two shortcomings below.

### D.  Commerce Did Not Demonstrate that Its Methodology Achieved a "Fair Comparison" Between Constructed Export Price and Normal Value

        The analysis Commerce put forth in the Final Issues and Decision Memorandum

fails to address the central issue raised by plaintiffs' claim in this litigation, which is

how the Department's methodology achieved a "fair comparison" between the

constructed export price sales of the subject merchandise in the United States and the

sales of the foreign like product in the home market.  In ensuring that Commerce

achieves a fair comparison when calculating a dumping margin, section 773(a)(7)(A) of

the Tariff Act requires Commerce to determine, first, whether there exists "a difference

in level of trade between the export price or constructed export price and normal

value." 19 U.S.C. § 1677b(a)(7)(A). Commerce reached a conclusory finding in the

Preliminary Decision Memorandum that "Universal's sales to the United States and

home market during the POR were made at the same LOT" and that "neither an LOT

adjustment nor a CEP offset is warranted when Universal's U.S. sales are compared to

its home market sales." *Prelim Decision Mem.* at 29. The Final Issues and Decision

Memorandum does not abandon this finding from the Preliminary Decision

Memorandum, but its analysis devotes no discussion to the comparison of the U.S. sales

(which were constructed export price sales) to the sales in the home market. *Final I&D*

*Mem.* at 16–18. Commerce states its ultimate finding entirely in terms of the home

market sales, not the comparison of those sales with the U.S. CEP sales. Based on its

finding that "[t]he selling functions for the Universal producers and home market

affiliated resellers are not sufficiently different nor are the home market affiliated

resellers [*sic*] selling functions at a significantly more intense level than those of the

Universal producers," Commerce concluded that "[t]herefore, we continue to find that a

LOT adjustment is not warranted." *Id.* at 18. In short, this analysis fails to address the

inquiry Congress directed Commerce to address. *See* 19 U.S.C. § 1677b(a)(7)(A)

(requiring Commerce to determine whether there was "a *difference* in level of trade

*between* the . . . *constructed export price* and *normal value*.") (emphasis added).

     As the court has explained, in determining constructed export price, Commerce

removed all selling expenses from the CEP starting price except for a limited group of

selling expenses, i.e., those that were not incurred in the United States. Congress had a

particular concern that such sales, i.e., CEP sales, when considered for comparison with

home market sales that were made at a "more advanced stage of distribution," 19 U.S.C.

§ 1677b(a)(7)(B), might not result in a "fair comparison," *id*. § 1677b(a), absent a level-of-

trade adjustment or constructed export price offset made according to § 1677b(a)(7).

In its response to Section A of the Department's initial questionnaire, the

Universal Producers explained that their home market sales occurred through two

channels of distribution, with Channel 1 consisting of the direct sales to unrelated

customers and Channel 2 consisting of the indirect sales made through their affiliated

resellers, which first purchased and stored the merchandise in inventory and then

resold the merchandise to unaffiliated customers in the U.A.E. *Circular Welded Carbon-*

*Quality Steel Pipe from the United Arab Emirates:*, at A-18–A-19, Ex. A-5 (May 22, 2019)

(P.R. Docs. 56–62) ("*Section A Resp.*").

Addressing the home market sales, Commerce found that "the Universal

producers and affiliated resellers perform virtually the same selling functions for

unaffiliated customers in the home market" and that "the differences in the level of

activities performed in each of Universal's claimed channels are not sufficiently

different to warrant a LOT adjustment." *Final I&D Mem.* at 18. There is no discussion

of how a "fair comparison" was achieved by grouping all the home market sales,

including the Channel 2 sales, within the same level of trade as the CEP sales of the

subject merchandise in the United States.

In its request for additional information, the court asked the parties to address

whether home market sales made by the affiliated producers used in determining

normal value would "qualify as sales made 'at a level of trade which constitutes a more

advanced stage of distribution than the level of trade of the constructed export price,' as

those words appear in 19 U.S.C. § 1677b(a)(7)(B)."  Letter 4 (Apr. 25, 2022), ECF No. 50.

Defendant's response sheds no light on the Department's implicit finding that the

Channel 2 sales were not made at a more advanced stage of distribution than the CEP

sales and merely summarizes the Department's findings in the Preliminary Decision

Memorandum and the Final Issues and Decision Memorandum.  *See* Def.'s Resp. to

Court's Questions 3–4 (May 25, 2022), ECF Nos. 51 (public). 52 (conf.).

