A-520-807<br>
Remand: Slip Op. 22-83<br>
POR: 12/01/2017 – 11/30/2018<br>
<strong>Public Version</strong><br>
E&C/OII: BAL

*Universal Tube and Plastic Indus., Ltd. v. United States*,
Court No. 20-03944, Slip Op. 22-83 (CIT July 15, 2022)
Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

**I.      SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination on remand pursuant to the opinion and remand order from the U.S. Court of International Trade (CIT) in *Universal Tube and Plastic Indus., Ltd. v. United States*, Court No. 20-03944, Slip Op. 22-83 (CIT July 15, 2022) (*Remand Order*).  This remand concerns the final results of the 2017-2018 antidumping duty (AD) administrative review on circular welded carbon-quality steel pipe (CWP) from the United Arab Emirates (UAE).[1]

In its *Remand Order*, the CIT held that Commerce:  (1) failed to demonstrate that its methodology to determine whether to grant a level of trade (LOT) adjustment and/or a constructed export price (CEP) offset achieved a "fair comparison" between CEP and normal value (NV); and (2) failed to consider certain record evidence in its final finding that neither an LOT adjustment nor CEP offset was warranted for Universal Tube and Plastic Industries, Ltd. (UTP)/THL Tube and Pipe Industries LLC (THL)/KHK Scaffolding and Formwork LLC (KHK)

---

[1] *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates*, 85 FR 77159 (December 1, 2020) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM), amended in *Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates:  Amended Final Results of Antidumping Duty Administrative Review*, 86 FR 289 (January 5, 2021) (*Amended Final Results*).

(collectively, Universal or the Universal Producers).² The CIT remanded the *Amended Final Results* to Commerce to reconsider its finding that Universal made home market (HM) sales and U.S. sales at one LOT and, thus, was not entitled to an LOT adjustment or CEP offset.

In accordance with the *Remand Order*, in these final results of redetermination, Commerce reconsidered the facts on the record. For the reasons explained below, Commerce finds that Universal made its HM sales at two LOTs. As a result, in instances where we are unable to make price-to-price comparisons at the same LOT, we now grant Universal an LOT adjustment. However, we continue to deny Universal a CEP offset. Therefore, we recalculated the estimated weighted-average dumping margin for Universal to 1.18 percent.

## II.   BACKGROUND

On December 1, 2020, Commerce published the final results of the AD administrative review on CWP from the UAE, covering the period December 1, 2017, through November 30, 2018.³ To correct ministerial errors, on January 5, 2021, Commerce published the *Amended Final Results*.⁴ The administrative review covers twenty producers and exporters of subject merchandise.

Universal reported that it sold CWP through two channels of trade in the HM, claiming that it provided sufficient, substantive support to demonstrate that it made HM sales at two

---

[2] In the less-than-fair-value investigation, Commerce found that UTP, Universal Tube and Pipe Industries, LLC, and KHK should be treated as a single entity. *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Determination of Sales at Less Than Fair Value*, 81 FR 75030 (October 28, 2016). Further, in the 2016-2017 administrative review of this order, we determined that THL is the successor-in-interest to Universal Tube and Pipe Industries, LLC. *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 44845 (August 27, 2019). Absent information to the contrary, Commerce continued to treat Universal as a single entity for the purposes of the 2017-2018 administrative review of this order. *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 7279, 7279 (n. 3) (February 7, 2020), and accompanying Preliminary Decision Memorandum (PDM), unchanged in *Final Results* and *Amended Final Results*.
[3] *See Final Results*, 85 FR at 77159.
[4] *See Amended Final Results*, 86 FR at 289.

LOTs. Universal also claimed a single channel of trade for its U.S. CEP sales, translating to one LOT, which Universal claimed was at a less advanced marketing stage than both HM LOTs. In the *Preliminary Results*, Commerce found that Universal made sales at one LOT in the HM and one LOT in the U.S. market during the period of review (POR).[5] We then compared the U.S. LOT to the HM LOT and found them to be at the same marketing stage.[6] Accordingly, we preliminarily denied Universal an LOT adjustment or CEP offset.

In its administrative case brief, Universal challenged Commerce's preliminary findings. However, in the *Final Results*, based on the parties' comments and our further examination of the evidence on the record, we continued to find that neither an LOT adjustment nor a CEP offset was warranted for Universal.[7]

Universal challenged Commerce's LOT finding at the CIT, arguing that Commerce erred in denying it an LOT adjustment. The CIT held that Commerce's decision to deny Universal an LOT adjustment "was unsatisfactory when viewed according to the statutory criteria and the record evidence as a whole."[8] Thus, on July 15, 2022, the CIT remanded the LOT determination to Commerce to reconsider its decision.

### III.    ANALYSIS

In response to the *Remand Order*, Commerce reconsidered the record evidence regarding Universal's claim for an LOT adjustment and/or a CEP offset. As a result, based on the analysis below, Commerce has revised its finding in the *Final Results* and, instead, finds that Universal made HM sales at two LOTs and, therefore, in instances where we are unable to make price-to-price comparisons at the same LOT, we have now granted Universal an LOT adjustment.