On remand, Commerce must perform the analysis expressly required by

19 U.S.C. § 1677b(a)(7) in light of the "fair comparison" standard the Tariff Act imposes

and must address, specifically, the validity of comparing the Channel 2 indirect sales

with the CEP sales in the United States without an adjustment made under 19 U.S.C.

§1677b(a)(7).  In doing so, Commerce also must include an explanation of whether or

not, and why, it considers the Channel 2 sales to have been made at a more advanced

stage of distribution than the CEP sales.

### E.  In Reaching Findings and Conclusions, Commerce Did Not Analyze Certain Record Evidence Relevant to the Request for a Level-of-Trade Adjustment

In ruling upon Universal's request for a level-of-trade adjustment, Commerce reached critical findings and conclusions in its Final Issues and Decision Memorandum but failed to address certain evidence on the record of the second review that detracts from these findings and conclusions.

Commerce found that "[a]ccording to Universal's selling expense chart, the Universal producers and affiliated resellers perform virtually the same selling functions for unaffiliated customers in the home market" and that "[w]here Universal claims the differences in selling functions are significant, this assertion is not supported by the documentation provided by Universal." *Final I&D Mem.* at 18.  Commerce provided an example to explain this finding: "Universal reported a level '6' for sales promotion and advertising for their affiliated resellers in Channel 2.  However, as support, Universal merely stated it annually advertises in the yellow pages and gives gifts to some customers." *Id.*

Before the court, plaintiffs argue that "while Universal reported a level '6' for sales promotion and advertising for the Universal Affiliated Resellers, Universal did not report *any* promotion or advertising for the Universal Producers," Pls.' Mot. 13, that "Universal reported that the Universal Affiliated Resellers performed numerous advertising and other promotional activities" which included, among other things, "running advertisements in the yellow pages, designing advertisements for newspaper

supplements, providing small promotional gifts . . . to customers throughout the year, and giving larger gifts to specific customers at particular times," and that the Universal Producers provided documentary support for these examples. *Id.* at 14.  Commerce did not address the record evidence that the Universal Producers, unlike the resellers, did not engage in any sales promotion and advertising activities.  Moreover, Commerce itself acknowledged that the Universal Producers informed Commerce during the review that the principal Channel 2 reseller, DSL, frequently performed sales activities that they did not perform, including maintaining inventory for a wide range of products, making small-quantity sales, and extensively training sales personnel. *See Final I&D Mem*. at 15.  Commerce did not refer to these arguments when reaching its finding that "the Universal producers and affiliated resellers perform virtually the same selling functions for unaffiliated customers in the home market." *Id.* at 18.

    In addition to the findings discussed above, Commerce also reached conclusions that failed to address record evidence pertaining to the selling activities in the Channel 2 sales it used in determining normal value.  As the court has discussed, Commerce calculated normal value using the indirect sales *by* the affiliated resellers to unaffiliated purchasers as well as the direct sales made by the Universal Producers to unaffiliated purchasers.  Even though the prices in those indirect sales must be presumed to have included the selling expenses of the resellers to their unaffiliated customers, and even though the prices in the CEP sales were adjusted to remove U.S.

selling expenses and reseller profit, Commerce decided against a level-of-trade

adjustment or CEP offset for its comparison of the prices in the Channel 2 indirect sales

and the adjusted prices in the CEP sales in the United States.

After stating that a request for a level-of-trade adjustment must be supported by

quantitative evidence, Commerce concluded that "Universal failed to provide sufficient

supporting documentation for its claims of the level and frequency of selling functions

*it performed* through each channel during the POR" and that "[t]he quantitative analysis

Universal does provide is not sufficient for Commerce to find that *Universal* made sales

at different levels of trade in the home market." *Id.* at 17–18 (emphasis added).[5]  These

conclusions do not capture in full the determination the Tariff Act required Commerce

to make based on the record evidence.  The issue Commerce was called on to decide

was not only whether *Universal* made sales at different levels of trade in the home

market.  It was essential for Commerce to decide also whether the sales Commerce

actually used in determining normal value—i.e., the home market sales, including in

particular the home market sales made by the resellers—occurred at a different level of

trade than the U.S. CEP sales and whether a level-of-trade adjustment (or CEP offset)

was required to achieve a "fair comparison" between CEP and normal value.  *See*

---

[5] In using the term "Universal," Commerce referred to the three Universal Producers, which it treated as a single entity for purposes of the review, not the affiliated resellers. *Final I&D Mem.* at 1.