---

[5] *See Preliminary Results* PDM at 28-29.
[6] *Id.* at 29.
[7] *See Final Results* IDM at Comment 3, unchanged in *Amended Final Results*.
[8] *See Remand Order* at 3.

3

However, because we find that Universal's U.S. LOT is equivalent to its LOT for sales from the Universal producers to unaffiliated HM customers (*i.e.*, HM LOT 1) and data are available with which to make an LOT adjustment, we continue to find that a CEP offset is not warranted.

Section 773(a) of the Tariff Act of 1930, as amended (the Act), requires Commerce to make a fair comparison between export price (EP) or CEP and NV when making a determination of whether subject merchandise is being, or is likely to be sold, at less than fair value. Thus, section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, Commerce will calculate NV based on sales at the same LOT as the U.S. sales. Moreover, 19 CFR 351.412(c)(2) provides that "the Secretary will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent)." Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing.[9] To determine whether the comparison market sales are at different stages in the marketing process than the U.S. sales, Commerce examines the distribution system in each market (*i.e.*, the chain of distribution), including selling functions, class of customer (customer category), and the level of selling expenses for each type of sale.

Pursuant to section 773(a)(1)(B)(i) of the Act, in identifying LOTs for EP and comparison market sales (*i.e.*, NV based on either HM or third country prices),[10] Commerce considers the starting prices before any adjustments. For CEP sales, Commerce considers only the selling activities reflected in the price after the deduction of expenses and profit under section 772(d) of the Act.[11]

---

[9] *See* 19 CFR 351.412(c)(2); *see also, e.g.*, *Certain Orange Juice from Brazil: Final Results of Antidumping Duty Administrative Review and Notice of Intent Not to Revoke Antidumping Duty Order in Part*, 75 FR 50999 (August 18, 2010) (*OJ from Brazil*), and accompanying IDM, at Comment 7.
[10] Where NV is based on constructed value, we determine the NV LOT based on the LOT of the sales from which we derive selling, general and administrative expenses, and profit for constructed value, where possible. *See* 19 CFR 351.412(c)(1).
[11] *See Micron Technology, Inc. v. United States*, 243 F.3d 1301, 1314-16 (Fed. Cir. 2001).

When Commerce is unable to match U.S. sales to the foreign like product in the comparison market at the same LOT as the EP or CEP, Commerce may compare the U.S. sale to sales at a different LOT in the comparison market. In comparing EP or CEP sales to sales at a different LOT in the comparison market (the NV LOT), where available data make it possible, we make an LOT adjustment under section 773(a)(7)(A) of the Act. For CEP sales only, if the NV LOT is at a more advanced stage of distribution than the LOT of the CEP and there is no basis for determining whether the difference in LOTs between NV and CEP affects price comparability (*i.e.*, no LOT adjustment is possible), Commerce will grant a CEP offset, as provided in section 773(a)(7)(B) of the Act.[12]

Commerce performs an LOT analysis in all investigations and administrative reviews. To determine if NV sales are at a different LOT than U.S. sales, we examine stages in the marketing process and selling functions along the chain of distribution between the producer and unaffiliated customer.[13] As stated above, substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing. Some overlap in selling activities will not preclude a determination that two sales are at different stages of marketing.[14] It is within this framework that Commerce conducts its LOT analysis.

Commerce's focus on selling activities rather than on individual selling expenses alone is supported by the statute, which specifies that a difference in LOTs "involves the performance of different selling activities."[15] The SAA also specifies that "Commerce will grant such {LOT}

---

[12] *See OJ from Brazil* IDM at Comment 7.
[13] *See* 19 CFR 351.412(c)(2); *see also Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan: Final Results and Final Rescission in Part of Antidumping Duty Administrative Review*, 74 FR 66620 (December 16, 2009), and accompanying IDM, at Comment 4.
[14] *See* 19 CFR 351.412(c)(2); *see also OJ from Brazil* IDM at Comment 7.
[15] *See* section 773(a)(7)(A) of the Act.

adjustments only where: (1) there is a difference in the LOTs (*i.e.*, there is a difference between the actual functions performed by the sellers at the different LOTs in the two markets); and (2) the difference affects price comparability."[16]  Commerce's regulations similarly follow the language in the statute, specifying that we will determine that sales are made at different LOTs if they are made at different marketing stages or their equivalent.[17]

Although Commerce does consider selling expenses, it does not consider them to the exclusion of the selling activities themselves.[18]  Commerce believes that a strict reliance on the amounts of the reported selling expenses is not a reliable measure of the levels of intensity in which each selling activity is performed.[19]  Performance of a selling activity at the same level of intensity in two markets could, in theory, incur very different expenses.  Additionally, expenses in a particular field might be allocated to a variety of selling activities.  One cannot tell from the relative expenses incurred the degree to which a selling activity was actually performed.