19 U.S.C. § 1677b(a)(7)(A) (identifying the comparison relevant to the LOT

determination as one that is between ". . . constructed export price and normal value").

Commerce acknowledged that the Universal Producers argued during the

review that "DSL's indirect selling expense ratio is more than 20 times higher than the

Universal producers' indirect selling expense ratio." *Final I&D Mem.* at 15.  In its

submissions to Commerce, the Universal Producers provided worksheets containing

comparisons of products and selling functions.  *Section A Resp.* at A-22, Ex. A-6; *Circular*

*Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Sections A and B*

*Supplemental Questionnaire Responses*, at Supp A-5, Ex. SA-9B (P.R. Doc. 137); *Circular*

*Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Sections A and D*

*Supplemental Questionnaire Response*, at SuppAD-3, Ex. SAD-4 (P.R. Doc. 172) ("*Suppl.*

*Sections A&D Resp.*").  The Universal Producers' analysis compared the two home

market distribution channels with respect to the total selling expenses, the number of

invoices per metric ton, the total finished goods warehouse areas, the warehouse

expenses per metric ton, the number of invoices with commissions per metric ton, the

number of sales staff, the number of sales with discounts, price, or billing adjustments,

and other factors.  It also compared the average inventory turnover periods for the U.S.

and home market sales.  *Suppl. Sections A&D Resp.*, Ex. SAD-4.

In their case brief submitted to Commerce during the review, the Universal

Producers summarized data submitted in its questionnaire responses, *Circular Welded*

*Carbon-Quality Steel Pipe from the United Arab Emirates – Case Brief* 10–19 (P.R. Doc. 196)

("*Case Brief*"), explained that each channel of distribution served a different customer

category, *id.* at 19–20, and provided a "comparison of the selling prices of CONNUMs

sold both through Channel 1 by the Universal producers (UTP, KHK, and TTP) and

through Channel 2 by DSL show[ing] that the prices of the Channel 2 sales" were

substantially higher than prices of Channel 1.  *Id.* at 22, Ex. 2.

Defendant argues that "Universal's evidence was qualitative rather than

quantitative and generally insufficient" and that "the numbers for intensity levels on

the selling functions chart are not quantitative."  Def.'s Resp. 16.  Similarly, defendant-

intervenor maintains that "Commerce gave Universal three opportunities to submit

sufficient quantitative evidence to demonstrate its entitlement to a LOT adjustment . . .

but it failed to do so."  Wheatland Tube's Resp. 11.  The court does not find these

arguments persuasive because they do not address the record evidence on the whole.

Also, these arguments fail to confront the problem posed by the Department's failure to

perform an analysis that was satisfactory according to the determination the Tariff Act,

in 19 U.S.C. § 1677b(a)(7), required Commerce to make in the circumstance presented

by the second review, in which Commerce compared prices in the indirect home market

(Channel 2) sales with downward-adjusted prices in the CEP sales in the United States.

### III.  CONCLUSION AND ORDER

For the reasons the court has identified, the court concludes that the Final Results did not include a satisfactory analysis of the issue presented by the Universal Producers' request for a level-of-trade adjustment.  On remand, Commerce must perform, under the "fair comparison" standard, a new analysis that expressly addresses the inquiry required by 19 U.S.C. § 1677b(a)(7) and reaches findings and conclusions supported by substantial evidence based on the record as a whole.

Therefore, upon consideration of all papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record (May 10, 2021), ECF Nos. 22 (conf.), 23 (public), be, and hereby is, granted; it is further

**ORDERED** that Commerce, within 90 days from the date of issuance of this Opinion and Order, shall submit a redetermination upon remand ("Remand Redetermination") that complies with this Opinion and Order; it is further

**ORDERED** that plaintiffs and defendant-intervenor shall have 30 days from the filing of the Remand Redetermination in which to submit comments to the court; it is further

**ORDERED** that should plaintiffs or defendant-intervenor submit comments, defendant shall have 15 days from the date of filing of the last comment to submit a response; and it is further

**ORDERED** that plaintiffs' Unopposed Motion for Oral Argument (Sept. 10, 2021), ECF No. 46, be, and hereby is, denied.

/s/ Timothy C. Stanceu
Timothy C. Stanceu, Judge

Dated:  July 15, 2022
          New York, New York