In addressing Commerce's LOT analysis, the CIT has stated that "the focal point of Commerce's LOT adjustment analysis is on the *selling activities* performed in each market."[20] The CIT has further stated that:

> {i}f Commerce . . . in reviewing an administrative determination, were to narrow the focus of its LOT analysis to selling expenses, it could act contrary to law and cause misleading results.  Expenses do not necessarily translate directly into activities nor do they capture the intensity of activities.  Moreover, expenses related to several selling activities may fall under a single expense field.[21]

---

[16] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), at 829.
[17] *See* 19 CFR 351.412(c)(2).
[18] *See Notice of Final Determination of Sales at Less Than Fair Value:  Stainless Steel Bar from Italy*, 67 FR 3155 (January 23, 2002), and accompanying IDM, at Comment 37.
[19] *See, e.g., Large Power Transformers from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 16461 (April 19, 2019), and accompanying IDM, at Comment 24 ("The petitioner's reliance on the relevance of "selling expenses" (in this case, the expenses related to inventory carrying costs) as an indicator of "selling functions" is inappropriate with respect to the total LOT analysis because it assumes that the expense data reported by Hyosung are an accurate depiction of the level of intensity in which the selling activities are performed.").
[20] *See Alloy Piping Products, Inc. v. United States*, 33 CIT 349, 355 (CIT 2009) (*Alloy Piping Prods.*).
[21] *Id.*, 33 CIT at 357.

Nevertheless, Commerce also considers quantitative analyses and information when examining the reported selling activities, as the quantitative information is not necessarily linked to specific selling expenses but should instead support the claimed differences in selling functions.[22] Although qualitative information is helpful and relevant to the LOT analysis, reliance on this information alone limits Commerce's ability to analyze selling functions to determine if LOTs identified by a party have meaningful differences and to evaluate whether a respondent's claims are reasonable and accurate.[23] Indeed, qualitative evidence alone, such as narrative descriptions of differences in selling functions, customer correspondence, sample sales records, meeting presentations and the like, without supporting quantitative evidence does not present a complete understanding of a respondent's selling activities.[24] Additionally, reliance on purely qualitative information may create the potential for manipulation (or inaccurate reporting) by permitting respondents to create a narrative that is not linked in any way to its verifiable financial data.[25]

Commerce requested supporting quantitative analysis in its Initial Questionnaire.[26] Commerce examines quantitative information linked to each reported selling function, as well as how indirect selling expenses support the claimed difference in selling functions.[27] Requiring quantitative evidence in support of thorough explanations of the differences in LOTs and the identified selling functions enhances Commerce's LOT analysis because such information allows

---

[22] *See Emulsion Styrene-Butadiene Rubber from Brazil: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 38847 (June 29, 2020) (*ESB Rubber from Brazil*), and accompanying IDM, at Comment 1.
[23] *See Pasta Zara Spa v. United States*, 34 CIT 355, 366 (CIT 2010) (*Pasta Zara*) (citing *Antidumping Duties; Countervailing Duties*, 62 FR 27296, 27371 (May 19, 1997) (*Preamble*)) ("{T}he statute indicates that two sales with substantial differences in selling activities nevertheless may be at the same level of trade, and the SAA adds that two sales with some common selling activities nevertheless may be at different levels of trade. Rather, {Commerce} must analyze selling functions *to determine if levels of trade identified by a party are meaningful*." (emphasis added)).
[24] *See, e.g.*, *Certain Frozen Warmwater Shrimp from Thailand: Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 69 (January 3, 2022), and accompanying IDM, at Comment 2.
[25] *Id.*
[26] *See* Commerce's Letter, Initial Questionnaire for Universal, dated April 16, 2019 (Initial Questionnaire), at A-6 through A-8.
[27] *See ESB Rubber from Brazil* IDM at Comment 1.

Commerce to determine whether differences in prices among various customer categories or differences in levels of expenses in different claimed LOTs are, in fact, attributable to differences in LOTs or to an unrelated factor, such as relative sales volumes.[28]

Accordingly, Commerce will make an LOT adjustment or CEP offset following an analysis of the case-specific information and where the record supports such an adjustment.[29] Further, Commerce's LOT analysis is holistic and evaluates the seller's marketing scheme as a whole.[30]

In the HM, Universal reported that it made sales through two channels of distribution, which translated to two claimed LOTs: (1) direct sales from the Universal Producers to unaffiliated HM customers (*i.e.*, HM channel 1 and HM LOT 1); and (2) sales to and through Universal's affiliated HM resellers to unaffiliated HM customers (*i.e.*, HM channel 2 and HM LOT 2).[31] Universal claimed that sales made through HM channel 2 were at a more advanced marketing stage than sales made through HM channel 1.[32] Universal further reported that HM channel 1 sales were made to unaffiliated customers that are manufacturers, fabricators, distributors, or contractors, and HM channel 2 sales were typically made to manufacturers, end users, fabricators, retailers, or, occasionally, other distributors.[33] A review of Universal's

---

[28] *See, e.g.*, *Pakfood Pub. Co. v. United States*, 34 CIT 1122, 1138 (CIT 2010); and *Alloy Piping Prods.*, 33 CIT at 357-58.

[29] *See Pasta Zara*, 34 CIT at 366 (citing *Preamble*, 62 FR at 27371) ("The *Preamble* draws a distinction between mere differences in selling activities and differences in selling activities that establish a separate selling function . . . .").

[30] *See Preamble*, 62 FR at 27371 ("{A}n analysis of selling activities alone is insufficient to establish the LOT. Rather, {Commerce} must analyze selling functions to determine if {LOTs} identified by a party are meaningful. In situations where some differences in selling activities are associated with different sales, whether that difference amounts to a difference in the LOTs will have to be evaluated in the context of the seller's whole scheme of marketing.").

[31] *See* Universal's Letter, "Circular Welded Carbon Quality Steel Pipe from the United Arab Emirates," dated May 22, 2019 (Universal AQR), at A-17 and Exhibit A-5. Universal's affiliated HM resellers consist of the following companies: DSS Steel LLC; Dayal Steel Suppliers LLC (DSS); DSS Ajman & Sharjah Branch; and Al Zaher Building Materials LLC (collectively, the affiliated HM resellers or affiliated resellers). *Id.* at A-6 and A-8 to A-9.

[32] *Id.* at A-23.

[33] *Id.* at A-17.

reported HM sales show that both HM channel 1 and HM channel 2 sales were made to unaffiliated customers of the following categories: (1) fabricators/manufacturers; (2) distributors; (3) retailers; (4) end users; and (5) contractors.[34] The vast majority of the customers for Universal's HM channel 1 sales were [          ], while the majority of Universal's HM channel 2 sales were to [     ], with sales to [                    ] making up a [              ] of the remaining HM channel 2 sales.[35]

Selling activities can be generally grouped into five selling function categories for our analysis:[36] (1) provision of sales support;[37] (2) provision of training services;[38] (3) provision of technical support;[39] (4) provision of logistical services;[40] and (5) performance of sales-related

---

[34] *See* Universal's Letters, "Sections B-E Questionnaire Response," dated June 13, 2019 (Universal BCDEQR), at B-17; and "Sections A and B Supplemental Questionnaire Responses," dated December 11, 2019 (Universal SABQR), at HM Sales Databases "UNIV_HM_02_A," "UNIV_HM_02_B," and "UNIV_HM_02_C" (collectively, UNIVHM02).

[35] *See* Universal SABQR at UNIVHM02.

[36] *See Acetone from Belgium: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 84 FR 49999 (September 24, 2019), and accompanying PDM, at 17, unchanged in *Acetone from Belgium: Final Determination of Sales at Less Than Fair Value*, 85 FR 8249 (February 13, 2020).

[37] Here, the provision of sales support can include sales forecasting, strategic/economic planning, advertising, sales promotion, sales/marketing support, market research, and other related activities. *See Preliminary Results* PDM at 26 (n. 113), unchanged in *Final Results* and *Amended Final Results*. We note that under provision of sales support, Universal included the following selling activities: sales forecasting, sales meetings, market research/economic planning, sales promotion/advertising, customer sales support, and employment of direct sales personnel. *See* Universal SABQR at Exhibit SA-9A.

[38] Here, the provision of training services can include personnel training/exchange, distributor/dealer training, and other related activities. *See Preliminary Results* PDM at 26 (n. 114), unchanged in *Final Results* and *Amended Final Results*. We note that under provision of training services, Universal included the following selling activities: personnel training, small customer support, and customer personnel training. *See* Universal SABQR at Exhibit SA-9A.

[39] Here, the provision of technical support can include engineering services, technical assistance, and other related activities. *See Preliminary Results* PDM at 27 (n. 115), unchanged in *Final Results* and *Amended Final Results*. We note that under provision of technical support, Universal included only the following selling activity: technical advice. *See* Universal SABQR at Exhibit SA-9A.

[40] Here, the provision of logistical services can include inventory maintenance, post-sale warehousing, repacking, freight and delivery, and other related activities. *See Preliminary Results* PDM at 27 (n. 116), unchanged in *Final Results* and *Amended Final Results*. We note that under provision of logistical services, Universal included the following selling activities: procurement/sourcing services, pre-sale reservation/period fulfillment, inventory maintenance, packing, delivery arrangements, company delivery, post-sale warehousing, and repacking services. *See* Universal SABQR at Exhibit SA-9A.

administrative activities.[41]  Universal reported that it and/or its affiliated resellers performed 26 selling activities that fall within these five selling function categories.[42]

Universal reported the breakdown of these 26 selling activities, including which Universal entities (*i.e.*, producers and/or affiliated resellers) performed these selling activities, and at what level of intensity and frequency they were performed.[43]  For HM channel 1 sales, Universal reported that the Universal Producers performed the following selling activities:  sales forecasting; sales meetings; market research/economic planning; employment of direct sales personnel; personnel training; small customer support; technical advice; inventory maintenance; packing; delivery arrangements; company delivery; customer contact/negotiation; order processing; price/billing adjustments; quality assurance/warranty services; commission payments; payment collection; and tax collection.[44]  According to Universal, these selling activities were generally performed at low to medium levels of intensity, except for delivery arrangements, which Universal reported as being performed at a high level of intensity.[45]  The frequency with which Universal reported that it performed these activities for HM channel 1 sales ranged from a daily basis to a yearly basis.[46]

---

[41] Here, the performance of sales-related administrative activities can include order input/processing, rebate programs, warranty service, and other related activities. *See Preliminary Results* PDM at 27 (n. 117), unchanged in *Final Results* and *Amended Final Results*.  We note that under provision of sales-related administrative activities, Universal included the following selling activities:  customer contact/negotiation, order processing, price/billing adjustments, quality assurance/warranty services, after sales service, commission payments, payment collection, and tax collection.  *See* Universal SABQR at Exhibit SA-9A.

[42] *See* Universal SABQR at Exhibit SA-9A.

[43] Intensities were reported on a scale of "1" to "10" with "1" being the lowest intensity and "10" being the highest.  Frequency was reported on the following basis:  daily; weekly; monthly; quarterly; or annually.  We also note that Universal reported the field in which the expense incurred to perform each selling activity was reported in its sales databases (*e.g.*, INDIRSH/U, PACKH/U, *etc.*).

[44] *See* Universal SABQR at Exhibit SA-9A; *see also Preliminary Results* PDM at 28; Universal's Letter, "Case Brief," dated April 20, 2020 (Universal's Case Brief), at 11 (where Universal makes public its HM selling functions chart).  Universal also reported that the Universal Producers rarely performed technical advice and inventory maintenance.  *See* Universal's Case Brief at 11 and 15.

[45] *See* Universal SABQR at Exhibit SA-9A; *see also* Universal's Case Brief at 11.

[46] *Id.*

For its HM channel 2 sales to and through its affiliated HM resellers, Universal reported that the Universal Producers performed the following sales activities: employment of direct sales personnel; packing; delivery arrangements; company delivery; customer contact/negotiation; order processing; price/billing adjustments; quality assurance/warranty services; payment collection; and tax collection.[47] Universal reported that these selling activities were performed at lower or similar levels of intensity and as or less frequently than for HM channel 1 sales.[48] However, in addition to the selling activities performed by the Universal Producers for HM channel 2 sales, Universal reported that, to sell to unaffiliated HM customers, the affiliated HM resellers also were engaged in selling functions/activities. Indeed, Universal reported that, for HM channel 2 sales, the affiliated resellers performed 26 selling activities.[49] The intensity with which these selling activities were performed ranged from low to high; however, the majority of them were reported to have been performed at a "7" level of intensity or above.[50] In addition, while the frequency with which the affiliated resellers performed the reported selling activities ranged from a daily basis to a yearly basis, the vast majority of the selling activities were reported to have been performed on a daily basis.[51]

In support of its qualitative comparison of its selling channels for HM sales, Universal provided a chart explaining what each Universal entity (*i.e.*, producers and affiliated resellers) did for each selling activity.[52] For example, Universal reported that the Universal Producers provided technical advice to its customers on HM channel 1 sales at a "2" level of intensity and only for small customers on a yearly basis.[53] Comparatively, Universal reported that the

---

[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *See* Universal AQR at Exhibit A-5; and Universal's Case Brief at 11.
[53] *See* Universal SABQR at Exhibit SA-9A; and Universal's Case Brief at 11.

Universal Producers did not provide technical advice on HM channel 2 sales, but that its affiliated HM resellers provided technical advice to their customers at a "5" level of intensity, and on a daily basis.[54] In its explanation of what each selling activity encompasses for the producers and affiliated resellers, Universal explained technical advice for the Universal Producers as: "[                                                                        ]."[55] In contrast, Universal describes technical advice for its affiliated resellers as: "[


                                                                                ]."[56] In addition, Universal provided documentation for the affiliated HM resellers, as well as explanations of the different documents, to demonstrate that they performed the selling activities reported at the levels of intensity and frequencies claimed.[57]

Further, Universal provided certain quantitative metrics in support of its qualitative reporting of its claimed HM LOTs. Specifically, Universal provided a chart demonstrating the differences in indirect selling expenses incurred, as well as other quantitative metrics, between its HM channel 1 and HM channel 2 sales.[58] In this chart, Universal compared certain quantitative metrics for both the individual Universal Producers and affiliated HM resellers, as well as the Universal Producers and affiliated HM resellers as a whole, respectively.[59] These metrics corroborate the differences in the customer base for each claimed HM LOT in addition to

---

[54] *Id.*
[55] *See* Universal AQR at Exhibit A-5.
[56] *Id.*
[57] *Id.* at Exhibits A-21 and A-22; *see also* Universal SABQR at Exhibits SA-2 through SA-8; and Universal's Letter, "Sections A and D Supplemental Questionnaire Response," dated February 18, 2020 (Universal SADQR), at Exhibit SAD-5. We also note that Universal provided extremely limited documentation for the Universal Producers in the context of providing documents for the affiliated HM resellers. However, we note that the basis of Universal's request for an LOT adjustment is the fact of the additional selling activities undertaken by the affiliated HM resellers.
[58] *See* Universal SABQR at Exhibit SA-9B.
[59] *Id.*

the difference in levels of intensity reported for certain selling activities. For example, Universal reported that the Universal Producers performed order processing at a level of intensity of "5" for HM channel 1 sales.[60] Likewise, the Universal Producers performed this selling activity at a level of intensity of "3" and the affiliated HM resellers performed it at a level of intensity of "8" for HM channel 2 sales.[61] In its quantitative analysis, Universal reported the following metrics:[62]

| Quantitative Metric | | Universal Producers | Affiliated HM Resellers | |
|---|---|---|---|---|
| Number of Invoices | [ | | | ] |
| Number of Reported HM Sales Observations | [ | | | ] |
| Number of Reported HM Sales Observations per Invoice | [ | | | ] |
| Metric Tons per Invoice | [ | | | ] |
| Invoices per Day | [ | | | ] |

These quantitative metrics and other reported metrics corroborate Universal's qualitative reporting in showing that the affiliated HM resellers typically had to perform more selling activities at a greater intensity and frequency to make [     ] sales, which also supports Universal's reporting of each group's customer base.[63] Further, according to the information provided, the total indirect selling expenses Universal entities incurred for Universal's HM channel 2 sales were substantially higher than those incurred on HM channel 1 sales.[64]

As explained above, the SAA explains that Commerce will only grant an LOT adjustment when the difference in LOTs affects price comparability."[65] Thus, Universal provided an analysis of the difference in price between the claimed HM LOTs.[66] To do so, Universal

---

[60] *Id.* at Exhibit SA-9A; and Universal's Case Brief at 11.
[61] *Id.*
[62] *See* Universal SABQR at Exhibit SA-9B. The chart contained in this document is a sampling of the quantitative metrics reported by Universal.
[63] *See* Universal AQR at A-17 through A-19; and Universal SABQR at Exhibit SA-9A.
[64] *See* Universal SABQR at Exhibit SA-9B.
[65] *See* SAA at 829.
[66] *See* Universal AQR at Exhibit A-6. Universal later updated this analysis. *See* Universal SADQR at Exhibit SAD-4.

provided a chart comparing the net HM prices of products identified using product control numbers (CONNUM) sold through both channels of distribution in the HM during the POR and window period.[67] For each CONNUM sold through both channels of distribution, Universal first calculated a net price for the Universal Producers and affiliated HM resellers, and it then used those net prices and quantities sold to calculate a net and weighted-average price difference between claimed LOTs in both an absolute monetary value and as a percentage.[68] The result of this analysis shows that the price of [

].[69] Moreover, the weighted-average difference in price between HM channel 2 and HM channel 1 was [    ] UAE dirham or [   ] percent.[70] This difference in price is higher than the additional average indirect selling expense factor of [   ] percent incurred by the affiliated HM resellers for HM channel 2 sales over the indirect selling expense factor of [   ] percent incurred by the Universal Producers in both channels of distribution.[71] Thus, this comparison suggests that the difference in price between HM channel 1 and HM channel 2 sales is attributable, at least in part, to the additional selling functions/activities undertaken by Universal's affiliated HM resellers for HM channel 2 sales.

In conclusion, we find that the totality of the evidence provided to support Universal's HM channel 2 selling activities, when compared to those performed for its HM channel 1 sales, are: (1) sufficient to meet the requirements of 19 CFR 351.412(c)(2); (2) performed at a higher

---

[67] *See* Universal AQR at A-22 and Exhibit A-6; *see also* Universal SADQR at Exhibit SAD-4. Universal stated that the "net price" used in the analysis was the gross unit price exclusive of the direct expenses reported to Commerce in the HM sales database. Universal stated it calculated the net price using the following formula: $Net\ Price = GRSUPR1H + BILLADJH - OTHDISH - INLFTWH - WAREHSH - INLFTCH - DIRSELH - PROCESSH\_COST - MIN(CUTTING\_REV, CUTTING\_COST) - PACKH$. This comparison also excluded sales from the Universal Producers to the unaffiliated HM resellers. Thus, the only sales included in the comparison are sales to the unaffiliated HM customer.
[68] *See* Universal SADQR at Exhibit SAD-4.
[69] *Id.*
[70] *Id.*
[71] *See* Universal SABQR at Exhibit SA-9B; *see also* Universal BCDEQR at Exhibit B-17.

degree of intensity; and (3) adequately supported through quantitative metrics related to indirect selling expenses. Therefore, based on the above analysis, we find that Universal made sales at two LOTs in the HM and that its HM channel 2 sales are at a distinct, higher LOT (*i.e.*, HM LOT 2) than its HM channel 1 sales (*i.e.*, HM LOT 1).

In the U.S. market, Universal reported that it sales through a single channel of distribution (*i.e.*, sales made to and through Universal's CEP affiliates, Prime Metal Corp. USA (Prime Metal) and UTP Pipe USA Corp. (UTP USA)), which constituted a single LOT.[72] Universal claimed that the U.S. LOT was at a less advanced marketing stage than all HM sales.[73] Universal further reported that U.S. CEP sales were made to unaffiliated customers that are wholesale distributors and fabricators.[74] A review of Universal's reported U.S. sales show that U.S. sales were made to unaffiliated customers of the following categories: (1) fabricators/manufacturers; (2) distributors; and (3) [       ], although the vast majority of U.S. sales were made to distributors and fabricators/manufacturers.[75]

For Universal's U.S. sales, it reported that the Universal Producers performed the following selling activities to sell to Universal's CEP affiliates: employment of direct sales personnel; packing; delivery arrangements; customer contact/negotiation; order processing; quality assurance/warranty services; and payment collection.[76] As is did for its HM channels of distribution, Universal reported that the Universal Producers' selling activities were performed at a [            ] and on a [              ].[77] Universal also included the selling

---

[72] *See* Universal AQR at A-17 and Exhibit A-5; *see also* Universal BCDEQR at C-26.
[73] *See* Universal AQR at A-23 ("Not only is the level of trade for Universal's affiliated resellers in the home market at a more advanced level of trade than that of the Universal producers, but the levels of trade in the home market also are at a more advanced stage of distribution than the CEP level of trade in the United States.").
[74] *Id.* at A-17.
[75] *See* Universal BCDEQR at C-15 and Exhibit C-6; *see also* Universal's Letter, "Sections C and D Supplemental Questionnaire Response," dated December 20, 2019, at U.S. Sales Database "UNIV_US_02" (UNIVUS02).
[76] *See Preliminary Results* PDM at 28.
[77] *See* Universal SABQR at Exhibit SA-9A

activities that its CEP affiliates undertook to sell the subject merchandise to unaffiliated customers in the United States; however, as noted above, Commerce does not consider the activities of U.S. affiliates in its LOT analysis, as Commerce only takes into account the activities performed in the foreign country (*i.e.*, for CEP sales, after the removal of expenses incurred in the United States).[78]  Universal did not provide documentation to support the claimed levels of intensity or frequency with which the Universal Producers performed selling activities for U.S. sales.  Universal provided limited documentation to support the selling activities reported as being undertaken by the Universal Producers for Universal's U.S. sales, mainly in the context of providing documentation to support the selling activities of Universal's CEP affiliates, Prime Metal and UTP USA.[79]  Based on Universal's reporting, because all sales in the United States were made through a single distribution channel, we determine that there is one LOT in the U.S. market (*i.e.*, the U.S. LOT).

    Finally, we compared the U.S. LOT to the HM LOTs and found that the types of selling functions Universal performed for its HM LOT 1 customers are not significantly different from those performed for its sales to its U.S. affiliates such that they would constitute a different marketing stage.  As an initial matter, the qualitative differences between HM LOT 1 and the U.S. LOT are minimal.  The Universal Producers perform many of the same selling functions and activities for their HM LOT 1 sales as they do to sell to their U.S. affiliates.  However, according to 19 CFR 351.412(c)(2), Commerce will determine that sales are made at different LOTs if they are made at different marketing stages (or their equivalent) and substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing.

---

[78] *See* section 772(d) of the Act.
[79] *See* Universal SADQR at SuppAD-2 through SuppAD-3 and Exhibit SAD-3.

Thus, to demonstrate its claim that the U.S. LOT is at a less advanced marketing stage than either HM LOT, Universal submitted a revised quantitative analysis that included quantitative metrics for its U.S. affiliates, Prime Metal and UTP USA, as well as a net price comparison of CONNUMs sold in the U.S. market by Universal's U.S. affiliates.[80]  However, neither the quantitative analysis nor the price comparison support Universal's assertion that its U.S. LOT is at a less advanced marketing stage than either HM LOT.  First, the quantitative analysis compares metrics for Universal's U.S. affiliates to the metrics for each HM LOT.  However, as noted above, Commerce examines only the selling activities performed in the HM to sell to the U.S. market, not the activities of the respondent's U.S. affiliates.  Thus, the quantitative metrics for Prime Metal and UTP USA cannot establish that the U.S. LOT is at a less advanced marketing stage than the HM LOTs.

Universal did compare the total indirect selling factors and average inventory turnover days between LOTs in the United States and the HM with respect to the Universal Producers.[81]  However, the indirect selling expense factor of the Universal Producers for sales to the United States is reported as [    ] percent for the U.S. LOT and [    ] percent for HM LOT 1, which are [                          ].[82]  Moreover, the indirect selling expense factor for the Universal Producers on their sales to their U.S. affiliates is [        ] than the indirect selling expense factor for Universal's HM LOT 1 sales, despite the fact that Universal [

      ] on the HM LOT 1 sales.  Thus, the indirect selling expense factor does not appear to correlate to the selling activities undertaken.

For inventory turnover, on U.S. sales the average inventory turnover days for the

---

[80] *Id.* at Exhibit SAD-4.
[81] *Id.*
[82] *Id.*

17

Universal Producers was [   ] days, while for HM sales it ranged from [   ] days to [   ] days, depending on the producer (*i.e.*, UTP, KHK, or THL).[83]  Moreover, the net price comparison provided by Universal for the U.S. market is a comparison of net prices between UTP USA/Prime Metal and their unaffiliated customers.[84]  This price comparison does not compare the net U.S. price to the net HM price; thus, it does not demonstrate whether any difference between U.S. LOT and HM LOTs affected price comparability.  Further, this comparison does not establish that any difference that may exist between net U.S. price and net HM price is, in fact, attributable to differences in LOTs rather than to an unrelated factor, such as relative sales volumes.  Thus, although there were certain minor differences in selling functions between HM LOT 1 and the U.S. LOT, we do not find that these differences are significant enough to warrant finding that Universal's U.S. LOT and HM LOT 1 constitute different LOTs.  Therefore, we determine that sales through HM LOT 1 were made at the same LOT as sales to the United States during the POR, and no LOT adjustment is warranted in making this comparison.

As explained above, we determine that HM sales in HM LOT 2 are at a more advanced LOT than those in HM LOT 1.  Because we find that sales in HM LOT 1 are at the same LOT as sales in the United States, we accordingly find that sales in HM LOT 2 are at a more advanced LOT than sales in the United States during the POR.  Moreover, based upon the information provided, and as explained above, we determine that the differences in the LOTs between HM LOT 1 and HM LOT 2 affect price comparability such that an LOT adjustment is warranted.  Consequently, in instances where we were unable to make price-to-price comparisons at the same LOT (*i.e.*, comparisons involving HM LOT 2), we made an LOT adjustment.  Additionally,

---

[83] *Id.*
[84] *Id.*  However, we do note that, in calculating net U.S. price, Universal appropriately removed adjustments made under sections 772(c) and (d) of the Act from the gross unit price.

18

because the data are available with which to make an LOT adjustment, when necessary, a CEP offset is not warranted.

With this method, a "fair comparison," as required by section 773(a) of the Act, is achieved when U.S. sales are compared to HM sales made at either HM LOT. When comparing U.S. sales to sales made at HM LOT 1, a fair comparison is achieved because the LOTs are the same.[85] Moreover, when comparing U.S. sales to HM LOT 2, because HM LOT 2 is at a more advanced marketing stage than the U.S. LOT, the LOT adjustment will provide for a fair comparison between these sales.[86] This determination is also consistent with how we have made fair comparisons between Universal's U.S. sales and HM sales to account for differences in LOTS in subsequent administrative reviews.[87]

For a complete description of the cost and sales adjustments performed, *see* the Universal 2017-2018 Remand Calculation Memorandum.[88]

## IV.   INTERESTED PARTY COMMENTS

On September 22, 2022, Commerce released the draft results of redetermination to all interested parties and invited interested parties to comment.[89] On September 28, 2022, we

---

[85] *See* section 773(a)(1)(B)(i) of the Act (requiring Commerce, to the extent practicable, to make comparisons between NV and CEP at the same LOT).
[86] *See* section 773(a)(7)(A) of the Act.
[87] *See Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review and Partial Rescission of Antidumping Duty Administrative Review; 2018-2019*, 86 FR 21688 (April 23, 2021), and accompanying PDM, at 19-22, unchanged in *Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 FR 59364 (October 27, 2021); and *Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Preliminary Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 930 (January 7, 2022), and accompanying PDM, at 20-22, unchanged in *Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Results of Antidumping Duty Administrative Review; 2019-2020*, 87 FR 41111 (July 11, 2022).
[88] *See* Memorandum, "Draft Remand Redetermination Sales Calculations for Universal," dated September 21, 2022 (Universal 2017-2018 Remand Calculation Memorandum).
[89] *See* Draft Results of Redetermination Pursuant to Court Remand, *Universal Tube and Plastic Indus., Ltd. v. United States*, Court No. 20-03944, Slip Op. 22-83 (CIT July 15, 2022), dated September 22, 2022.

received comments from only Universal.[90] In its comments, Universal stated it "fully agrees with Commerce's Draft Remand Results."[91] We did not receive comments from Wheatland Tube Company, the defendant-intervenor in the litigation. Accordingly, we made no changes to the draft results of redetermination for these final results of redetermination.

V.   **FINAL RESULTS OF REDETERMINATION**

As a result of our reconsideration of the evidence on remand, we have recalculated the weighted-average dumping margin for Universal based on our finding that Universal made its HM sales at two LOTs such that an LOT adjustment is warranted. As a result, the estimated weighted-average dumping margin for Universal is revised to 1.18 percent.[92]

Because Universal's weighted-average dumping margin is different from that published in the *Amended Final Results*, we intend to publish a *Timken Notice* with these amended final results should the Court sustain these final results of redetermination.

10/12/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[90] *See* Universal's Letter, "Comments on Draft Results of Redetermination," dated September 28, 2022.
[91] *Id.* at 1.
[92] *See* Universal 2017-2018 Remand Calculation Memorandum.